United States District Court
For the Northern District of California

1
2
3
4
5                        IN THE UNITED STATES DISTRICT COURT

6                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   LARRY BOWOTO, et al.,                          No. C 99-02506 SI

9              Plaintiffs,                          **ORDER GRANTING IN PART
                                                    DEFENDANTS' MOTION TO DISMISS
10     v.                                           AND DETERMINING APPLICABLE
                                                    LAW**
11  CHEVRON CORP., et al.,

12             Defendants.
                                            /
13

14          On February 24, 2006, the Court heard argument on defendant's motion to dismiss for failure

15  to state a claim and for a determination of applicable law.  Having considered the arguments presented

16  and the papers submitted, and for good cause appearing, the Court hereby issues the following order.

17

18                                      **BACKGROUND**

19          Plaintiffs filed this suit in 1999, seeking to recover for a series of brutal attacks that plaintiffs

20  allege occurred in three separate areas of Nigeria in mid-1998 and early 1999.[1]  The first attack occurred

21  on May 28, 1998, at a Chevron offshore drilling facility known as the "Parabe platform," which

22  consisted of an oil drilling platform and an attached construction barge.  On May 25, 1998, more than

23  100 representatives from a community near the Parabe platform, including plaintiffs Larry Bowoto and

24  Bassey Jeje and decedents Bola Oyinbo and Arolika Irowarinun, traveled to the barge.  These

25  individuals occupied the platform and barge until May 28, 1998.  On that day, the Nigerian military

26  arrived to violently oust the protestors.  Plaintiffs allege that Arolika Irowarinun was killed, and Jeje and

27  ─────────────────

28      [1]As the majority of facts in this matter are disputed, this section is taken primarily from the
    allegations in plaintiffs' complaint.

Bowoto were shot, when this occurred.  Plaintiffs also allege that Bola Oyinbo was taken into custody by the Nigerian military and tortured in the days following the event.[2]

The second and third attacks occurred on January 4, 1999.  Plaintiffs allege that on that day the Nigerian military attacked the villages of Opia and Ikenyan, shooting civilians and burning the villages to the ground.  In these attacks, plaintiffs allege that Timi Okoro, Kekedu Lawuru, Shadrack Oloku, and Bright Pabulogba were killed.

The instant lawsuit seeks to hold Chevron and its American subsidiary liable for the actions of the Nigerian military.  The lawsuit alleges that Chevron, acting through its Nigerian subsidiary, paid the Nigerian military to carry out the three attacks.  Although a number of the current plaintiffs bring this lawsuit for their own injuries, seven plaintiffs have brought this lawsuit on behalf of third parties killed in the attacks and their heirs.  The status of those plaintiffs is of central relevance to the current motion.

Of the seven plaintiffs who bring this lawsuit on behalf of deceased individuals, only Ola Oyinbo claims to be a successor in interest to the third party she represents.  The rest of these plaintiffs purport to represent the children and spouses of their deceased relatives:

1)     Sunday Johnbull Irowarinun sues on behalf of his dead brother, Arolika Irowarinun. Arolika is survived by three wives and eight children.  Sunday is the guardian *ad litem* of Arolika's children.  Irowarinun Decl., ¶ 4.  He has also submitted an executed power of attorney from each of Arolika's three wives, authorizing him to "bring and pursue in any lawsuit any causes of action of my deceased husband . . . that succeeded to me upon his death." *Id.*, Exhs. 1-3.[3]

2)     Benson Edekou sues on behalf of his dead sister, Timi Okoro.  Timi is survived by her husband and two children, although she was separated from her husband at the time she was killed.  Edekou Decl., ¶ 4.  Edekou maintains that, as "eldest brother by the same mother and father" he is "authorized to act on behalf of [his] sister's successors in interest with respect to their interests in this action." *Id.*  Edekou also maintains that he is caring for his sister's children. *Id.*  He has also submitted a power of attorney signed by Timi's husband, authorizing him to represent the interests of Timi's husband and her two children in this lawsuit. *Id.*, Exh. 1.

3)     Anthony Lawuru sues on behalf of his dead brother, Kekedu Lawuru.  Kekedu is survived by one wife and three children.  Anthony has submitted a declaration and power of attorney similar to that submitted by Edekou.  Lawuru Decl., ¶ 4 & Exh. 1.

_____

[2]Bola Oyinbo died three years later in Lagos, Nigeria.

[3]Defendants have objected to the power of attorney forms submitted by the decedents' relatives. Their objections are OVERRULED.

United States District Court

For the Northern District of California

4)   Menekiei Job[4] sues on behalf of his dead brother, Shadrack Oloku.  Shadrack is survived by one wife and seven children.  Menekiei has submitted a declaration and powers of attorney similar to that submitted by Edekou.  Job Decl., ¶¶ 4-5 & Exhs. 1-5.

5)   Henry Pabulogba sues on behalf of his dead brother, Bright Pabulogba.  Bright is survived by one wife and three children.  Bright has submitted a declaration and powers of attorney similar to that of Edekou.  Pabulogba Decl., ¶¶ 4-5 & Exhs. 1-2.

6)   Ola Oyinbo sues on behalf of her dead husband, Bola Oyinbo.[5]

7)   John Ikeyan sues on behalf of his dead father, Agbagbaedi Ikeyan.  Agbagbaedi's wife died in August 2003.  Ikeyan Decl., ¶ 3.  Ikeyan has submitted powers of attorney to act in this lawsuit on behalf of his three younger siblings.  *Id.*, Exhs. 1-3.

**DISCUSSION**

Chevron's motion seeks three different types of relief.  First, the motion seeks a determination of the law that will apply to plaintiffs' tort claims.  Second, it seeks to dismiss claims by the representative plaintiffs, who it alleges lack capacity and standing.  Third, it seeks to have claims dismissed that are brought by plaintiffs who have not alleged a corresponding injury.  The Court considers each argument in turn.

**I.    Applicable Law**

Defendants argue that all of plaintiffs' state law claims should be governed by Nigerian law, with the exception of the claims arising from the incident on the Parabe construction barge, which it argues should be governed by French or Nigerian law.  The Court agrees with defendants that Nigerian law governs the events that occurred on the barge, but finds that California law should govern the remainder of plaintiffs' claims.

**A.    Claims Arising under Admiralty Jurisdiction**

Defendants claim that French or Nigerian law governs events that occurred on the CBL-101 barge.  This claim is based on their assertion that admiralty choice-of-law principles attach to those

---

[4]Apparently this plaintiff is also known as Smart Iteimor.

[5]Bola Oyinbo survived the Parabe incident and died in Lagos in 2001.

