IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY BOWOTO, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>CHEVRON CORP., et al.,<br><br>    Defendants.<br>_____ / | No. C 99-02506 SI<br><br>**ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR LEAVE TO FILE EIGHTH AMENDED COMPLAINT AND DENYING PLAINTIFFS' MOTION IN LIMINE FOR APPLICATION OF JUDICIAL AND/OR EQUITABLE ESTOPPEL** |

On February 24, 2006, the Court heard argument on plaintiffs' motion for leave to file an eighth amended complaint and motion *in limine* for application of judicial and/or equitable estoppel. Having carefully considered the arguments of counsel and the papers submitted, and for good cause shown, the Court hereby GRANTS IN PART plaintiffs' motion for leave to file an eighth amended complaint, and DENIES plaintiffs' motion *in limine*, for the reasons set forth below.

**BACKGROUND**

Plaintiffs filed this action in 1999, seeking damages for a series of brutal attacks in Nigeria that they allege were connected to Chevron's oil operations on the Niger River Delta. Unable to sue the Chevron entity they allege was directly involved, Chevron Nigeria Limited ("CNL"), plaintiffs brought suit against Chevron Corporation ("Chevron").[1] In 2002, this Court granted plaintiffs leave to amend their complaint to include claims against ChevronTexaco Overseas Petroleum, Inc. ("CTOPI"), now

---

[1] In 2001, Chevron merged with Texaco to form ChevronTexaco Corporation. On May 9, 2005, the company announced that it was changing its name back to Chevron Corporation. This Court's past orders have referred to both ChevronTexaco and Chevron as the same entity.

named Chevron Investments, Inc. ("CII"), an American subsidiary of Chevron that is the parent company to CNL.[2]

The instant dispute began on July 15, 2005, only a few months before the end of discovery, when defendants produced supplemental responses to plaintiffs' interrogatories, changing many answers that defendants claimed named the wrong entity. Although many of defendants' original answers had referred to actions taken by CII personnel, defendants' supplemental responses contended that these individuals had actually worked for Chevron U.S.A., Inc. ("CUSA"), an American subsidiary of Chevron that had no ownership interest in CNL. The majority of defendants' changes simply substituted CUSA for CII in the interrogatory responses.[3] In other instances, however, defendants deleted references to CII from their responses. During depositions in September and October, witnesses produced by defendants explained that during the relevant time period CII had been a holding company with officers and directors but no employees. They also explained that, given the similarity of names between Chevron subsidiaries, many employees were confused about the true name of their employer.

In their motion, defendants have explained to the Court the organization of the relevant Chevron entities for the first time. Three entities are relevant to this motion: (1) the original Chevron subsidiary named Chevron Overseas Petroleum, Inc. ("Pre-1995 COPI"); (2) CUSA and its division, Chevron Overseas Petroleum ("COP")[4]; and (3) CII, frequently referred to as Chevron Overseas Petroleum, Inc. ("COPI"), because that is the name it held when the Nigerian attacks allegedly took place. The precise

---

[2] Except where otherwise indicated, this order will refer to the parent company of CNL as CII. The abbreviations used to refer to the various Chevron entities that are relevant to this case are quite confusing because many of those entities have undergone numerous name changes over the past ten years. The situation is made all the more confusing because these entities have frequently held names that are virtually identical. For example, the Chevron subsidiary that was added as a defendant in plaintiffs' fourth amended complaint was CTOPI. At the same time, however, there was another Chevron subsidiary in existence named ChevronTexaco Overseas Petroleum – "CTOP." Confusion caused by these two entities' names caused the Court to refer to CTOPI as CTOP in in its order granting plaintiffs leave to file their fourth amended complaint.

[3] In actuality, the supplement changed "COPI" – Chevron Overseas Petroleum, Inc., the name for CII at that time – to "CUSA/COP." CUSA/COP refers to CUSA and Chevron Overseas Petroleum, a division of CUSA under Pennsylvania corporate law. *See* Soler Decl., ¶ 8.

[4] CUSA is incorporated under Pennsylvania law, which allowed corporations to create divisions without separately incorporating. CUSA's division COP was created on January 1, 1994, apparently to take over the functions of pre-1995 COPI. This order uses "CUSA" to refer to both CUSA and its division COP.

2

relationship between these entities is as follows.

From 1968 through December 31, 1994, Pre-1995 COPI existed to provide services to Chevron's foreign subsidiaries. Soler Decl., ¶ 14; Matzke Decl. at ¶ 2. Over the course of 1994, however, Pre-1995 COPI assigned to CUSA its "counsel and service" agreements with Chevron's foreign subsidiaries, including one such agreement with CNL.[5] At the end of 1994, Pre-1995 COPI merged with CUSA and ceased to exist. Soler Decl., ¶ 15. At that time, all employees and officers of Pre-1995 COPI became employees and officers of CUSA and its division, COP. Matzke Decl. ¶ 3. From 1995 forward, COP carried out the functions that Pre-1995 COPI had performed.

