IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY BOWOTO, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>CHEVRON CORPORATION, et al.,<br><br>    Defendants.<br>_____/ | No. C 99-02506 SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' RICO CLAIMS** |

On February 9, 2007, the Court heard argument on defendants' motion for summary judgment on plaintiffs' RICO claim. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court hereby GRANTS defendants' motion, on several grounds.

**BACKGROUND**

Plaintiffs filed this suit in 1999, seeking to recover for a series of brutal attacks that plaintiffs allege occurred in Nigeria in mid-1998 and early 1999. The first alleged attack occurred on May 28, 1998, at a Chevron Nigeria Ltd. (CNL) offshore drilling facility known as the "Parabe platform," which consisted of an oil drilling platform and an attached construction barge. According to plaintiffs, on May 25, 1998, more than 100 representatives from a community near the Parabe platform, including plaintiffs Larry Bowoto and Bassey Jeje, and decedents Bola Oyinbo and Arolika Irowarinun, traveled to the barge. These individuals occupied the platform and barge until May 28, 1998. According to defendants, after three days of occupation, CNL decided to seek assistance of the Nigerian Government security forces ("GSF"). On May 27, 1998, CNL asked the head of the GSF in Delta State, Captain Ita, to intervene. On the evening of May 27, according to defendants, Captain Ita sent Lieutenant Sadiq to

meet with CNL. The following day, Lieutenant Sadiq and his soldiers flew to the barge and platform in CNL-leased helicopters, to oust the protestors. Plaintiffs allege that Arolika Irowarinun was killed, and Jeje and Bowoto were shot, when this occurred. Plaintiffs also allege that Bola Oyinbo was taken into custody by the GSF and tortured in the days following the event.[1]

The second and third alleged attacks occurred on January 4, 1999. Plaintiffs allege that on that day the GSF attacked the villages of Opia and Ikenyan, shooting civilians and burning the villages to the ground. In these attacks, plaintiffs allege that Timi Okoro, Kekedu Lawuru, Shadrack Oloku, and Bright Pabulogba were killed.

The instant lawsuit alleges that Chevron, acting through its Nigerian subsidiary, aided the GSF in carrying out the three attacks. Defendants have now brought a motion for summary judgment on plaintiffs' claim for violation of the Racketeering Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) and (d).[2]

**LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

On a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317

---

[1] Bola Oyinbo died three years later in Lagos, Nigeria.

[2] Plaintiffs state that they have elected not to pursue RICO liability under 18 U.S.C. § 1962(b).

2

(1986)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir.), *cert. denied*, 479 U.S. 949 (1986).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2nd Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980). The party who will have the burden of proof must persuade the Court that it will have sufficient admissible evidence to justify going to trial.

**DISCUSSION**

Under § 1962(c) of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). In order to succeed on a RICO claim under § 1962(c), a plaintiff must show "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Jarvis v. Regan*, 833 F.2d 149, 151-52 (9th Cir. 1987) (citations omitted).

18 U.S.C. § 1962(d) makes unlawful conspiracy to violate any of the provisions of § 1962. "[I]f the section 1962(c) claim does not state an action upon which relief could ever be granted, regardless of the evidence, then the section 1962(d) claim cannot be entertained." *Neibel v. Trans World Assurance Co.*, 108 F.3d 1123, 1127 (9th Cir. 1997).

3

## I. Extraterritorial application of RICO

The first issue dividing the parties is whether, and when, RICO applies to conduct occurring outside of the United States. The Ninth Circuit has recently addressed this issue, stating:

> RICO itself is silent as to its extraterritorial application. Although the RICO and the securities fraud contexts are not precisely analogous, the tests used to assess the extraterritorial application of the securities laws provide useful guidelines for evaluating whether the jurisdictional minimum exists -- particularly in cases such as this one, where comity concerns arising out of a foreign government's interest in the action are too peripheral to impact our threshold jurisdictional inquiry.

*Poulos v. Caesars World, Inc.*, 379 F.3d 654, 663 (9th Cir. 2004) (citing cases). The court then went on to apply the "conduct" or "effects" test, as borrowed from securities law and *Grunenthal GmbH v. Hotz*, 712 F.2d 421, 424 (9th Cir. 1983).