3

United States District Court

For the Northern District of California

1   events.[6]  The court agrees with defendants that admiralty choice-of-law principles apply and finds that

2   Nigerian law should therefore govern the events on the Parabe barge.

3

4          **1.      Applicability of Admiralty Choice-of-Law Principles**

5          As an initial matter, plaintiffs claim that admiralty choice-of-law principles do not apply

6   because, under the "saving-to-suitors" clause, they have not chosen to bring their claims under the

7   Court's admiralty jurisdiction.[7]  The "saving-to-suitors" clause of 28 U.S.C. § 1333(1) provides that

8   "district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil

9   case of admiralty jurisdiction, saving to suitors in all cases all other remedies to which they are

10  otherwise entitled." 28 U.S.C. § 1333(1).  "The 'saving-to-suitors' clause establishes the right of a party

---

12          [6]Admiralty jurisdiction may also extend to the events that occurred on the Parabe platform, even
13  though oil drilling platforms generally fall outside the reach of admiralty law because they are
    considered "artificial islands."  *See Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 422 (1985) (rejecting
14  "untenable" argument that offshore drilling is maritime commerce); *Rodrigue v. Aetna Casualty &
    Surety Co.*, 395 U.S. 352, 360 (1969) (finding that accident on fixed drilling platform did not fall within
15  admiralty jurisdiction).  The Extension of Admiralty Jurisdiction Act ("EAJA"), however, extends
    admiralty jurisdiction to "include all cases of damage or injury, to person or property, caused by a vessel
16  on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46
    U.S.C. App. § 740.  Here, it may be the case that injuries sustained during an operation to remove
17  intruders from a vessel would fall within the jurisdiction created by the EAJA, despite the fact that the
    injuries occurred on land.  The Court need not reach this question, however, because plaintiffs have not
    provided the Court with any evidence that the torts at issue occurred on the platform.

18          [7]In a footnote, plaintiffs argue that their claims do not sound in admiralty because admiralty
19  jurisdiction does not extend to the territorial waters of a foreign nation.  This argument is based on the
    Supreme Court's statement in *Victory Carriers* that "maritime law governs only those torts occurring
20  on the [high seas and the] navigable waters of the United States."  *Victory Carriers*, 404 U.S. at 205.
    While some courts have used this statement to conclude that federal maritime law does not extend to
21  torts that occur in territorial waters of other nations, other courts have refused to follow the statement
    as dicta.  *Compare Dunham v. Hotelera Canco S.A. de C.V.*, 933 F.Supp. 543, 547 (E.D. Va. 1996)
22  (denying admiralty jurisdiction over tort where injury occurred in territorial waters of Mexico), *and
    Sharma v. Skaarup Ship Management Corp.*, 699 F.Supp. 440, 448 (S.D.N.Y. 1988) (denying admiralty
23  jurisdiction where injury occurred in territorial waters of British Columbia), *with Exter Shipping Ltd.
    v. Kilakos*, 310 F. Supp. 2d 1301, 1310-11 (N.D. Ga. 2004) (exercising admiralty jurisdiction where
24  ships were seized in Singapore and the United Kingdom), *and Szollosy v. Hyatt Corp.*, 208 F.Supp.2d
    205, 211 n. 4 (D. Conn.2002) (exercising admiralty jurisdiction over accident in Cayman Islands
25  waters).          Because *Victory Carriers* concerned a tort that occurred in United States waters, the
    Court agrees with those courts that have found the Supreme Court's statement to be dicta.  The Court
26  further sees no reason to differentiate between torts occurring in the navigable waters of other nations
    and torts that occur on the high seas.  Accordingly, the Court finds that its admiralty jurisdiction extends
27  to this action.  *See Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co. Ltd.*, 436 F.3d 349, 354 n.11 (3d
    Cir. 2006) (finding admiralty jurisdiction over tort that occurred in Chinese waters and noting that "a
28  tort need not have occurred in waters under the jurisdiction of the United States for us to exercise
    admiralty jurisdiction").

4

to choose whether to proceed within the court's admiralty jurisdiction or general civil jurisdiction when both admiralty and non-admiralty federal jurisdiction exist." *Wilmington Trust v. U.S. District Court for Dist. of Hawaii*, 934 F.2d 1026, 1029 (9th Cir. 1991); *see also Victory Carriers, Inc. v. Law*, 404 U.S. 202, 204 (1971) ("The saving-to-suitors clause allows claimants to pursue actions for maritime torts at law either in state courts or in federal courts pursuant to diversity jurisdiction."). Thus, Rule 9(h) provides that "[a] pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claims as an admiralty or maritime claim . . . . If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether so identified or not." Fed. R. Civ. P. 9(h). In accordance with these two authorities, plaintiffs argue that they have elected to bring their claims under this Court's diversity jurisdiction, and that admiralty law is therefore inapplicable to this action.

Plaintiffs' argument misperceives the effect of the saving-to-suitors clause. Although the clause allows a plaintiff to choose the forum in which it brings suit, if a claim is a maritime tort it is governed by the substantive rules of admiralty law regardless of whether the plaintiff chooses to invoke the court's admiralty jurisdiction. *Mendez v. Ishikawajima-Harima Heavy Indus. Co., Ltd.*, 52 F.3d 799 (9th Cir. 1995) ("Regardless of the chosen forum, the applicable substantive law will be federal maritime law."). Thus, the relevant question is whether the actions at issue constitute maritime torts.

The Supreme Court has articulated a two-prong test to determine whether a tort constitutes a maritime tort:

> First, the tort must occur on or over navigable waters; this is the "locality" or "situs" test. Second, the actions giving rise to the tort claim must "bear a significant relationship to traditional maritime activity." This is the "nexus" or "relationship" test. Admiralty jurisdiction exists only when both these requirements are satisfied.

*Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir. 2005); *see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). Although it is a close question, the Court finds that the torts in this case constitute maritime torts, and that admiralty jurisdiction exists over the

1    events that transpired on the barge.[8]

2          As an initial matter, the "situs" test is easily met here.  Barges constitute vessels for admiralty

3    jurisdiction purposes, whether or not they are self-propelled.  *See Stewart v. Dutra Const. Co.*, 543 U.S.

4    481, 492 & n.6 (2005) (citing cases holding that barge is vessel for admiralty jurisdiction purposes);

5    *Phillips v. Amoco Trinidad Oil Co.*, 632 F.2d 82, 83-84 (9th Cir. 1980) (applying admiralty jurisdiction

6    where drilling vessel had to be "towed to its drilling site").  Further, events that occur on moored vessels

7    also take place over navigable waters, unless those vessels are permanently attached to land.  *See, e.g.*,

8    *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 64 (1st Cir. 2000) (finding that floating

9    docks were not vessels but were "extensions of land" because they were "moored to a fixed location and

10   serve[d] no navigational function").  Because it is undisputed that the CBL-101 barge was attached to

11   the Parabe platform only for a temporary period of time, the events that occurred on the CBL-101 barge

12   occurred over navigable waters.