The day after this merger, on January 1, 1995, CII (then named Transocean Chevron Company) changed its name to Chevron Overseas Petroleum, Inc. ("COPI"). Soler Decl., ¶ 5. On October 10, 2001, COPI was renamed CTOPI, and on June 18, 2005, it was renamed CII. *Id*. at ¶ 4. From 1995 through 2000, during which it was known as COPI, CII was a holding company whose primary purpose was to own other Chevron subsidiaries, one of which was CNL. *Id.* at ¶ 7. According to defendants, CII had officers and directors, but no employees, during this time period. *Id*.

CUSA has had the same legal name since at least 1986. *Id*. at ¶ 8. A division of CUSA, however, has changed names in virtual lock step with CII. From its inception in 1994 until 2001, covering the time CII was named COPI, CUSA's division was named COP. Following the 2001 merger with Texaco, COP was renamed Chevron Texaco Overseas Petroleum ("CTOP"). At the same time, COPI became CTOPI. On May 9, 2005, CTOP was renamed Chevron International Exploration and Production Company, the name it holds today.

As mentioned above, the similarity of names and acronyms has caused considerable confusion to the witnesses, the parties, and the Court. This confusion has been exacerbated by CUSA's business decision in 1995 to have employees continue to refer to their employer as "COPI" and to use "COPI" letterhead on memos and letters in order to take advantage of goodwill associated with the name

---

[5]This counsel and service agreement may be a large part of the basis for the confusion. Because it was executed in 1987, the agreement states that one of the parties is "Chevron Overseas Petroleum, Inc." Mitchell Decl., Exh. 3. Plaintiffs have been operating under the assumption that this is the same entity as the COPI that existed between 1995 and 2001. As described above, given that the agreement was assigned to CUSA, and given the various name changes that occurred, plaintiffs were incorrect; Pre-1995 COPI is the entity named in the agreement.

3

1 "COPI," even though that name was technically incorrect. *Id*. at ¶ 4.

2 The above confusion came to a head in 2002, when plaintiffs sought to amend their complaint to include CII as a defendant. Because plaintiffs understood CII and COP to refer to the same entity, they did not attempt to include CUSA as a defendant. Plaintiffs contend that they only learned of this error when served on July 15, 2005, with "Defendants' Consolidated Supplemental Response to Plaintiffs' Phase I Interrogatories," which changed many of the interrogatory responses defendants had provided between 2001 and 2003. These changes replaced the term "COPI" with "CUSA/COP" as the employer of certain key personnel, renamed CII divisions as departments within CUSA, and removed the words "by agreement with COPI" in several responses that previously indicated that CUSA performed certain services for CNL only through agreement with CII.

Based on this dramatic change in defendants' story, plaintiffs bring two motions before the Court. First, plaintiffs request leave to file an eighth amended complaint to include CUSA as a defendant. Second, plaintiffs request that the Court estop defendants from attributing actions to CUSA that had previously been attributed to CII.

## LEGAL STANDARD

### I. Leave to Amend

Federal Rule of Civil Procedure 15 governs the amendment of complaints. It provides that if a responsive pleading has already been filed, the party seeking amendment may amend the its pleading only by leave of court or by written consent of the adverse party. Fed. R. Civ. P. 15(a). The rule reflects an underlying policy that disputes should be determined on their merits, and not on the technicalities of pleading rules. *See Foman v. Davis*, 371 U.S. 178, 181-82 (1962). Thus, courts should grant leave to amend with "extreme liberality." *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

Leave to amend is not automatic, however. There are several accepted reasons why leave to amend should not be granted, such as the presence of bad faith on the part of the plaintiff, undue delay, prejudice to the defendant, and futility of amendment. *See AmerisourceBergen Corp. v. Dialysist West, Inc.*, 445 F.3d 1132 (9th Cir. 2006). One reason that an amendment may be futile is that the claim it

4

raises is barred by the statute of limitations. *See Deutsch v. Turner Corp.* 324 F.3d 692, 718 n.20 (9th Cir. 2003).

## II.     Judicial Estoppel

"Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Wagner v. Prof. Eng. in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004). It is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from "playing fast and loose with the courts." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). The United States Supreme Court has identified three non-exclusive factors that courts should consider in determining whether to apply the doctrine of judicial estoppel:

> First, a party's later position must be "clearly inconsistent" with its earlier position. . . . Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled." Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," . . . and thus no threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 121 S.Ct. 1808, 1815, 149 L.Ed.2d 968 (2001) (citations omitted).