This Court has already applied the "conduct" or "effects" test to this case, in denying defendants' motion to strike plaintiffs' RICO claim. The Court stated:

> Plaintiffs further contend that they satisfy the effects test because the defendants' racketeering actions had a significant impact on commerce in the United States, since Nigeria exports 40% of its oil to the United States, and the majority of its oil comes from the regions where the attacks occurred; Chevron exports much of its oil from Nigeria to the United States; the manner of oil production exploited the environment and indigenous communities, including plaintiffs; and the intent of such practices was to secure competitive advantages in the United States. Finally, plaintiffs allege that the predicate acts, defendants' attempts to quash the protests and defendants' false statements to the media about the protest, were undertaken for the purpose of gaining a competitive advantage in the United States.
>
> The facts alleged in plaintiffs' complaint are similar to the facts in *Wiwa v. Dutch Petroleum*, 2002 WL 319887 *20, (S.D.N.Y.), a case on which plaintiffs rely heavily. In *Wiwa* the court found that the effects test was satisfied based on plaintiffs' claims that defendants shipped substantial amounts of oil to the U.S.; that defendants intended to gain an economic advantage through racketeering activities; and that the oil shipped to the U.S. came from the region in which plaintiffs resided. Plaintiffs have alleged essentially the same facts in their fourth amended complaint. *See* Fourth Amended Complaint ¶ 124. The Court finds that plaintiffs satisfy at least the "effects" test.

January 21, 2003 Order at 12:15-13:2.

Plaintiffs have now presented evidence of several of the allegations that the Court found sufficient to establish "effects" at the pleading stage. Plaintiffs present evidence that defendants export a great deal of oil to the United States. *See* Chomsky 1006 Decl., Ex. 1. Plaintiffs present evidence that defendants' oil extraction activities have negatively impacted the environment and the sources of livelihood of surrounding communities. *See* Plaintiffs' RICO Statement of Facts ("RSF") ¶¶ 1139-1161.

4

Plaintiffs also present evidence that the one of the goals of the protests allegedly repressed by defendants was to persuade defendants to improve their treatment of the surrounding communities. *See* Plaintiff's Affirmative Statement of Facts (re: crimes against humanity motion) ("PASOF") (Docket No. 1475) ¶ 258. Plaintiffs fail, however, to provide any evidence that defendants' treatment of the environment, the local community, oil protestors generally, or these specific plaintiffs, generated any impact on the United States economy. Plaintiffs state that "[s]uppressing protest allows defendants to escape paying for measures that would avoid and remediate the harms caused by extraction, thereby lowering the cost of extraction and increasing profits earned by defendants from the sale of Nigerian oil in the U.S." Pl.'s Opp. at 5:8-12. Plaintiffs' statement, however, lacks any evidentiary support. Plaintiffs present no evidence that killing or otherwise suppressing protestors saves defendants money, or otherwise increases their profit margin.[3] Plaintiffs therefore fail to present evidence that defendants gained a competitive advantage in the United States, or impacted the U.S. economy, by engaging in the alleged racketeering activity.

Having failed to present evidence of an "effect," plaintiffs must present evidence that a sufficient amount of the RICO conduct occurred in the United States. In *Grunenthal*, the Ninth Circuit defined the "conduct" test as follows: "whether defendant's conduct that involved the use of instrumentalities of interstate commerce in the United States was significant with respect to the alleged violation . . . and whether it furthered the fraudulent scheme. . . . The conduct in the United States cannot be merely preparatory . . . and must be material, that is, directly cause the losses." 712 F.2d at 424 (quoting *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.*, 592 F.2d 409, 420 (8th Cir. 1979)).

Plaintiffs have presented evidence of a link between the conduct of Chevron in the United States ("CUSA") and the attacks in Nigeria at issue. Defendants, however, characterize that conduct as, if anything, "merely preparatory," and not a "direct cause" of the attacks. *See id.* The Court agrees with defendants. Plaintiffs present evidence that CUSA designed and adjusted the general security policies

---

[3]Nor could a reasonable jury infer this fact from the evidence presented. It is equally likely that defendants' alleged exploitation and abuses have led to increased instability and violence in the region, resulting in increased production costs and decreased output. Similarly, defendants' alleged actions might have had both deleterious and beneficial effects, resulting in no net impact on the United States' economy (thus, the parties' dispute during oral argument over whether the effects must be deleterious, is irrelevant).

5

and procedures of CNL, CUSA approved payments from CNL to the GSF, CUSA had general control and supervision over CNL, and CUSA had substantial financial control over CNL. *See* Opp. at 6 n.2. Plaintiffs also present evidence that, after the attacks, CUSA engaged in a media campaign to cover up CNL's involvement in the attacks. *See* Opp. at 5:27-28. None of this activity, however, constitutes "material" conduct as defined by the Ninth Circuit. *See Grunenthal*, 712 F.2d at 424. This conduct was "merely preparatory"; it did not "directly cause the losses." *See also Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229 (N.D. Cal. 2004) (Phase I summary judgment order) (finding that "[t]he evidence produced by plaintiffs reflects not that defendants made decisions during the attacks, but that there was an extraordinarily close relationship between the parents and the subsidiary prior to, during and after the attacks."). Plaintiffs therefore fail to present sufficient evidence of "conduct" or "effects" to allow RICO to apply extraterritorially in this case. *See Poulos*, 379 F.3d at 663 .