13         The nexus test has two subparts.  First, a court must "'assess the general features of the type of

14   incident involved' to determine whether the incident has 'a potentially disruptive impact on maritime

15   commerce.'  Second, a court must determine whether 'the general character' of the 'activity giving rise

16   to the incident' shows a 'substantial relationship to traditional maritime activity.'"  *Taghadomi*, 401 F.3d

17   at 1086 (quoting *Grubart*, 513 U.S. at 534).

18         The first of these subparts examines the incident at "an intermediate level of possible generality."

19   *Grubart*, 513 U.S. at 538.  Thus, *Grubart*, which involved buildings that were damaged after

20   construction caused the Chicago River to flood a freight tunnel, described the incident as "damage by

21   a vessel in navigable water to a structure."  *Id.* at 539.  Similarly, *Taghadomi*, which involved a sea

22   kayaker who drowned after rescue operations were negligently performed, described the incident as

23   "injury to boaters whose vessel capsizes at sea because of a potential rescuer's negligence in carrying

24   ────────────────────

25         [8]Although plaintiffs' seventh amended complaint refers to events that occurred on the platform, the evidence the parties have put before the Court makes it clear that the bulk of the Parabe incident

26   occurred on the CBL-101 barge.  The barge is where the helicopters containing Nigerian military personnel landed and began firing on the protestors.  Bowoto and Jeje were shot on the barge, and

27   Irowarinun was killed there.  *See, e.g.*, Cunningham Decl., Exh. 2 at 9-10, 15-18 (Bowoto interrogatory response describing helicopters landing on barge and shooting at protestors on barge deck);

28   Cunningham Decl., Exh. 3 at 10 (Bassey Jeje interrogatory response describing shootings occurring on barge).

United States District Court
For the Northern District of California

1   out its rescue operation." *Taghadomi*, 401 F.3d at 1086; *see also Sisson*, 497 U.S. at 363 (describing

2   incident as "a fire on a vessel docked at a marina on navigable waters").

3        Under this level of generality, the Court finds that the proper description of the incident is

4   "injury to intruders during operations to regain control of a vessel in navigable waters."  Using this

5   description, the conclusion that the incident has the potential to disrupt maritime commerce is compelled

6   by the Ninth Circuit's *Taghadomi* decision.  As in *Taghadomi*, the efficacy of operations to regain

7   control of a vessel from intruders has a direct bearing on the ability of that vessel and its crew to engage

8   in maritime commerce.  *See Taghadomi*, 401 F.3d at 1086 ("The efficacy of search-and-rescue

9   operations has a direct effect on the health and lives of seamen. . . . Search-and-rescue operations also

10  affect the vessels themselves: insofar as the rescuer can preserve the vessel, it prevents economic loss

11  to the vessel's owner.").

12       The second subpart of the nexus test is a much closer question.  This inquiry focuses on the

13  tortfeasor's activity, asking "whether one of the arguably proximate causes of the incident originated

14  in the maritime activity of a tortfeasor."  *Id.* at 541.  This is not a particularly demanding test; the

15  Supreme Court has noted that torts involving vessels on navigable waters will ordinarily fall within

16  admiralty jurisdiction.  *See Grubart*, 513 U.S. at 542 (acknowledging possibility that "virtually every

17  activity involving a vessel on navigable waters would be a traditional maritime activity sufficient to

18  invoke maritime jurisdiction," but finding that to be "not a fatal criticism").

19       What makes this case complicated is the fact that it involves an unusual relationship between

20  the tortfeasor and the injured parties, as well as an unusual injury.  Ordinarily in a maritime tort case,

21  the tortfeasors are vessel owners or others engaging in maritime commerce. *See, e.g.*, *Grubart*, 513 U.S.

22  at 530 (defendant flooded buildings in downtown Chicago by damaging tunnel while replacing dolphins

23  on Chicago River).  Thus, the defendants are generally those who were engaged in some form of

24  maritime activity that led to the injury.  Defendants here, however, were operating an oil platform,

25  which is not maritime activity.  *See Herb's Welding*, 470 U.S. at 422; *Rodrigue*, 395 U.S. at 360.  The

26  alleged actions of the defendants that led to the injuries – paying the Nigerian military to attack the

27  protestors – is also difficult to classify as "maritime activity."   In addition, the types of injury caused

28  by the attacks – gunshot wounds in particular – are far removed from any injuries that typically result

1    from maritime operations.

2         In these respects, this case bears a strong resemblance to *Peytavin v. Gov't Employees Ins. Co.*,

3    453 F.2d 1121, 1127 (5th Cir. 1972), in which the Fifth Circuit found that a car accident that occurred

4    on a floating pontoon did not bear sufficient relation to maritime commerce to fall under admiralty

5    jurisdiction, despite the fact that the pontoon constituted a vessel.  *See Grubart*, 513 U.S. at 542-43

6    (citing *Peytavin* with approval).  Because the accident, its cause, and the resulting injury (whiplash)

7    were not maritime in nature, the Court found that admiralty jurisdiction did not apply.  *Peytavin*, 453

8    F.2d at 1126-27 ("[N]either the parties, nor the nature or the apparent cause of the accident, nor the

9    injury sustained demonstrates any further connection with maritime activities or interests.").  As

10   *Peytavin* illustrates, the mere fact that a tort occurs on or near a vessel does not necessarily make it a

11   maritime tort.

12        Nonetheless, the Court finds that the Ninth Circuit's *Taghadomi* decision also compels the result

13   in this case.  "The activity at issue . . . is the behavior of *any* 'putative tortfeasor[ ]' . . . that is an

14   'arguably proximate cause[ ]' of the injury."  *See Taghadomi*, 401 F.3d at 1087 (emphasis added).  In

15   *Taghadomi*, the Ninth Circuit found that the case fell under admiralty jurisdiction because the Coast

16   Guard was a putative tortfeasor, and its rescue operations were maritime in nature.  *Id.*; *see also Kelly*

17   *v. United States*, 531 F.2d 1144, 1147 (2d Cir. 1976) ("[R]escue operations of the Coast Guard

18   conducted on navigable waters . . . bear a significant relationship to traditional maritime activities for

19   purposes of admiralty jurisdiction.").  Here, the Nigerian military's conduct is strongly analogous to

20   the Coast Guard's role in *Taghadomi*.  The military was summoned to remove intruders from a vessel,

21   and in the process allegedly committed a tort.  Although the Court has found no case holding that

22   removing intruders from a vessel is a "traditional maritime activity," the Court believes that it is strongly

23   analogous to rescue operations, and should therefore be considered as such.