## III.    Equitable Estoppel

The traditional elements of equitable estoppel are: "(1) the party to be estopped knows the facts; (2) the party intends that his or her conduct will be acted on; (3) the claimant must be ignorant of the true facts; (4) and the claimant must detrimentally rely on the other party's conduct." *Salgado-Diaz v. Ashcroft*, 395 F.3d 1158, 1166 (9th Cir. 2005).

**DISCUSSION**

As mentioned above, plaintiffs move to amend their complaint to add CUSA as a defendant. Plaintiffs also seek to preclude defendants from attributing conduct to CUSA that they previously

attributed to CII. Before discussing the merits of these motions, the Court will describe the relevant discovery responses and defendants' recent changes.

## I. Discovery Responses at Issue

Before they filed their supplemental interrogatory responses, defendants had produced a substantial amount of discovery in this case that indicated that the actions defendants now claim were taken by CUSA were actually taken by CII. The amount of mistaken discovery that plaintiffs point to is considerable, and includes documents, interrogatory responses, and deposition testimony. The following are representative examples of defendants' mistaken discovery:

- On May 21, 2001, defendants served interrogatory responses identifying CII as the owner of CNL. Pl. Exh. 2 at 8-11. These responses also indicated that CII had provided technical, professional, and administrative services to CNL, or that it had authorized CUSA to do so. For example, one interrogatory response stated that "[t]he authority to make certain [Foreign Corrupt Practices Act] compliance determinations . . . has been delegated to COPI's Finance Department" and that "by agreement with COPI, these job functions are carried out by certain U.S.-based employees of CUSA/COP." Pl. Exh. 2 at 47. On July 15, 2005, defendants changed this and other similar answers to remove the words "by agreement with COPI," and by changing "COPI" to "CUSA/COP," negating CII's role. Pl. Exh. 28 at 3.

- On December 7, 2001, defendants served supplemental interrogatory responses identifying a number of CII employees during the relevant period. The interrogatories name both "Joe Lorenz of COPI's Public Affairs Department" and "Brian Kay of COPI" Pl. Exh. 3 at 15, 19. On July 15, 2005, defendants replaced both references to "COPI" with "CUSA/COP." Pl. Exh. 28 at 3.

- In a February 7, 2002, deposition, Chevron executive Thomas Schull described how he and another CII employee moved from CII to CNL and back to CII over the course of their careers, at the behest of CII executives. Pl. Exh. 5 at 31-34, 84-87. Schull described a position in Nigeria as typically a four-year assignment, after which the employee would return to CII. *Id.* at 86-87. During the deposition, Schull repeatedly referred to his employer as "COPI."

- In February 28, 2002, interrogatory responses, Chevron identified twelve individuals as being "COPI" employees during years after 1995, in roles including human resources, facilities engineering, and vice-president for various "COPI" divisions. *See* Pl. Exh. 8 at 2-7. Chevron's July 15, 2005, supplemental interrogatory responses changed every reference to "COPI" to "CUSA/COP." Pl. Exh. 28 at 4.

- In an April 9, 2002, deposition, Scott Davis, a CNL employee who allegedly was part of the decision to send the military to Parabe in 1998, explicitly testified that he worked for COPI while based in the U.S. Indeed, Davis testified that an interrogatory answer that identified him as a CUSA employee during that period was "incorrect." Pl. Exh. 6 at 16. Mr. Davis also testified about a document that offered to transfer him to CNL. *Id.* at 16:8-17:9. That document, a "fixed duration assignment offer," has the acronym "COPI" printed in large type at the top, states that the offer is from "Chevron Overseas

6

<div style="margin-left: 2em;">

Petroleum, Inc.," that it was prepared on December 17, 1996, and that the completed form should be returned to "COPI HR" by December 27, 1996. Pl. Exh. 7.

- On October 1, 2002, defendants sent a letter brief to the Court describing an attached exhibit as "a fax sent by a CTOP employee in Washington to two CTOP employees in the United States and a CNL employee in Nigeria." Pl. Exh. 10. Although defendants' letter brief used the correct acronym "CTOP," the letter brief indicated at its beginning that "CTOP" represented "ChevronTexaco Overseas Petroleum Inc." In addition, the fax was sent with a COPI cover sheet. Pl. Exh. 10.

- In a November 19, 2002, deposition, Thomas W. Harrison described himself as a former Manager of Drilling Operations International at CII and detailed how daily drilling reports were sent from CNL to CII for review by CII staff. Pl. Exh. 13 at 29-31, 37-38, 121-22.

- In a January 7, 2003, deposition, James Bates, manager of Chevron's Nigerian business unit, testified that he supervised a team of CII engineers and earth scientists. When asked who his employer and the employer of the engineers and scientists was, Bates responded "COPI, Chevron Overseas Petroleum, Inc." Pl. Exh. 16 at 40-41.