On this basis alone, the Court GRANTS defendants' motion. As discussed below, there are additional reasons why plaintiffs' RICO claim fails.

## II.     Extortion

Plaintiffs also fail to establish a triable issue as to their extortion-based RICO claims. RICO liability is centered around the commission of "racketeering activities," otherwise referred to as "predicate acts." *See* 18 U.S.C. § 1962(c). Plaintiffs' RICO claim rests on predicate acts of extortion, murder, and arson. Under the Hobbs Act, "[t]he term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. §1951(b)(2). Defendants argue, and the Court agrees, that plaintiffs present no evidence that defendants obtained any property from plaintiffs. In response, plaintiffs argue that "[w]hat defendants 'obtained' from the plaintiffs is increased revenue and profits as a result of their destruction of plaintiffs' property." Opp. at 13:18-19. This indirect theory of extortion does not fit the plain language of the Hobbs Act, and is unsupported by any caselaw.

In support of their theory, plaintiffs cite *United States v. Muscarella*, 2004 WL 2186561 *6 (S.D.N.Y. Sep. 28, 2004), in which the district court found that union members' rights to vote and elect their own representatives were protectable property rights under the Hobbs Act. Plaintiffs contend that,

just as the defendants in *Muscarella* extorted the union members' rights to vote, defendants here extorted from plaintiffs their right to assemble to protect their livelihoods. As defendants correctly point out, however, in *Muscarella* the defendants took away the union members' rights and used them for their own benefit; the defendants "extorted the Union members' LMRDA rights by, among other things, placing handpicked individuals in key leadership positions within Locals 14 and 15." *Id.* (citations omitted). Thus, the defendants "actually exercised the Union members' [statutory] rights by controlling the Locals, which control, in the absence of the extortion, would have been exercised by the Union members through their [statutory] rights." *Id.* (internal quotations and alterations omitted). Thus, unlike in this case, in *Muscarella* the defendants obtained something *from* the plaintiffs, as required by the Hobbs Act. Plaintiffs here fail to present sufficient evidence of extortion, and the Court therefore GRANTS defendants' motion for summary judgment on plaintiffs' extortion-based RICO claims.[4]

---

[4]Defendants also argue that all of plaintiffs' predicate acts fail because they are not "chargeable" under state law. The Court disagrees. The RICO statute defines "racketeering activity" as "any act or threat involving murder, kidnapping, gambling, [etc.] . . . , *which is chargeable under State law* and punishable by imprisonment for more than one year . . . ." 18 U.S.C. 1961(1) (emphasis added). Plaintiffs' RICO claim is based on predicate acts of murder, arson and extortion, as defined by the California penal code and Nigerian law. Defendants contend that because the acts occurred on foreign soil, they would not be "chargeable" under the California penal code, which applies only to crimes committed in California, *see* Cal. Penal Code § 27, and would not be "chargeable" in California pursuant to Nigerian state law, because courts in the United States may not try a person for violation of the penal law of a foreign state, *see Restatement (Third) on Foreign Relations Law* § 422(1) (1987). Thus, under defendants' interpretation of "chargeable," RICO would not apply extraterritorially.

Defendants' interpretation of the "chargeable" requirement is inconsistent with the Ninth Circuit's approach to RICO in *Poulos*, discussed above. *See* 379 F.3d at 663. *Poulos* allows extraterritorial application of RICO where either the "conduct" or the "effects" of the RICO violation occur in the United States. If the predicate acts, i.e., the "conduct," had to occur in California to be "chargeable" for purposes of RICO, then the "conduct" or "effects" test would be redundant and irrelevant, and RICO would not apply extraterritorially, as a matter of law. The Court therefore must agree with the Second Circuit, that "'under RICO . . . state offenses are included by generic designation,' and that 'references to state law serve merely a definitional purpose, to identify *generally* the kind of activity made illegal by the federal statute.'" *United States v. Carrillo*, 229 F.3d 177, 182 (2d Cir. 2000) (quoting case) (emphasis in original; alterations omitted). "In other words, the phrase 'chargeable under State law' does not require that the particular underlying conduct at issue could have been charged under state law, only that such conduct be chargeable as a general matter; i.e., that such conduct is criminal under state law." *Id.* at 182-83 (citing case); *see also Wiwa*, 2002 WL 319887 at *24 ("location is best categorized as a procedural obstacle to conviction of the sort that plaintiffs are not required to satisfy in order to allege a predicate act under RICO.").

Defendants urge the Court to follow *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005), in which the district court dismissed an extraterritorial RICO claim. Defendants misinterpret *Corrie*. In dismissing the plaintiffs' RICO claim, the court did not rule that the predicate acts had to occur in Washington, but rather simply applied the *Grunenthal* "conduct" or "effects" test. *See* 403 F. Supp. 2d at 1029.