24        Thus, the Court holds that, to the extent events took place on the CBL-101 barge, admiralty

25   choice-of-law principles apply.[9]

26

27        [9]As an alternative basis for the application of admiralty choice-of-law principles, defendants
     argue that the Death on the High Seas Act ("DOHSA"), 46 U.S.C. App. §§ 761 *et seq.*, provides the
28   Court with admiralty jurisdiction over this matter.  DOHSA covers the "death of a person . . . caused

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

### 2.      Admiralty Choice-of-Law Analysis

The Supreme Court has articulated a list of eight non-exclusive factors to be considered in determining the appropriate choice-of-law in an admiralty case.  These factors are: (1) the place of the wrongful act, (2) the law of the flag, (3) the allegiance or domicile of the injured party, (4) the allegiance of the shipowner, (5) the place of the seaman's employment contract, (6) the accessibility of a foreign forum, (7) the law of the forum, and (8) the shipowner's base of operations.  *Lauritzen v. Larsen*, 345 U.S. 571, 583-92 (1953); *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 309 (1970) (adding eighth factor).  "The question to be answered by reference to these factors is a simple one: are the United States's interests sufficiently implicated to warrant the application of United States law?"  *Warn v. M/Y Maridome*, 169 F.3d 625, 628 (9th Cir. 1999).

Three of the above factors point to the application of French law: the law of the flag, the allegiance of the shipowner, and the shipowner's base of operations.  Ordinarily, the law of the flag is the most significant of all the *Lauritzen* factors.  *Bilyk v. Vessel Nair*, 754 F.2d 1541, 1545 (9th Cir. 1985) ("*Lauritzen* itself firmly mandates that the law of the flag presumptively controls, unless other factors point decidedly in a different direction.").[10]  Here, however, none of these three factors are particularly compelling because the shipowner is not a party.  *See, e.g.*, *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.*, 426 F.3d 580, 586-87 (2d Cir. 2005); *Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 86, 92-93 (2d Cir. 1996) ("Whatever significance law of the flag may have in cases

---

by wrongful act . . . occurring on the high seas beyond a marine league" from U.S. shore.  46 U.S.C. App. § 761.  Because the deaths in this case occurred off the Nigerian coast and well over one marine league from U.S. shore, DOHSA clearly applies.  *See Howard v. Crystal Cruises, Inc.*, 41 F.3d 527, 529-30 (9th Cir. 1994) (holding that "high seas" includes territorial waters of foreign countries).

Although plaintiffs have not affirmatively pled a cause of action under DOHSA, they have included a California wrongful death claim in their complaint. DOHSA, however, preempts state-law wrongful death actions when it applies.  *See Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 232 (1986).  Thus, plaintiff's wrongful death claim is only cognizable as a claim under DOHSA, and provides an alternate basis for applying admiralty choice-of-law principles.

[10]The law of the flag is generally given the most weight for two reasons.  First, the general tort principle that the law of the place of the injury controls is substantially diminished with maritime torts, because of the "varieties of legal authority over waters [a vessel] may navigate, and because of the high seas, which belong to no one." *Lauritzen*, 345 U.S. at 583.  Second, the law of the flag controls because vessels are "deemed to be a part of the territory of that sovereignty" whose flag they fly. *Id.* at 585.  In addition, from a pragmatic perspective the law of the flag prevents the law that governs a ship from "chang[ing] at every change of waters." *Id.*

United States District Court

For the Northern District of California

where the ship or its owner is a party and where other factors fail to point clearly to another jurisdiction's law, we see no reason to apply the law of the flag here in preference to that of another jurisdiction whose ties are more pertinent to the dispute, especially given the fact that neither the ship nor the owner is a party."). Where, as here, the owner of the vessel is not even a tortfeasor, the injured parties are not members of the vessel's crew, and the injuries did not result from operation of the vessel, the law of the flag has a substantially diminished relevance to the action. Indeed, the application of French law to this dispute would strike the Court as somewhat arbitrary.

Two of the above factors point to the application of Nigerian law: the place of the wrongful act, and the domicile of the injured party. Because the barge was so tenuously related to the events that transpired at Parabe, the Court finds that these two factors bear significant weight. Indeed, their significance is amplified by the fact that the Nigerian military is responsible for the injuries that occurred. Thus, unlike in many maritime tort cases, this injury did not occur in Nigeria by happenstance; rather, the injuries are strongly related to the fact that the barge was in Nigerian waters.

Finally, one factor points to the application of United States law: the law of the forum. This factor, however, is generally given the least weight. *See Warn*, 169 F.3d at 628 n.2 ("*Lauritzen* indicates that the law of the forum is largely irrelevant . . . and our cases are in accord . . . ."). The remaining two *Lauritzen* factors are irrelevant here: neither the place of the seaman's employment contract nor the accessability of a foreign forum apply.

Based on the above, the Court finds that Nigerian law should be applied to the events that transpired on the CBL-101 barge. Because the vessel and its owners did not play any role in the torts that occurred, the factors that point towards the application of French law are weak. At the same time, the factors that support the application of Nigerian law are particularly strong. Thus, the Court finds that Nigerian law should apply.

Plaintiffs' seventh amended complaint pleads only causes of action under California and United States law. Accordingly, the Court GRANTS defendants' motion to dismiss with respect to plaintiff's claims that concern the events that transpired on the Parabe barge. Plaintiffs may amend their complaint to replead these causes of action under Nigerian law.

10

**United States District Court**
For the Northern District of California

**B.     Choice of Law for Remaining Claims**

Both parties agree that the choice-of-law analysis for plaintiffs' state law claims is governed by California law.  *See Competitive Tech. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 115-57 (N.D. Cal. 2003) ("In diversity cases, the choice of law rules of the state in which the court sits are applied.  Similarly, in federal question cases where the court is exercising supplemental jurisdiction over state law claims, the federal court applies the choice of law rules of the forum state to those state law claims.") (citation omitted).  "California follows a three-step 'governmental interest analysis' to address conflict of laws claims and ascertain the most appropriate law applicable to the issues . . . ." *Washington Mutual Bank, FA v. Superior Court*, 24 Cal. 4th 906, 919 (2001).  This analysis has three parts:

> First, the court examines the substantive law of each jurisdiction to determine whether the laws differ as applied to the relevant transaction.  Second, if the laws do differ, the court must determine whether a "true conflict" exists in that each of the relevant jurisdictions has an interest in having its law applied.  If only one jurisdiction has a legitimate interest in the application of its rule of decision, there is a "false conflict" and the law of the interested jurisdiction is applied.  On the other hand, if more than one jurisdiction has a legitimate interest, the court must move to the third stage of the analysis, which focuses on the "comparative impairment" of the interested jurisdictions.  At this stage, the court seeks to identify and apply the law of the state whose interest would be the more impaired if its law were not applied.

*Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000) (citations omitted).  The choice of law analysis includes a presumption that California law applies; the proponent of foreign law therefore bears the burden of showing that there is a compelling reason to displace California law.  *Marsh v. Burrell*, 805 F. Supp. 1493, 1496 (N.D. Cal. 1992).

**1.     Steps 1 and 2: True Conflicts Between Nigerian and California Law**

"A separate choice-of-law inquiry must be made with respect to each issue in a case." *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881, 896 (Cal. App. 1998) (quoting *S.A. Empresa De Viacao Aerea Grandense v. The Boeing Co.*, 641 F.2d 746, 749 (9th Cir. 1981).  Defendants challenge each of the eight state-law tort claims plaintiffs have brought.  Seven of the claims are discussed below.  The eighth is for wrongful death.  Because California's wrongful death statute does not apply extraterritorially, the Court finds that Nigerian law is the only law that may apply to plaintiffs' wrongful death claims.  *See Beckett v. MasterCraft Boat Co.*, 126 Cal. App. 4th 1045, 1050

(Cal. App. 2005) ("We find nothing in Code of Civil Procedure, section 377[.60], indicating that it was intended to have any extraterritorial effect.") (quoting *Gordon v. Reynolds*, 187 Cal. App. 2d 472, 477 (Cal. App. 1987)).

a)      **Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Loss of Consortium, and Civil Conspiracy**

Defendants claim that Nigerian law differs from California law because Nigerian law does not recognize a cause of action for intentional infliction of emotional distress, negligent infliction of emotional distress, loss of consortium, or civil conspiracy.  In support of this assertion, defendants have submitted a declaration from Anthony I. Ikemefuna Idigbe, Esq., SAN,[11] in which Idigbe states that "[a] search of applicable Nigerian case law in the appellate and Supreme Courts failed to reveal any cases that have recognized a cause of action for Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Civil Conspiracy, or Loss of Consortium."  Idigbe Decl., ¶ 11.  In addition, plaintiff's expert on Nigerian law has admitted that he knows of no case in which the Supreme Court of Nigeria has recognized a cause of action for intentional infliction of emotional distress. Cunningham Decl., Exh. 4 at 35.

Plaintiffs argue that these statements are merely unsupported assertions, and are insufficient to meet defendants' burden.  Given that plaintiffs have introduced no evidence that Nigerian law recognizes the above causes of action, however, the Court finds that defendants have established that Nigerian law does not recognize intentional infliction of emotional distress, negligent infliction of emotional distress, civil conspiracy, and loss of consortium.

Plaintiffs also argue that  Nigerian law allows for consideration of emotional distress in the calculation of damages in claims for personal injury, and that any difference between Nigerian and

_____

[11]Senior Advocate of Nigeria.  Plaintiffs have objected to Idigbe's supplemental declaration, which was submitted in support of defendants' reply brief.  Plaintiffs argue that it presents matters for the first time that should have been raised in defendants' opening brief.  The Court finds that the bulk of plaintiffs' objections concern material that was either raised in Idigbe's initial declaration or the declaration of plaintiffs' expert, Bamidele F. Aturu.  The Court agrees with plaintiffs, however, that paragraphs 13, 14, and 15 of Idigbe's supplemental declaration contain new material that should have been raised in defendants' opening brief.  Accordingly, the Court SUSTAINS plaintiffs' objections to paragraphs 13, 14 and 15 of the Idigbe supplemental declaration and OVERRULES the remainder of plaintiffs' objections.

California law is therefore not material.  The Court disagrees; inclusion of emotional distress in the calculation of damages for a physical injury is clearly different from a separate tort wholly related to emotional distress.  Thus, the Court finds that defendants have established that a material difference exists for the intentional infliction of emotional distress claim.  *See McGhee v. Arabian American Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989); *Abogados v. AT&T, Inc.*, 223 F.3d 932, 935-36 (9th Cir. 2000) ("[T]his case does not involve a damages limitation rule . . . .  Instead, this case involves Mexico's determination of the scope of its substantive law: the point at which it will attach tort liability to conduct occurring within its borders.").

Accordingly, the Court finds that a true conflict exists between California law and Nigerian law on the above causes of action.

**b)       Assault and Battery**

Defendants argue that Nigerian law differs from California law because Nigerian law imposes a stricter burden of proof for the torts of assault and battery.  Specifically, defendants argue that the torts must be proven beyond a reasonable doubt under Nigerian law.

The law in California, however, is that burden of proof is a procedural matter, and that the law of the forum applies.  *See United Airlines, Inc. v. Weiner*, 335 F.2d 379, 391 (9th Cir. 1964) ("California follows the settle rule of Restatement, Conflict of Laws, § 595 [now Restatement (Second) of Conflict of Laws § 133], that the law of the forum governs the proof of the facts alleged . . . ."); *see also* Restatement (Second) of Conflict of Laws § 133 (1974) ("The forum will apply its own local law in determining which party has the burden of persuading the trier of fact on a particular issue . . . .").  Defendant has made no argument that Nigeria's heightened burden of proof represents a desire to affect the decision of the issue.  *See id.*

Thus, as defendants have not established a material difference between the laws of California and Nigeria, California law of assault and battery shall apply.

### c)      Negligence

Defendants argue that Nigeria does not support the tort of negligence per se.  The Court does not find this to be a material difference from California law.  Defendants do not argue that Nigeria does not have a general negligence cause of action; negligence per se merely uses the violation of "a statute, ordinance, or regulation" to create a rebuttable presumption that a person failed to exercise due care.  *See* Cal. Evid. Code § 669.  Given that negligence per se is merely an evidentiary rule, the Court cannot find the difference between California and Nigerian law material.

Defendants also argue that under Nigerian law landowners owe no duty of care to trespassers.  But plaintiffs have stated no cause of action that depends upon a property owner's duty of care to trespassers.  Indeed, the defendants in this case did not own or operate any of the relevant property.  Thus, this difference is also immaterial.

Accordingly, California law shall apply to plaintiffs' negligence claims.

### d)      Survival Actions

Defendants argue that, to the extent plaintiffs' tort causes of actions are brought on behalf of the estates of deceased individuals, they materially differ from California law because Nigerian law does not allow punitive damages in such situations.  The Court agrees that this is a material difference.  *See Hurtado v. Superior Court*, 11 Cal. 3d 574, 580-81 (1974) (finding that Mexican law limiting damages constituted a material difference from California law).