- On May 26, 2005, defendants responded to an interrogatory which asked them to "set forth the purpose and function of the Nigeria Strategic Business Unit located in San Ramon, as well as the nature of its organizational relationship to other CHEVRON ENTITIES during the period from January 1, 1994 through January 31, 2000." Pl. Exh. 25 at 79. Defendants' response referred plaintiffs to an organizational chart that showed this business unit as being a part of "Chevron Overseas Petroleum, Inc." Pl. Exh. 25 at 79; Pl. Exh. 26.

</div>

As the above examples illustrate, defendants have produced a formidable amount of discovery in this action that directly contradicts their current position that CII was nothing more than a holding company during the relevant time period. These examples are only a selection of the discovery produced by defendants that identifies CII employees and describes CII's ongoing relationship with CNL. Numerous other examples exist in which witnesses characterize themselves as CII employees and describe CII as having provided personnel, administrative, planning, technical and oversight services to CNL. There are also numerous instances in which plaintiffs' counsel asked a witness to confirm the name of his or her employer and the answer was "COPI."

Defendants attempt to justify the erroneous discovery by arguing that they provided plaintiffs with other discovery sufficient to make plaintiffs aware of Chevron's corporate structure. Defendants claim that documents they produced reveal that Pre-1995 COPI merged with CUSA and that CUSA was involved in managing the business and assets of CNL following the merger. For example, defendants produced the articles of merger between Pre-1995 COPI and CUSA; an agreement assigning Pre-1995 COPI's contract with CNL to CUSA; payroll records showing that "811 CHEVRON OVERSEAS

7

PETROL DIV/CUSA" or "811 CHEVRON OVERSEAS PETROLEUM (COP)," and not "COPI," paid the salaries of CNL employees; and accounting records showing debts and payments between CNL and CUSA. *See* Def. Exhs. 7, 11, 12; Matke Decl., Exh. 1; Soler Decl., Exh. 10.

While the discovery defendants point to accurately reflects the corporate relationships between Chevron, CUSA, and CII, it is insufficient to overcome the misleading discovery responses described above. The reason for many of plaintiffs' discovery requests was to learn which Chevron entity assisted CNL with planning and decision making. Defendants' erroneous discovery responses bear directly on that issue, while the correct discovery defendants point to does not. For example, some of the documents pointed to by defendants merely show that COPI and CUSA are separate entities, which has never been in question. *See* Def. Exhs. 7, 14, 15. The assignment agreement and articles of merger only show that a corporation called COPI assigned its counsel and service agreements to CUSA in 1995 pursuant to a merger in which CUSA was the surviving entity. Matzke Decl. Exh. 1; Soler Decl. Exh. 10. These documents are not inherently inconsistent with the far-more-explicit statements of numerous individuals that they worked for an entity called "COPI" that did a variety of work for CNL after 1995.

The accounting records defendants produced suffer from the same lack of illumination. For example, defendants highlight an entry in a spreadsheet entitled "Intercompany Capital Contributions (Returns of Capital)" that reads "April '94 asset tsfr. from COPI to COP-CUSA Division." Def. Exh. 9. But this entry gives no insight into the respective roles that CII and CUSA played in the support and management of CNL. More importantly, the accounting records have contributed to the confusion in this case. When plaintiffs propounded an interrogatory asking what the code "811" on the payroll records referred to, the response was "COPI or CTOP." Pl. Exh. 18 at 6. Defendants argue that any confusion was remedied during the March 4, 2003, deposition of Rick Brown. At his deposition, Brown testified that employees of foreign subsidiaries paid in U.S. dollars were initially "on COPI's payroll," but were later transferred to the payroll of a new entity called "COP." Def. Exh. 20. Brown, however, provided very few details about the transfer. His testimony was certainly not detailed enough to be viewed as more accurate than defendants' interrogatory responses or the sworn testimony of others that they performed work for CNL while employed by "COPI."

Defendants also argue that some interrogatory responses provided in May 2001 adequately

8

showed plaintiffs the relationship between CUSA, CII, and CNL. These responses indicated that CUSA employees were involved in Foreign Corrupt Practices Act compliance "by agreement with COPI"; that CUSA provided payroll services to CNL "by agreement with COPI"; that CUSA had U.S.-based employees whose jobs related to the maintenance and supervision of CII's international investments; and that two of the primary individuals involved in the Parabe and Opia/Ikenyan incidents, Thomas Schull and Scott Davis, were employees of CNL and CUSA from 1995-2000. Def. Exh. 16 at 11, 47, 60.