### III.    Defendants' relationship to the enterprise

Though the Court already addressed the general issue of whether defendants can be liable for the actions of CNL and the GSF, *see* 312 F. Supp. 2d at 1248-49 (Phase I summary judgment order), the parties again raise the issue here.

#### A.    Direct liability

In the Phase I summary judgment order, the Court concluded that "defendants cannot be held directly liable for the events that transpired." 312 F. Supp. 2d at 1240. Plaintiffs now contend that "the role of CUSA had been obscured by defendants," and there is new evidence of defendants' direct participation in the events. *See* Opp. at 21 n.13. The Court has reviewed the evidence presented by plaintiffs and finds that it does not materially differ from the evidence presented by plaintiffs during Phase I. *See* RSF ¶¶ 692, 862-1001, 1126-1132. As with the Phase I evidence, the new evidence "reflects not that defendants made decisions during the attacks, but that there was an extraordinarily close relationship between the parents and the subsidiary prior to, during and after the attacks." 312 F. Supp. 2d at 1243. The Court is therefore not compelled to revisit its prior holding that plaintiffs have failed to present evidence of direct liability.

#### B.    Indirect liability

Defendants contend that they cannot be held vicariously liable because plaintiffs have failed to present evidence that defendants benefitted from the alleged racketeering activity. In support of their argument, defendants cite *Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149 (9th Cir. 1992), in which

---

Defendants also rely heavily on *Small v. United States*, 544 U.S. 385, 125 S. Ct. 1752, 1755-56 (2005), in which the Supreme Court held that the phrase "convicted in any court," as contained in the federal unlawful gun possession statute, applied only to domestic convictions. The Court relied in part on the fact that "[p]ast foreign convictions for crimes punishable by more than one year's imprisonment may include a conviction for conduct that domestic laws would permit, for example, for engaging in economic conduct that our society might encourage." *Id.* at 1755. Defendants contend that similar logic should apply to the "chargeable" language of the RICO statute. Plaintiffs do not argue, however, that RICO should cover acts "chargeable" under foreign law; they argue that RICO covers foreign acts which would be "chargeable" under domestic state law if they occurred within the territory covered by the state law. Thus the reasoning of *Small* pointed to by defendants is inapplicable in this context. The Court therefore finds that RICO claims may be based on extraterritorial predicate acts.

8

the Ninth Circuit stated:

> We hold that an employer that is benefitted by its employee or agent's violations of section 1962(c) may be held liable under the doctrines of respondeat superior and agency when the employer is distinct from the enterprise. Corporations and other employers *that have benefitted from* their employees or agents' RICO violations will be forced to compensate the victims of racketeering activity.

*Id.* at 1154-55 (emphasis added).[5]

As discussed above in the context of the "conduct" or "effects" test, plaintiffs fail to present evidence that the incidents at Parabe, Opia and Ikenyan benefitted CUSA. *See supra* § I. The Court therefore finds that plaintiffs' RICO 1962(c) claim may not proceed against defendants under an agency theory.[6]

The *Brady* agency analysis also applies to 1962(d) RICO conspiracy claims. *See Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 775-76 (9th Cir. 2002). The Court therefore GRANTS defendants' motion for summary judgment on plaintiffs' 1962(d) RICO conspiracy claim.

## CONCLUSION

There are many issues, primarily factual ones, which were argued in connection with this motion which remain unresolved. As counsel demonstrated during oral argument, the parties dispute almost every fact of the Parabe and Opia and Ikenyan incidents. What is undisputed is that human toll taken by those encounters was great and that the results were sad, maybe even tragic. However, for the reasons outlined above, the Court finds that summary judgment must as a matter of law be granted in favor of defendants on plaintiffs' RICO claim.

///

---

[5] Plaintiffs also cite this passage from *Brady* as providing the appropriate standard for assessing agency liability in the RICO context. *See* Opp. at 22:23-23:1.

[6] This ruling is not inconsistent with the Court's previous ruling that "[h]aving allowed the balance of plaintiffs' claims to proceed against defendants on the grounds that plaintiffs have created a triable issue of material fact regarding defendants' liability for CNL's acts under an agency theory, the Court allows plaintiffs' RICO claims to proceed on this basis as well." 312 F. Supp. 2d at 1249. In the prior Order, the Court did not consider, and the parties did not argue, the *Brady* standard.

9

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion for summary judgment on plaintiffs' RICO claim.[7] (Docket No. 1128)

**IT IS SO ORDERED.**

Dated: March 14, 2007

SUSAN ILLSTON
United States District Judge

---

[7] Defendants' evidentiary objections (Docket No. 1507) are OVERRULED as moot. Plaintiffs' evidentiary objections (Docket No. 1546) are also OVERRULED as moot; none of the evidence objected to by plaintiffs affected the Court's rulings on this motion.