However, the Court rejects defendants' argument that this causes a conflict.  Numerous cases have found that limitations of liability, as opposed to exposure to tort liability, are false conflicts when the defendant is a non-resident corporation.  *See Hurtado*, 11 Cal. 3d 581 ("Since it is the plaintiffs and not the defendants who are the Mexican residents in this case, Mexico has no interest in applying its limitation of damages - Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican defendants."); *Marsh v. Burrell*, 805 F. Supp. 1493, 1498-99 ("[F]oreign states are generally presumed to have absolutely no interest in reducing recovery by their residents against non-resident tortfeasors.").

Accordingly, the Court finds that there is no true conflict between California law and Nigerian

14

law on plaintiffs' survival claims.

### 2.    Step 3: Comparative Impairment of Interests

The parties have radically different views of the respective interests of California and Nigeria, both arguing that one jurisdiction's interests will be drastically impaired if its law is not applied, and that the other's interest will not be impaired in any way.  The Court finds that neither jurisdiction has a more compelling interest at stake, and that the law of the forum shall therefore apply.  *See Kosel*, 24 Cal. App. 3d 731; *Engel v. CBS Inc.*, 981 F.2d 1076, 1081 (9th Cir. 1992) ("The balancing of impairment is slightly weighted by California's general preference for applying its own law.").

California's interest in this lawsuit is relatively strong.  California has an interest in ensuring that its corporations behave in an appropriate manner.  *See In re Pizza Time Theatre Sec. Litig.*, 112. F.R.D. 15, 18 (N.D. Cal. 1986) ("Not only are the contacts evident, but California has a strong interest in the allegedly fraudulent conduct of its corporations and residents, and in protecting its residents and others from such fraud.").  This interest is magnified by the seriousness of the allegations brought against defendants.  Indeed, if defendants were found responsible for the attacks allegedly committed by the Nigerian military but could not be held fully liable, California's interest would be significantly impaired.[12]

While strong, however, California's interest is not as significant as plaintiffs would make it. Plaintiffs do not maintain that defendants ordered the attacks from California; rather, plaintiffs' evidence points to a decision that was made in Nigeria, but was approved and later ratified in California.  Because defendants' alleged wrongful conduct is a step removed in this way, California's interest is correspondingly diminished.

Nigeria's interest in this lawsuit is similarly strong.  Nigeria certainly has an interest in

---

[12]Plaintiffs have submitted voluminous materials in support of their contention that defendants exercised control over Chevron's Nigerian subsidiary, CNL.  The Court finds it unnecessary to address this factual issue at this juncture, however.  Given that plaintiffs' claims all rely on the agency relationship between defendants and CNL, the Court finds that the choice-of-law inquiry is the same as the agency inquiry – to the extent plaintiffs can prove that defendants should bear responsibility for the attacks, California has an interest in this lawsuit.  If plaintiffs cannot prove that defendants were responsible, then Nigeria's interests will not be impaired by the application of California law.

United States District Court

For the Northern District of California

regulating conduct that occurs within its borders.  Moreover, to a certain degree this lawsuit implicates the actions of the Nigerian military, a unit of the Nigerian government.  As discussed above, however, Nigeria's interest is limited to defining the contours of its tort law.  To the extent that this means depriving the plaintiffs of a mechanism to recover for allegedly brutal attacks, the Court does not believe that Nigeria's interest is legitimate.  Indeed, the cases cited by defendants involved much less serious torts than those at issue in this suit.  *Compare Abogados*, 223 F.3d at 935 (action brought for tortious interference with contract); *McGhee*, 871 F.2d at 1414 (causes of action for wrongful termination of employment contracts, defamation, intentional infliction of emotional distress, fraud, and conversion). Thus, the Court cannot say that Nigeria's interests will be significantly impaired by allowing Nigerian citizens to maintain this lawsuit against American corporations.

While a close question, the Court holds that California law should apply to this action. Accordingly, defendants' motion to dismiss is DENIED with respect to all incidents that did not occur on the CBL-101 barge.[13]

## II.     Plaintiffs' Ability to Sue in a Representative Capacity

Defendants also challenge plaintiffs' complaint on the ground that certain plaintiffs do not possess the ability to sue in a representative capacity.  Defendants argue both that these plaintiffs lack the ability to bring suit on behalf of deceased family members, and also that these plaintiffs lack the ability to represent the proper plaintiffs in this litigation.  This challenge raises complicated issues of representation and survivorship, made all the more complicated by the fact that plaintiffs' communities do not adhere to traditional western notions of inheritance.  Indeed, as discussed above, a number of plaintiffs have submitted declarations stating that, as the elder male siblings of a deceased individual, they bear responsibility for protecting that individual's property and family, and have the authority to

---

[13]Defendants also move to dismiss claims 1, 3, 4, 6, 7, and 8 to the extent they are alleged to arise under the "common law of the State of California."  Plaintiffs have not opposed these requests. Accordingly, defendants' request is GRANTED.  Defendants also move to dismiss plaintiffs' claims 10-17 to the extent they are alleged to have arisen under federal law.  This request is also GRANTED.

United States District Court

For the Northern District of California

take steps to do so.[14]  The Court finds that a number of the current plaintiffs are not proper plaintiffs, but that this defect can easily be cured by amendment of the complaint.

### A.    Standing of Sibling Plaintiffs

Plaintiffs Sunday Johnbull Irowarinun, Menekiei Job (a.k.a. Smart Iteimor), Benson Edekou, Anthony Lawuru, and Henry Pabulogba all bring suit as siblings of decedents.  Defendants argue that, as siblings, these plaintiffs lack standing to bring claims on behalf of the decedents and their family members.

### 1.    ATS and TVPA Claims

Defendants first argue that the sibling plaintiffs lack standing to bring the decedents' claims under the Alien Tort Statute ("ATS") and the Torture Victim Protection Act ("TVPA").  In the case of an extrajudicial killing, the TVPA allows the decedent's "legal representative, or . . . any person who may be a claimant in an action for wrongful death," to bring an action for damages.  28 U.S.C. § 1350, Note, § 2(a)(2).  The ATS does not address standing.  Both parties agree, however, that the standard from the TVPA should govern plaintiffs' standing under the ATS.  *See Cabello v. Fernandez-Larios*, 157 F. Supp. 2d 1345, 1356-58 (S.D. Fla. 2001); *Beanal v. Freeport McMoran, Inc.*, 969 F. Supp. 362, 368 (E.D. La. 1997).

In analyzing whether a plaintiff "may be a claimant in an action for wrongful death," courts look first to the law of the forum state.[15]  *Xuncax*, 886 F. Supp. at 191-92.  Because the decedents at issue all have surviving spouse(s) and children, plaintiffs do not contend that California law would allow them to maintain their actions.  *See* California Code of Civil Procedure 377.60 (listing who may bring a cause

---

[14]There are also other indications that the other members of the decedents' families may be incapable of maintaining this lawsuit.  For example, numerous power of attorney forms are signed by a mere fingerprint, suggesting to the Court that many of the decedents' family members may be illiterate.  In addition, given the apparent state of women's rights in the traditional communities at issue, *see, e.g.*, Yebu Decl., ¶ 7, it is unclear whether the wives of the deceased individuals could maintain this action independently of their representatives.