However, defendants' interrogatory responses are insufficient to have educated plaintiffs about the roles of CUSA and CII in relation to CNL. Although the responses from May 2001 may have given plaintiffs notice that they *might* have a claim against CUSA, virtually all of the discovery that followed undercut this proposition, as deposition after deposition led plaintiffs to the reasonable conclusion that the Chevron employees involved in the Nigeria incidents were CII employees, not CUSA employees. The May 2001 interrogatory responses do not contradict this conclusion; the fact that CUSA is listed as providing services to CNL would not have meant CII could not also be providing any number of other services to CNL, a conclusion fully supported by subsequent discovery. Furthermore, the listing of Schull and Davis as CUSA employees was later contradicted by the CII document transferring Davis to CNL, and by their depositions, in which both characterized themselves as CII employees. Indeed, Davis was explicitly told of the interrogatory response that lists him as a CUSA employee and he responded "that is incorrect," stating that he had never worked for CUSA. Pl. Exh. 6 at 16:2-17.

The Court finds defendants' conduct to be troubling. The discovery outlined above contains repeated instances in which defendants incorrectly identified the relevant corporate actor. These mistakes were not limited to employees' deposition testimony, which might be somewhat understandable, but also occurred throughout defendants' interrogatory responses. Indeed, defendants' supplemental interrogatory responses changed "COPI" to "CUSA/COP" more than twenty times.

Of even greater concern to the Court, however, is the strong suggestion that *defense counsel* knew that both plaintiffs and the Court misunderstood Chevron's corporate structure, yet failed to correct these misunderstandings for years. Defendants' opposition brief admits that, in its understanding, its interrogatories had "clearly draw[n] a distinction between [CUSA and COPI]" as far

9

1 back as 1999. Def. Oppo. Br. at 6. Further, during a February 2002 deposition defense counsel revealed
2 that he understood the difference between CUSA and CII. Mitchell Decl., Exh. 2, at 121 (defense
3 counsel stating during a deposition that he did not think "COP refers to COPI" yet failing to elaborate
4 despite plaintiffs' counsel's clear confusion).

5 Despite their superior knowledge, defense counsel chose not to inform plaintiffs or this Court
6 of the confusion, although they were presented with numerous opportunities to do so. Indeed, this
7 Court's summary judgment order, which issued over two years ago, is replete with references to actions
8 taken by CII, actions that defendants now claim were taken by CUSA. The instant motion, however,
9 is the first that the Court has heard of its misunderstanding. Even setting aside the question of whether
10 defendants had a duty to promptly correct the discovery responses they provided to plaintiffs' counsel,
11 defendants had an obligation to clarify the misunderstanding of this Court.

12 Defendants justify their belated disclosure of this information by arguing that they were merely
13 "supplementing" their discovery responses in compliance with this Court's deadline. Referring to
14 defendants' July 15, 2005, corrections as "supplements," however, is disingenuous. When defendants
15 learned that their discovery responses were incorrect, and especially when they saw that their errors
16 were affecting this Court's understanding of the issues, they had a duty to promptly issue corrections.
17 Allowing this litigation to proceed, while the opposing party and the Court suffered from an obvious
18 misunderstanding, was not acceptable.

## II.     Leave to Amend

21 In light of defendants' erroneous discovery responses and the effect they have had on this
22 litigation, plaintiffs move to amend their complaint. Plaintiffs seek to add CUSA as a defendant to their
23 three general classes of state and federal causes of action: (1) their causes of action under the Alien Tort
24 Statute ("ATS") and Torture Victim Protection Act ("TVPA"); (2) their cause of action under the federal
25 Racketeer Influenced and Corrupt Organizations Act ("RICO"); and (3) their other state law causes of
26 action.

27 Defendants do not oppose plaintiffs' motion for leave to amend to the extent it seeks to add
28 CUSA as a defendant to claims brought under the ATS or TVPA, as the statute of limitations on those

10

claims has not yet run. Defendants, however, contest plaintiffs' motion as to their causes of action under RICO and California state law, claiming that they are time-barred. Plaintiffs concede that, without tolling, the California and RICO claims were due to be filed by May 27 and 28, 2002, respectively, but advance three arguments as to why they should nevertheless be allowed. Specifically, plaintiffs argue that: (1) defendants should be equitably estopped from raising a statute of limitations defense; (2) the limitations period for the California and RICO claims should be equitably tolled; and (3) the proposed amendment relates back under Federal Rule of Civil Procedure 15(c).

### A. Equitable Estoppel

Equitable estoppel can excuse the failure to file a claim within the applicable statute of limitations when the defendant's actions have prevented the plaintiff from filing suit in a timely manner.[6] *See Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000). "A finding of equitable estoppel rests on the consideration of a non-exhaustive list of factors, including: (1) the plaintiff's actual and reasonable reliance on the defendant's conduct or representations, (2) evidence of improper purpose on the part of the defendant, or of the defendant's actual or constructive knowledge of the deceptive nature of its conduct, and (3) the extent to which the purposes of the limitations period have been satisfied." *Id*. This list of factors is not exhaustive, and "[w]hether other considerations are relevant to a claim of equitable relief should be determined on the basis of the facts of each case." *Naton*, 649 F.2d at 696 n.5.