[15]The legislative history makes clear when a TVPA suit is brought on behalf of a deceased individual, "legal representative" is confined to the "executor or executrix of the decedent's estate."  S. Rep. No. 102-249, at 7 (1991).  Thus, the legal representative provision is not relevant here.

United States District Court

For the Northern District of California

1    of action for wrongful death).

2        This is not the end of the inquiry, however.  "Where application of Anglo-American law would

3    result in no remedy whatsoever for an extrajudicial killing, . . . application of foreign law recognizing

4    a claim by a more distant relation in a wrongful death action is appropriate."  S. Rep. No. 102-249,

5    at 7 n.10 (1991).  Following the guidance in this statement, a number of courts have examined foreign

6    law to see if it would allow the plaintiff to proceed with a wrongful death action.  *See, e.g.*, *Xuncax v.*

7    *Gramujo*, 886 F. Supp. 162, 191 (D. Mass. 1995); *Cabello v. Fernandez-Larios*, 157 F. Supp. 2d 1345,

8    1356-58 (S.D. Fla. 2001), *overruled in nonrelevant part*, *Aldana v. Del Monte Fresh Produce, N.A.,*

9    *Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005).  *But see Beanal v. Freeport McMoran, Inc.*, 969 F. Supp.

10    362, 368 (E.D. La. 1997) (deciding, without considering foreign law, whether unrelated third party could

11    maintain action for wrongful death).  In both *Xuncax* and *Cabello*, the courts found that siblings could

12    maintain a wrongful death action under the law of Guatemala and Chile, respectively.

13        Actions for wrongful death in Nigeria stem from the Fatal Accidents Law or the Torts Law.  *See*

14    Idigbe Decl., ¶ 8.  These statutes limit the individuals who may bring wrongful death actions to the

15    executor or administrator of the deceased person's estate, or the wife, husband, parent, or child of the

16    decedent.  Idigbe Decl., ¶ 2 & Exhs. 2, 3, 4.  Thus, it does not appear that siblings are proper wrongful

17    death claimants under Nigerian law.

18        Plaintiffs attempt to avoid this result by arguing that Nigerian law allows "any person who has

19    an interest in the continued existence of the deceased" to bring a wrongful death claim.  *See* Aturu Decl.,

20    ¶¶ 6-10.  This statement, however, occurs only in a concurrence in the Nigerian Supreme Court's case

21    of *Bello v. Attorney-General of Oyo State*.  *See* Supp. Idigbe Decl., Exh. 13 at 877.  The lead opinion

22    in that case adhered to the statutory requirement that a wrongful death action be brought by the spouse,

23    parents, or children of the deceased.[16]  *Id.* at 858.  Accordingly, the Court finds that siblings are not

24    proper plaintiffs in a wrongful death action under Nigerian law.

25        Plaintiffs also argue that this Court should recognize immediate family members as proper

26

27        [16]One of the plaintiffs in *Bello* was the sibling of the deceased.  The court did not address his
28    presence, but ruled that the plaintiffs were proper because "among the plaintiffs include the wife, father,
     mother and children of the deceased."  Supp. Idigbe Decl., Exh. 13 at 858.

United States District Court

For the Northern District of California

1  parties under the ATS based on federal common law.  Without considering the issue, a number of courts

2  have allowed siblings to recover under the ATS.  *See, e.g.*, *Foti v. Suarez-Mason*, 672 F. Supp. 1531

3  (N.D. Cal. 1987) (ATS claim brought by sister for torture and summary execution of her brother by

4  Argentine officials), *reconsideration granted in part*, 694 F. Supp. 707 (1988).  Plaintiff argues that

5  these courts have begun to create a body of federal common law to fill in the many gaps in the ATS.

6      Even assuming that the these decisions were somehow based on a federal common law, the

7  Court declines to apply such common law here.  Rather, the Court believes the approach that will most

8  further the goals of uniformity and predictability is to apply the standards set forth in the TVPA.  *See*

9  *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1145-46 (E.D. Cal. 2004) ("To ascertain . . . whether

10 Plaintiff has standing to bring a claim under the ATCA, the Court either follows the approach of the

11 TVPA to look to California law . . . or employs a choice of laws analysis to look to Salvadoran law.");

12 *cf. Papa v. United States*, 281 F.3d 1004, 1012 (9th Cir. 2002) (looking to TVPA to determine statute

13 of limitations for ATS claims).  Thus, the Court finds that the sibling plaintiffs lack standing to bring

14 claims under the ATS.

15

16          **2.      Other Claims**

17     Defendants also challenge the ability of the sibling plaintiffs to bring third party tort claims.

18 Defendants base this challenge on Federal Rule of Civil Procedure 17, which provides that "[e]very

19 action shall be prosecuted in the name of the real party in interest."  Fed. R. Civ. P. 17(a).  Defendants

20 argue that plaintiffs have failed to comply with this provision, because the siblings at issue are not "real

21 parties in interest."

22     The Court agrees with defendants.  To the extent the sibling plaintiffs wish to represent other

23 relatives of the individuals who were killed, those individuals must be named in the complaint.  The

24 purpose of the real party in interest requirement is to "protect the defendant against a subsequent action

25 by the party actually entitled to recover, and to insure generally that the judgment will have its proper

26 effect as res judicata."  Fed. R. Civ. P. 17, adv. comm. notes; *see also Pacific Coast Agriculture Export*

27 *Ass'n v. Sunkist Growers*, 526 F.2d 1196, 1208 (9th Cir. 1975) (purpose of Rule 17(a) is to "protect a

28 defendant from subsequent similar actions by one not a party to the initial action").  Here, while the

Court believes there to be little risk that this case will not receive full *res judicata* effect, amendment of the complaint to include the names of the real parties in interest is a relatively minor matter.

### B.     Capacity to Bring Survival Actions

Defendants argue that the representative plaintiffs lack capacity to assert their tort claims on behalf of the decedents.  Capacity to sue is governed by Federal Rule of Civil Procedure 17(b), which provides that, for an individual acting in a representative capacity, "capacity to sue or be sued shall be determined by the law of the state in which the district court is held."  Fed. R. Civ. P. 17(b).  Under California law, only a decedent's personal representative or successor in interest may bring an action on the decedent's behalf.  Cal. Civ. Proc. § 377.30.  As plaintiffs do not argue that they are their decedent's "personal representative," they must establish that they are successors in interest.