---

[6]Although they are traditionally distinct doctrines, in the limitations context equitable estoppel has been equated with fraudulent concealment. *See Thorman v. Am. Seafoods Co.*, 421 F.3d 1090, 1094 (9th Cir. 2005); *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176-1177 (9th Cir. 2000); *see also Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2006) ("Equitable estoppel, also termed fraudulent concealment, halts the statute of limitations . . . ."). The legal standard for fraudulent concealment, however, is stated in a slightly different manner. *See, e.g.*, *Thorman*, 421 F.3d at 1094. To establish fraudulent concealment, a plaintiff must establish (1) that the defendant "affirmatively misled" him as to the operative facts that gave rise to his claim, and (2) that the plaintiff "had neither actual nor constructive knowledge" of these operative facts despite his diligence in trying to uncover them. *Id.*
  Because plaintiffs frame their arguments under the equitable estoppel standard, the Court will apply the framework for equitable estoppel. Although defendants' argue primarily in terms of fraudulent concealment, their arguments focus on plaintiffs' alleged actual or constructive knowledge of their claim against CUSA. Because such knowledge would also prevent the application of equitable estoppel, defendants are not prejudiced by adoption of the framework advanced by plaintiffs. *See Towne v. Robbins*, 339 F. Supp. 2d 1105, 1117 (D. Or. 2004).

11

### 1. Reliance upon Defendants' Representations

There can be no doubt that plaintiffs actually relied on the numerous misstatements and errors that were contained in defendants' discovery responses; plaintiffs' reliance is clear from their decision to include only CII as a defendant in their fourth amended complaint. Defendants certainly provide no convincing strategic reason for plaintiffs' decision not to sue CUSA. This Court's order granting plaintiff's motion for leave to file a fourth amended complaint also demonstrates plaintiff's reliance on defendants' discovery responses. In that order the Court explicitly referred to discovery responses indicating that CII employees were involved in the decision to enlist the aid of the Nigerian military: "In particular, plaintiff learned that [CII] wholly owned Chevron Nigeria, Ltd. and funded its capital budget; that [CII] management was involved in decision making concerning events at issue, particularly the decision to seek assistance from the Nigerian military; and that [CII] may have made some of the public statements upon which plaintiffs' *Kasky* claim rests." Order Granting in Part and Denying in Part Plaintiff's Motion to File Fourth Amended Complaint (Docket No. 204), at 10. The argument on defendant's 2004 motion for summary judgment similarly demonstrates plaintiff's misunderstanding. There, the Court accepted plaintiffs' argument that Chevron and CII could be held liable for CNL's actions, relying in large part on evidence of CII's close relationship with CNL. In short, it is clear to the Court that, until July 15, 2005, plaintiffs honestly and actually believed that CII had taken many of the actions that defendants now attribute to CUSA.

The Court also finds that plaintiffs' reliance was reasonable. As described above, discovery produced by defendants over the course of years identified specific CII personnel and stated that CII employees played a role in a broad spectrum of CNL's operations. The sporadic instances in which defendants correctly described the relationship between CII and CUSA, much of which consists of relatively cryptic statements, is simply insufficient to overcome the effect of the specific and detailed discovery that erroneously described CII's relationship to CNL.

Accordingly, the Court finds that plaintiffs relied on defendants' misrepresentations when they did not attempt to add CUSA as a defendant in June 2002, and that this reliance was entirely reasonable.

### 2. **Defendants' Improper Purpose or Knowledge of Deception**

The second equitable estoppel factor concerns whether a defendant had an improper purpose or knowledge of the deceptive nature of its conduct. Here, defendants assert that there was no improper motive at work, and that the only reason plaintiffs were led to believe that CII, rather than CUSA, performed planning and oversight of CNL is the innocent practice of CUSA employees of referring to their employer by its pre-merger name and the continued use of old letterhead and forms.

Whether or not defendants had an improper purpose, they certainly had knowledge of the deceptive nature of their conduct. A meet and confer letter plaintiffs sent on December 21, 2000, stated that plaintiffs wished to conduct discovery into the extent to which both CUSA and CII were responsible for the control, management and operations of CNL. Def. Exh. 6 at 11. This letter was followed by the discovery described above, in which individuals who were involved with CNL were repeatedly described as working for "COPI." It was also followed by the depositions of Thomas Schull and Scott Davis, described by defendants as two of the primary people involved in both the Parabe and Opia/Ikenyan incidents, in which both men unequivocally stated that they worked for CII. *See* Def. Exh. 18 at 12; Pl. Exh. 6 at 16. While Davis indicated that he was no expert on the corporate structure of ChevronTexaco, such expertise is not required to accurately name one's own employer. *See* Def. Exh. 17 at 17.