Defendants argue that plaintiffs may not proceed as successors in interest because they have not complied with § 377.32 of the California Code of Civil Procedure.  That section requires that a decedent's successor in interest file an affidavit attesting to a number of facts, including facts establishing the person's right to proceed on the decedent's behalf.[17]  The section also requires that a certified copy of the decedent's death certificate be attached to the affidavit or declaration.  Cal. Civ. P. § 377.32(c).

As an initial matter, the Court finds that a § 377.32 declaration is not required under Federal

---

[17]Section 377.32 requires, among other things, that the declaration state:

(1) The decedent's name.

(2) The date and place of the decedent's death.

(3) "No proceeding is now pending in California for administration of the decedent's estate."

. . .

(6) "No other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding."

Cal. Civ. P. § 377.32(a).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Rule of Civil Procedure 17(b).[18]  Section 337.32 does not purport to define "successor in interest." Rather, "successor in interest" is defined by California Code of Civil Procedure 377.11.  *See* Cal. Civ. P. § 377.11 ("For the purposes of this chapter, 'decedent's successor in interest' means the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action.").  Section 377.32, in contrast, does not purport in any way to affect who is considered a successor in interest.  It only establishes a procedural requirement that a party must meet to establish that she is a successor in interest.[19]  Thus, the Court finds that plaintiffs need not comply with § 377.32.

        That is not the end of the inquiry, however.  As mentioned above, § 377.11 defines "successor in interest" as "the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action."  Cal. Civ. P. § 377.11.  When a person dies intestate, as the decedents here, "beneficiary of the decedent's estate" means "the sole person or all of the persons who succeed to a cause of action, or to a particular item of property that is the subject of a cause of action, under Sections 6401 and 6402 of the Probate Code or, if the law of a sister state or foreign nation governs succession to the cause of action or particular item of property, under the law of the sister state or foreign nation."  Cal. Civ. P. § 377.10.  Thus, because the intestate succession in this case is governed by Nigerian law, "successor in interest" signifies those persons who succeeded to the survival causes of action under Nigerian law.

_____

[18]A few cases have reached the opposite conclusion.  *See Horn v. State of Cal.*, 2005 WL 1925917, *2 (E.D. Cal. 2005) (stating, without analysis, that such an affidavit was required); *Pino v. City of Sacramento*, 2006 WL 193181, *2 n.1 (same); *Dillard v. Curtis*, 2004 WL 2496130 (N.D. Cal. 2004) ("Although Civil Procedure Code 377.32 is a rule of California (not federal) procedure, it seems to set a minimum threshold below which a person claiming to be a 'successor in interest' should not be permitted to slip.").

[19]Regardless of whether § 377.32 applies, the Court finds that the declarations plaintiffs have submitted are sufficient.  Defendants' primary challenge to the declarations is based upon plaintiffs' failure attach death certificates, as required by § 377.32(c).  Plaintiffs' conduct, however, is explained by the fact that death certificates are rarely issued in Nigeria when a person dies in a rural area.  *See* Sondheimer Decl., Exh. 10 ("If a person dies in a hospital, definitely there will be a death certificate. Outside the hospital it's very rare.  Someone dying at home, for example, in the rural areas, hardly that.").  Although defendants argue that the death certificate requirement should be strictly enforced, the Court cannot agree that strict enforcement is appropriate in this case.  In essence, defendants would have the Court decide now that the decedents at issue did not actually die, *see* Def. Br. at 17, even when this is a disputed issue of material fact.  Plaintiffs have submitted evidence sufficient to create an issue of fact regarding whether the decedents were killed in the attacks.  The Court finds that sufficient.

United States District Court

For the Northern District of California

1   As discussed above, survival actions may only be brought by spouses, parents, and children

2   under Nigerian law; siblings may not bring such causes of action.  Thus, the sibling plaintiffs are not

3   the proper plaintiffs to bring the survival actions under Nigerian law.

4

5   **C.    Ability to Cure**

6   Finally, plaintiffs argue that they should be allowed to amend their complaint to remedy the

7   defects identified above.  The Court agrees.  The failure to identify the correct parties is a matter of form

8   only, and has not prejudiced the defendants in any way.  Plaintiffs have provided this Court with signed

9   powers of attorney from the real parties in interest, authorizing the sibling plaintiffs to pursue their

10  claims on their behalf.  The Court finds these powers of attorney acceptable and therefore will allow the

11  sibling plaintiffs to proceed on behalf of the real parties in interest as attorneys-in-fact.

12  Defendants argue that the sibling plaintiffs may not act as attorneys in fact in this lawsuit. They

13  argue that "[a]n attorney in fact may bring an action on behalf of his or her principal only as a guardian

14  ad litem." *In re Marriage of Caballero*, 27 Cal. App. 4th 1139, 1152 (Cal. App. 1994).  That statement,

15  however, concerns an attorney-in-fact's ability to bring a case as attorney-at-law – *i.e.*, without counsel.

16  *See Caballero*, 27 Cal. App. 4th 1151 ("Despite broad statutory language of the power of attorney with

17  respect to claims and litigation, the attorney in fact may not act as an attorney at law on behalf of his

18  principal, even though the principal could appear in propria persona.").  When an attorney-at-law

19  represents a party, an attorney-in-fact may prosecute the action on that party's behalf. *See* Cal. Probate

20  Code. § 4459; *Choi v. Kim*, 50 F.2d 244 (3d. Cir. 1995).

21  Accordingly, plaintiffs may remedy their defective standing and capacity by amending their

22  complaint to name the real parties in interest.  The sibling plaintiffs may represent those parties as

23  attorneys-in-fact going forward.

24

25  **III.    Miscellaneous Claims**

26  In a short final paragraph, defendants request that the Court dismiss the claims of each plaintiff

27  who does not have standing to assert the claim.  Specifically, defendants request that the Court dismiss

28  the claims of Bowoto, Oyinbo, and Jeje as to claims 1, 2, 10, and 17, because they do not allege any

22

1  death in connection with the incidents.  Plaintiffs do not object to this request.  It is therefore

2  GRANTED.

3         Defendants also request that the Court dismiss the claims of torture brought by all plaintiffs

4  except Bola Oyinbo.  The Court, however, agrees with plaintiffs; the single sentence on this point in

5  defendants' opening brief is insufficient to convince the Court that plaintiffs torture claims should be

6  summarily dismissed.  Accordingly, defendants' request is DENIED.

8                                      **CONCLUSION**

9         For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART

10  defendants' motion to dismiss (Docket No. 795).  The Court DENIES defendants' motion to strike

11  (Docket No. 997). **Plaintiffs may file an amended complaint remedying the defects identified above**

12  **within 30 days of the date of this order.**

13         **IT IS SO ORDERED.**

15  Dated: August 21, 2006                    _____

16                                            SUSAN ILLSTON
                                             United States District Judge