As discussed above, defendants' actions during discovery demonstrate that they understood the difference between COPI and CUSA. Indeed, according to defendants' brief, they had attempted to distinguish between COPI and CUSA since 1999. Despite this fact, defendants failed to reveal the true difference to plaintiffs for years, instead waiting until the end of discovery was imminent. This is more than sufficient for the Court to find that defendants had knowledge of the deceptive nature of their conduct.

### 3. **Satisfaction of the Purposes of the Limitations Period**

The final factor for equitable estoppel is the extent to which the purposes of the limitations period have been satisfied. Statutes of limitations have two major purposes: encouraging plaintiffs to be diligent in pursuing their claims; and giving defendants adequate notice of a claim while the evidence

13

and memories of witnesses are fresh. *See United States v. Kubrick*, 444 U.S. 111, 117, 123 (1979). Both of these purposes are satisfied here. Plaintiffs have been seeking to discover which Chevron divisions and subsidiaries bear responsibility in this case for years, and CUSA has long had notice of plaintiffs' claim. Indeed, employees of CUSA – although they testified that they were actually employees of CII – have sat for numerous depositions in this case.

Defendants' main defense to the equitable estoppel claim is that plaintiffs knew or should have known of their claim against CUSA and simply failed to do anything about. Defendants assert that equitable estoppel should not apply because plaintiffs had constructive notice of their claim against CUSA. *See Campbell v. The Upjohn Co.*, 676 F.2d 1122, 1127 (6th Cir. 1982) (rejecting claim of fraudulent concealment where defendant was in possession of documents that would have given him notice of cause of action). Although defendants are correct that plaintiffs were aware of the possibility of a claim against CUSA, their failure to pursue that claim is entirely forgivable because the bulk of discovery led plaintiffs away from that claim. Given the repeated discovery errors identified above, the Court finds that plaintiffs cannot be charged with having constructive notice of their claim against CUSA.

Accordingly, the Court finds that plaintiffs are entitled to benefit from the application of equitable estoppel.

### B. Equitable Tolling

Plaintiffs also argue that the statute of limitations should be equitably tolled. "Unlike equitable estoppel, equitable tolling does not depend on any wrongful conduct by the defendant to prevent the plaintiff from suing. Instead it focuses on whether there was excusable delay by the plaintiff." *Santa Maria*, 202 F.3d at 1178. Equitable tolling applies where, "despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of his claim." *Id.* Here, plaintiffs argue that the statute of limitations should be deemed tolled from May 21, 2001, the date defendants' first served erroneous interrogatory responses, until September 28, 2005, the date defendants' first produced corporate witnesses who testified about the correct relationship between CUSA, CII, and CNL.

The Court finds that equitable tolling is appropriate in this case. For the reasons discussed

14

above, plaintiffs' failure to file a timely claim against CUSA is wholly excusable. Indeed, the practice of referring to Chevron entities by nearly identical acronyms is confusing enough; when plaintiffs sought to clarify the meaning of those acronyms, everything they were told led them away from CUSA and towards CII. Plaintiffs were only able to learn of their claim against CUSA when defendants, without any explanation, served them with their amended interrogatory answers on July 15, 2005.

Defendants argue that they would be prejudiced by the addition of CUSA as a defendant at this late date. The fact that defendants do not object to the addition of CUSA as a defendant to plaintiffs' ATS and TVPA claims, however, renders their claim of prejudice somewhat disingenuous. Regardless, the Court finds the prejudice defendants cite to be lacking. Unlike in many cases, CUSA is not truly a new defendant. Rather, its employees have participated in discovery, and its role in the attacks in Nigeria, and its relationship with CNL, have already been the subject of discovery. Further, given that defendants knew of the misleading nature of their discovery responses, any prejudice to defendants is a result of their delay in correcting plaintiffs' misunderstandings.

Accordingly, the Court finds that plaintiff's may benefit from equitable tolling.

### C.  Relation Back under Federal Rule of Civil Procedure 15

Finally, plaintiffs argue that the addition of CUSA as a defendant should "relate back" under Federal Rule of Civil Procedure 15(c)(3). The Court rejects this argument, for the same reasons expressed in its order on plaintiff's motion to file a fourth amended complaint. Rule 15(c)(3) only applies where the plaintiff was mistaken as to the proper identity of the defendant, not when plaintiff knew the identity of the defendant but didn't ascertain defendant's liability until after the statute of limitations had expired. *See Louisiana-Pacific Corp. v. ASARCO, Inc.*, 5 F.3d 431, 434 (9th Cir. 1993). Here, plaintiffs were not mistaken as to the proper identify of CUSA. Accordingly, the Court rejects plaintiffs' argument that the addition of CUSA as a defendant relates back under Rule 15.

### D.  Extent of Estoppel and Tolling

Having found that equitable estoppel and equitable tolling apply, the Court must decide the effect that these equitable doctrines will have on this case. Plaintiffs argue that the statute of limitations

15

should be tolled from at least May 21, 2001, the earliest date they believe Chevron provided incorrect discovery about the relationship between CUSA, CII, and CNL. The Court disagrees. Despite the fact that defendants misinformed plaintiffs about CII's relationship to CNL, plaintiffs did not seek to add CII as a defendant until June 28, 2002, when their RICO and state-law claims were already time-barred. Plaintiffs make no argument that they would have brought their claims against CUSA any sooner than they brought them against CII, had they understood that CUSA was the appropriate entity. Accordingly, the Court will only allow plaintiffs to bring those claims against CUSA that were not time-barred as of June 28, 2002.

Plaintiffs urge the Court to arrive at a different result, arguing that defendants' erroneous discovery responses stopped the statute of limitations "clock" as of May 21, 2001, and that their RICO and state-law claims therefore remain timely. *See Socop-Gonzalez v. I.N.S.*, 272 F.3d 1176, 1195 (9th Cir. 2001) ("In tolling statutes of limitations, courts have typically assumed that the event that 'tolls' the statute simply *stops the clock* until the occurrence of a later event that permits the statute to resume running.") (emphasis in original). There are two problems with this argument. First, equitable tolling and equitable estoppel are, as their names indicate, equitable doctrines. And the Court does not find it equitable to give plaintiffs a second opportunity to raise claims that they let expire long ago. More importantly, plaintiffs' claims against CUSA do not exist in a vacuum; rather, they depend upon actions that were previously attributed to CII. Plaintiffs' claims against CUSA therefore do not exist independently, but derive from their claims against CII. In other words, plaintiffs do not seek to add new claims against a new defendant, they seek to split their existing claims to cover two defendants. The fact that the CII claims are time-barred is therefore fatal to plaintiffs' claims against CUSA.

Accordingly, the Court finds that, while both equitable estoppel and equitable tolling apply, neither is sufficient to render plaintiffs' RICO and state law causes of action against CUSA timely. Plaintiffs may only amend their complaint to include CUSA as a defendant to those claims that were timely as of June 28, 2002.[7]

---

[7] Because the Court effectively concludes that equitable estoppel and equitable tolling provide plaintiffs with no relief, it does not reach defendants' argument that plaintiffs waived the attorney-client privilege by raising the two doctrines.

### III. Plaintiffs' Motion in Limine

Plaintiffs also argue that defendants should be estopped from attributing conduct to CUSA or other Chevron entities that they had previously attributed to employees of CII. Specifically, plaintiffs seek an order that would bar defendants from (1) denying that CUSA employed individuals previously identified as working for CII, (2) claiming that a wide range of documents that refer to "COPI" business plans, decisions, and actions refer to an entity other than CII, and (3) trying to shift responsibility for previously identified CII actions to CUSA or any other entity.

Plaintiffs' proposal is unworkable. The Court will not order witnesses to incorrectly identify their employer, nor will it prevent witnesses from naming the true entity that they worked for.[8] Furthermore, while plaintiffs have been somewhat prejudiced by the limited amount of discovery they were able to take regarding CUSA and the relationship between CUSA, CII, and CNL, any prejudice is greatly mitigated by the fact that many of the so-called CII employees that took part in discovery were actually CUSA employees.[9] In any case, CUSA and CII are now each defendants to the same extent as the other. Thus, the Court DENIES plaintiff's motion for application of judicial or equitable estoppel.

///

---

[8] This concern ismitigated somewhat by the apparent fact that many witnesses do not seem to understand which Chevron entity their employer actually was.

[9] In their opposition brief, defendants suggest that their discovery changes may also be detrimental to the merits of plaintiffs' case, because the facts indicate that the alleged control over CNL (CUSA/COP) was separated from ownership of CNL (COPI). While the Court takes no position on this point, it notes that, to a certain degree, the amount of confusion over which Chevron entity took the actions in question is further evidence that defendants did not strictly enforce the corporate structures they had in place. The overlap of employees, and their general confusion over who their employer was, only further calls into questions Chevron's faithfulness to its corporate structure.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART plaintiffs' motion for leave to file an eighth amended complaint. Plaintiffs may amend their complaint to include CUSA as a defendant to the ATS and TVPA causes of action (Docket No. 822). The Court DENIES plaintiffs' motion *in limine* for application of equitable or judicial estoppel (Docket No. 821).

**IT IS SO ORDERED.**

Dated: August 21, 2006

SUSAN ILLSTON
United States District Judge