IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY BOWOTO, et al.,<br><br>        Plaintiffs,<br>  v.<br><br>CHEVRON CORPORATION, et al.,<br><br>        Defendants.<br>                                    / | No. C 99-02506 SI<br><br>**ORDER GRANTING LEAVE TO FILE A MOTION FOR RECONSIDERATION AND DENYING WITHOUT PREJUDICE CERTIFICATION OF ORDERS 1202, 1203, AND 1204 FOR INTERLOCUTORY APPEAL** |

Plaintiffs seek reconsideration of an order issued on August 22, 2006, in which this Court determined that many of plaintiffs' claims could not be pursued in district court under the Alien Tort Statute, because such claims could only be brought against state actors, which defendants are not. Based upon plaintiffs' motion and the Ninth Circuit's April, 2007 opinion in *Sarei v. Rio Tinto PLC*, 487 F.3d 1193 (9th Cir. 2007), the Court now grants plaintiffs' motion for reconsideration and reinstates several of plaintiffs' claims brought under the Alien Tort Statute.

In addition, plaintiffs seek certification of two other orders (orders 1202 and 1204) for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This motion will be denied without prejudice.

**BACKGROUND**

Plaintiffs filed this suit in 1999, seeking to recover for a series of brutal attacks that plaintiffs allege occurred in Nigeria in mid-1998 and early 1999.[1] The first alleged attack occurred on May 28, 11998, at a Chevron Nigeria Ltd. (CNL) offshore drilling facility known as the "Parabe platform,"

---

[1] The Court provides a detailed summary of the incidents giving rise to this case in the concurrently issued Order Re: Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 through 17.

which consisted of an oil drilling platform and an attached construction barge. According to plaintiffs, on May 25, 1998, more than 100 representatives from a community near the Parabe platform, including plaintiffs Larry Bowoto and Bassey Jeje, and decedents Bola Oyinbo and Arolika Irowarinun, traveled to the barge. These individuals occupied the platform and barge until May 28, 1998. According to defendants, after three days of occupation, CNL decided to seek assistance of the Nigerian Government. On May 27, 1998, CNL asked the head of Government Forces in Delta State, Captain Ita, to intervene. On the evening of May 27, according to defendants, Captain Ita sent Lieutenant Sadiq to meet with CNL. The following day, Lieutenant Sadiq and his soldiers flew to the barge and platform in CNL helicopters, to oust the protestors. Plaintiffs allege that Arolika Irowarinun was killed, and Jeje and Bowoto were shot, when this occurred. Plaintiffs also allege that Bola Oyinbo was taken into custody by the Nigerian military and tortured in the days following the event.[2]

The second and third alleged attacks occurred on January 4, 1999. Plaintiffs allege that on that day the Nigerian military attacked the villages of Opia and Ikenyan, shooting civilians and burning the villages to the ground. In these attacks, plaintiffs allege that Timi Okoro, Kekedu Lawuru, Shadrack Oloku, and Bright Pabulogba were killed. The instant lawsuit alleges that Chevron, acting through its Nigerian subsidiary, aided the Nigerian military in carrying out the attacks.

On August 22, 2006, the Court issued the three Orders that are the subject of the instant motions. In the first Order (Docket No. 1202) (hereinafter "Order 1202"), the Court dismissed plaintiffs' claims under the Torture Victim Protection Act, 28 U.S.C. § 1350 ("TVPA"). The Court did so on the ground that the TVPA only provides for liability against "individuals," and that a corporation is not an "individual" for TVPA purposes. In doing so, the Court recognized that it was revising its own finding, in a previous Order, that "individual" does encompass corporations. *See* July 14, 2004 Order. Plaintiffs now request that the Court certify Order 1202 for interlocutory appeal.

In the second Order (Docket No. 1203) (hereinafter "Order 1203"), the Court dismissed several of plaintiffs' claims brought under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). The Court found that plaintiffs' ATS claim for "crimes against humanity" could proceed under a theory of aiding and

---

[2] Bola Oyinbo died three years later in Lagos, Nigeria.

2

abetting. The Court dismissed the remainder of the ATS claims, because all require state action. The Court held that color-of-law and vicarious liability principles from U.S. law could not be used to bring ATS claims requiring state action against private actors. Plaintiffs seek reconsideration of this Order, and in the alternative, certification for appeal.

In the third Order (Docket No. 1204) (hereinafter "Order 1204"), the Court dismissed several of plaintiffs' claims arising out of events that transpired on the Parabe barge, after finding that Nigerian law applied to those claims. The Court first determined that admiralty choice-of-law principles applied to several of the claims. In doing so, the Court found that the torts at issue occurred on or over navigable waters, and that there was a nexus between the events and maritime activity. Applying the admiralty choice-of-law analysis, the Court determined that Nigerian law applied to the claims arising out of events transpiring on the Parabe barge, and dismissed those claims. Plaintiffs seek certification of Order 1204 for interlocutory appeal.

## I. PLAINTIFFS' MOTION FOR LEAVE TO SEEK RECONSIDERATION OF ORDER 1203

In Order 1203, the Court found that aiding and abetting liability is available under the ATS, but may only be used to hold a private party liable if the private party could be held liable as a principal had it directly committed the violation at issue. Because most international human rights norms can only be enforced against state actors, the Court dismissed the majority of plaintiffs' ATS claims against defendants, who are private parties. The Court stated: "Defendants could not be held liable for directly committing the offenses; it therefore makes little sense to find them liable for lesser conduct." Order 1203 at 14:23-24. The Court continued:

> The history of aiding and abetting liability supports this analysis. Plaintiffs seek to incorporate aiding and abetting liability from international criminal law norms. From Blackstone's time, however, courts have treated those guilty of aiding and abetting a crime as a principal. *See* William Blackstone, Commentaries on the Laws of England, Book IV, Chap. 5 (1769) ("[A]nd all accessories to piracy, are declared to be principal pirates . . . ."); *see also* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); U.S. Dep't of Defense, *Military Commission Instruction No. 2*, Art. 6(c), at 16 (April 30, 2003) ("A person is criminally liable as a principal for a completed substantive offense if that person . . . aids or abets the commission of the offense."); Allied Control Council Law No. 10, Punishment of Persons Guilty of War

3

> Crimes, Crimes Against Peace and Against Humanity, 20 Dec. 1945, Art. II.2 ("Any person without regard to nationality or the capacity in which he acted, is deemed to have committed [crimes against peace, war crimes, crimes against humanity, or membership in a criminal group], if he … (b) was an accessory to the commission of any such crime or ordered or abetted the same."). Defendants, however, cannot be held liable as a principal for the offenses in question.

*Id.* at 15.

As plaintiffs now point out, this was a faulty premise.[3] The fact that "courts have treated those guilty of aiding and abetting a crime as a principal," does not implicitly require that an abettor be of the class of people that can be held liable as a principal. In fact, one of the authorities cited by the Court explicitly leads to the opposite conclusion. According to the Supreme Court, the cited provision of 18 U.S.C. § 2(a) – "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, *is punishable as a principal*" – was added to the statute "to eliminate all doubt that in the case of offenses whose prohibition is directed at members of specified classes (*e.g.*, federal employees) a person who is not himself a member of that class may nonetheless be punished as a principal if he induces a person in that class to violate the prohibition." *Standefer v.*

---

[3]Defendants' only response to plaintiffs' argument on this point is contained in a footnote. It states:

> While in some circumstances domestic law imposes aiding and abetting liability on defendants who lack the status to commit the principal offense, in other circumstances it does not. For example, under 42 U.S.C. § 1983 and the Torture Victims Protection Act (28 U.S.C. § 1350 note), private parties cannot be held liable merely for aiding and abetting state actors (§ 1983) or foreign state actors (TVPA).

Opp. at 11 n.14. The Court agrees with plaintiffs that both of defendants' examples, the TVPA and § 1983, support plaintiffs. Several courts have suggested that under the TVPA, private individuals can be liable for aiding foreign state actors. *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247-48 (11th Cir. 2005) ("State-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the Alien Tort Act. . . . In construing this state action requirement, we look 'to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983.' A claim for state-sponsored torture under the Alien Tort Act or the Torture Victim Protection Act may be based on indirect liability as well as direct liability.") (citations omitted); *Doe v. Saravia*, 348 F. Supp. 2d 1116, 1148 (E.D. Cal. 2004) ("Saravia's role in coordinating and planning the assassination of Archbishop Romero is sufficient to establish liability against him under the TVPA and [ATS] as a direct participant, conspirator, accomplice, and aider and abettor."); *Wiwa v. Royal Dutch Petroleum Co.*, 2002 U.S. Dist. LEXIS 3293, 2002 WL 319887 at *50 (S.D.N.Y. 2002) ("individuals who 'cause someone to undergo' torture or extrajudicial killing, as well as those who actually carry out the deed, could be held liable under the TVPA. The legislative history of the TVPA supports this reading. In the Committee Report, the Senate Judiciary Committee explained that the Act would permit suits 'against persons who ordered, abetted, or assisted in torture.' S.Rep. No. 249, 102nd Cong., 1st Sess. (1991)."). Similarly, under § 1983, private parties can be liable for aiding a state actor's violations if they "acted in concert." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002).

4

*United States*, 447 U.S. 10, 18 n.11 (1980) (citing S. Rep. No. 1020, 82d Cong., 1st Sess., 7-8 (1951)); *accord Busic v United States*, 446 U.S. 398, 411 n.18 (1980) ("aiders and abettors may be held vicariously liable 'regardless of the fact that they may be incapable of committing the specific violation which they are charged to have aided and abetted.'") (quoting S. Rep. No. 1020).

Even under the original version of the statute, which read simply "is a principal," rather than "is punishable as a principal," the Seventh Circuit held that a defendant "incapable of committing the crime" could be held liable for "aiding and abetting another in the commission of the crime." *Haggerty v. United States*, 5 F.2d 224, 225 (7th Cir. 1925). The court explained further:

> Before the statute aiders and abettors of others in the commission of crime were punishable as such, whether or not they were themselves capable of committing the principal crime. Wharton Crim. Law (10th Ed.) § 211; *Coffin v. United States*, 162 U.S. 664, 16 S. Ct. 943, 40 L. Ed. 1109 [(1896)]. The statute, in designating aiders and abettors as principals, granted them no immunity, but merely prescribed and simplified the means and manner of procedure for their prosecution on account of their part in the crime.

*Id.* Thus, according to the Seventh Circuit, under both the original federal criminal aiding and abetting statute, and the common law, aiders and abettors were not required to have the same capacity to commit the crime as principals, in order to be treated as principals. *See id.; see also United States v. Snyder*, 14 F. 554, 556 (C.C.D. Minn. 1882) (finding a defendant guilty of aiding and abetting a postmaster's violation of a statute which criminalized the making of a false return by a postmaster; rejecting defendant's argument that he could not be guilty as he was not, himself, a postmaster).

In the civil common law context as well, it appears that a party can be liable for aiding and abetting, even if the party could not be held liable were it a principal actor. For example, Restatement (Second) of Torts § 876 provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

5

The distinction between subsections (b) and (c) suggests that in order to be liable for assisting commission of a tort, one need not owe a duty to the victim. Thus, as the court held in *Nelson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1133 (C.D. Cal. 2003), there is no rule "that a party must owe the plaintiff a duty before he or she can be held liable as an aider and abettor."[4]

In light of the foregoing, the Court is compelled to reconsider its finding that an aider and abettor must be of the class that can be held liable as principal violators. Without this premise, having decided that aiding and abetting liability is available under the ATS against private parties, there is no reason to limit that liability only to international norms that do not require state action.

Policy considerations also favor allowing a private party to be held liable for aiding and abetting

---

[4]Also of some relevance to this issue is the case of *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133 (1795), which this Court cited in support of the viability of aiding and abetting liability under the ATS. *See* Order 1203 at 6:1-5 (citing *Talbot* for the proposition that "[s]ince the early days of this country, courts have recognized that private individuals may be held liable for aiding and abetting violations of international law.") In that case, the individual found liable of aiding and abetting, Talbot, could not have been held liable had he committed the primary violation himself.

The facts of *Talbot* are as follows. At the time of the case, France and Holland were at war. The United States was a neutral. Ballard, a U.S. citizen, was captain of a ship sailing from the state of Virginia. Talbot was a naturalized French citizen, and captain of a ship operating under a French commission. As such, Talbot was permitted to attack Dutch ships; he was immune from anti-piracy laws. Talbot substantially aided Ballard in the capture of a Dutch ship, out of which the action arose. *See id.* at 156. The owner of the Dutch ship, Janson, subsequently brought suit against Ballard and Talbot for restitution. *See id.*

Had Talbot captured the vessel himself, he would not have been liable, as his actions would simply have been a permissible act of war by a French ship. As the Court stated:

> If [Talbot] was a French citizen, duly naturalized, and if, as such, he had a commission, fairly obtained, he was authorized to capture ships belonging to the enemies of the French Republic, but not warranted in reducing the citizens of neutral actions from their duty, and assisting them in committing depredations upon friendly powers.

*Id.* The Court thus explicitly held that if acting alone, Talbot would not have been liable; however, because he aided and abetted another, who could be liable, Talbot was liable. *See id.* The *Talbot* case thus supports the proposition that parties can be liable for aiding and abetting actions for which they could not be held liable as a principal.

Similarly, in *Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers*, 325 U.S. 797, 807 (1945), the Supreme Court held that while unions are immune from most provisions of the Sherman Act, they are not immune from being held liable when they "aid and abet business men who are violating the Act."

Cases such as *Talbot* and *Allen Bradley* support the proposition that when a party abuses its immunity by aiding and abetting another, who is not immune, the immunity is lost. Here, the state-action requirement under most international law norms can also be seen as immunity for non-state actors. As discussed *infra*, this immunity is designed to protect state sovereignty. In this case, defendants allegedly abused their immunity from international human rights law by aiding and abetting actors of the state.

international human rights violations that require state action.[5] The limitation of international human rights norms to state actors is based on fundamental notions of sovereignty – that states generally have the sovereign right and power to determine who, how, and what they will punish within their own borders.[6] However, establishing liability for aiding and abetting a state actor's violation necessarily requires a showing that the state actor violated an international norm. When a state actor violates an international norm, concern for the state's sovereignty dissolves. Similarly, when a private actor aids the state in committing a violation, the state, by participating in the violation, unequivocally demonstrates that it is unwilling to punish its co-perpetrator, and concern for the state's sovereignty is diminished.[7] Allowing a private party to be held liable for aiding and abetting a state actor's human

---

[5] In very limited circumstances, international law places responsibility on private entities acting wholly independent of any state action. For example, state action is not required for slavery, war crimes, genocide, aircraft hijacking, or piracy. *See Kadic v. Karadzic*, 71 F.3d 232, 239-40 (2d Cir. 1995). One reason that international law reaches private actors in these situations is because the violations, by their very nature, demonstrate that the state sovereign lacks the will or ability to prevent or punish the violation. Pirates, for example, are "hostis humani generis" (an enemy of all mankind), because they act "without any pretense of public authority." *Id.* at 239 (quoting *The Brig Malek Adhel*, 43 U.S. (2 How.) 210, 232, 11 L. Ed. 239 (1844)). Because pirates roam the open seas, incapable of being controlled by any single sovereign, they must be subjected to international law.

[6] Thus, modern international law arose primarily as a means to address wrongs committed by one state against another. *See Tel-Oren v. Libyan Arab Republic*, 233 U.S. App. D.C. 384, 794 (D.C. Cir. 1984) ("In the 19th century, the view emerged that states alone were subjects of international law, and they alone were able to assert rights and be held to duties devolved from the law of nations."); *see generally* Louis B. Sohn, *The New International Law: Protection of the Rights of Individuals rather than States*, 32 Am. U.L. Rev. 1 (1982). In the wake of the atrocities of World War II, international law began to evolve to address wrongs committed by states against individuals. *See* Sohn at 9. In some instances, international law has also evolved to hold states responsible for failures to protect its citizens from violations of international law by private parties. *See, e.g.,* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. GAOR (No. 51), Art. 4, U.N. Doc. A/39/51 (1984).

[7] *Talbot* was also a case in which concerns with sovereignty were overridden. Imposition of liability on a French captain, of a French ship, for helping capture a Dutch ship, while France was at war with Holland, would clearly constitute an affront to French sovereignty. Even more important, France could have viewed such punishment as a betrayal of the United States' neutrality. For these reasons, if Talbot "was a French citizen, duly naturalized, and if, as such, he had a commission, fairly obtained, he was authorized to capture ships belonging to the enemies of the French Republic." 3 U.S. at 156. Concerns of sovereignty and neutrality, in other words, would normally override the United States' concern with enforcing against Talbot an otherwise universal norm of international law: the prohibition on piracy. However, because Talbot aided and abetted a party that did not benefit from the same deference, the Court held that concerns with sovereignty and neutrality no longer trumped international law. Talbot's actions themselves jeopardized the United States' neutrality. As the Court stated: "you shall not make use of our neutral arm, to capture vessels of your enemies, but of our friends." *Id.* at 157. Talbot's actions constituted "a fraud upon the principles of neutrality, a fraud upon the law of nations,

7

rights violation therefore does not conflict with the concern for state sovereignty that underlies the state-action requirement.

The Ninth Circuit's April 12, 2007 decision in *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193 (9th Cir. 2007), also supports reconsideration.[8] In *Rio Tinto*, the Ninth Circuit reversed the district court's dismissal of the plaintiffs' ATS claims, in a case factually analogous to this one. *See id.* at 1198. The plaintiffs in *Rio Tinto* "are current or former residents of Bougainville, Papua New Guinea ('PNG'), who allege that they or their family members were the victims of numerous violations of international law as a result of defendant mining corporation Rio Tinto, PLC's ('Rio Tinto') Bougainville mining operations and the 10-year civil conflict that followed an uprising at the Rio Tinto mine." *Id.* at 1197. According to allegations in the complaint:

> [i]n November 1988, Bougainvilleans engaged in acts of sabotage that forced the mine to close. Rio Tinto sought the assistance of the PNG government to quell the uprising and reopen the mine. The PNG army mounted an attack on February 14, 1990, killing many civilians. In response, Bougainvilleans called for secession from PNG, and 10 years of civil war ensued.

*Id.* at 1198.

In the order appealed to the Ninth Circuit, the district court:

> found that the plaintiffs had stated cognizable [ATS] claims for racial discrimination, crimes against humanity and violations of the laws of war, but that of the environmental claims, only the violation of the United Nations Convention on the Law of the Sea ("UNCLOS") was cognizable under the [ATS]. The court further held that if proven, the allegations supported liability against Rio Tinto for certain acts committed by the PNG government. The court, however, dismissed all of the plaintiffs' claims as presenting nonjusticiable political questions. The court alternatively dismissed the racial discrimination and UNCLOS claims under the act of state doctrine and the doctrine of international comity. It also held that the [ATS] did not require exhaustion.

*Id.* at 1199 (citing *Sarei v. Rio Tinto, PLC*, 221 F. Supp. 2d 1116 (C.D. Cal. 2002)). The Ninth Circuit reversed most of the district court's findings, stating:

---

and an insult, as well as a fraud, against the United States, and the Republic of France." *Id.* at 158. Holding Talbot liable for aiding and abetting did not, therefore, conflict with concerns of French sovereignty and the United States' neutrality.

[8]This opinion withdrew a prior opinion, *Sarei v. Rio Tinto, PLC*, 456 F.3d 1069 (9th Cir. 2006). The Ninth Circuit issued the 2006 *Rio Tinto* opinion after the parties in this case had fully briefed and argued defendants' motion to dismiss, but before this Court issued Order 1203. Plaintiffs filed a copy of the decision, along with a brief cover letter arguing its relevance, on August 10, 2006. Despite not receiving full briefs or argument on the importance of the decision, the Court briefly addressed the 2006 *Rio Tinto* opinion in Order 1203. *See* Order 1203 at 13-14.

8

> We hold that the district court erred in dismissing all of the plaintiffs' claims as presenting nonjusticiable political questions, and in dismissing the plaintiffs' racial discrimination claim under the act of state doctrine. We also vacate for reconsideration the district court's dismissal of the plaintiffs' United Nations Convention on the Law of the Sea ("UNCLOS") claim under the act of state doctrine, and its dismissal of the racial discrimination and UNCLOS claims under the international comity doctrine. Although Rio Tinto and *amicus curia* have asserted several plausible rationales in support of an exhaustion requirement, we affirm the district court's conclusion that no such requirement presently exists, and leave it to Congress or the Supreme Court to alter the status quo if warranted.

*Id.* at 1197. Thus the bulk and emphasis of the Ninth Circuit's opinion in *Rio Tinto* regarded the political question, act of state, and international comity doctrines, and whether the ATS requires exhaustion of domestic remedies.

Though its focus was elsewhere, in *Rio Tinto* the Ninth Circuit determined that it had jurisdiction under the ATS over the plaintiffs' claims, including a discrimination claim. *Id.* at 1200-03. Under international law, discrimination requires state action. *See Sarei*, 221 F. Supp. 2d at 1153; Restatement (Third) of Foreign Relations Law of the United States § 702. The plaintiffs in *Rio Tinto* claimed discrimination against private actors. Plaintiffs in this case therefore argue that the Ninth Circuit's finding of jurisdiction in *Rio Tinto* establishes that private actors can be liable for violations that require state action.[9]

Unfortunately, however, the Ninth Circuit explicitly stopped short of deciding "whether plaintiffs' substantive claims and theories of vicarious liability constitute valid ATCA claims after *Sosa*." *Id.* at 1203. Instead, in analyzing the jurisdictional issue, the Ninth Circuit only asked "whether the claims do not 'appear to be immaterial and made solely for the purpose of obtaining jurisdiction'

---

[9] Plaintiffs also argue that "[t]his Court's interpretation of *Sosa*, with its heavy emphasis on the cautionary language in *Sosa*, is at odds with the approach adopted by the Ninth Circuit in *Rio Tinto*." Mot. at 4 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)). *Rio Tinto*, they argue, "reaffirmed the continued viability of pre-*Sosa* case law." *Id.* Accordingly, plaintiffs urge the Court to abandon its position that *Sosa* requires the courts to look primarily to international law in shaping ATS liability, rather than importing, for example, U.S. federal color-of-law principles.

Plaintiffs overstate *Rio Tinto's* discussion of the impact of *Sosa*. The Ninth Circuit's principal finding with regard to *Sosa* was only that "it adopted a view of ATCA jurisdiction that is 'generally consistent' [citation] with the Ninth Circuit law applied by the district court in this case: 'In evaluating plaintiffs' ATCA claims, therefore, the court must consider . . . whether they identify a specific, universal and obligatory norm of international law.'" *Rio Tinto*, 487 F.3d at 1201-02 (quoting *Sarei*, 221 F. Supp. 2d at 1132). This very narrow holding does not suggest that this Court's interpretation of *Sosa* was misguided. Indeed, the Ninth Circuit's discussion of *Sosa's* impact only affirms the Court's conclusion that *Sosa* requires a party to "allege a violation of a definite and accepted norm of international law." Order at 2-3 (citing *Sosa*).

9

and are not 'wholly insubstantial and frivolous.'" *Id.* at 1200 (citing case). With respect to vicarious liability, the court held:

> [P]laintiffs' attempt to hold Rio Tinto liable for directing or aiding PNG's alleged commission of the international law violations alleged in the complaint is not frivolous. Courts applying the [ATS] draw on federal common law, and there are well-settled theories of vicarious liability under federal common law. *See, e.g., Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 n. 15 (7th Cir. 1998) (deriving federal common law agency liability principles from the Restatement of Agency); Restatement (Second) of Torts, §§ 876-77 (setting forth tort principles of vicarious liability); *see also Project Hope v. M/V IBN SINA*, 250 F.3d 67, 76 (2d Cir. 2001) (citing the Restatement of Torts as a source of federal common law). Authorities contemporaneous to the [ATS]'s passage also suggest that the law of nations has long incorporated principles of vicarious liability. *See Talbot v. Janson*, 3 U.S. (3 Dall.) 133, 156-58, 1 L. Ed. 540, 3 Dall. 133 (1795) (seriatim opinion of Paterson, J.) (holding a French citizen civilly liable for aiding a U.S. citizen to unlawfully capture a Dutch ship); *id.* at 167-68 (seriatim opinion of Iredell, J.) (similar); 1 Op. Att'y Gen. 57, 59 (1795) (describing [ATS] jurisdiction and noting that those who "commit[], aid[], or abet[] hostilities" have "render[ed] themselves liable to punishment under the laws of nations"); Act of April 30, 1790, ch. 9 § 10, 1 Stat. 114 (criminalizing aiding and abetting piracy). Modern international authorities have also invoked theories of vicarious liability. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 322-24 (S.D.N.Y. 2003) (noting that "the concept of complicit liability for conspiracy or aiding and abetting is well-developed in international law" and citing authorities).

*Id.* at 1202-03.

Despite the Ninth Circuit's explicit disclaimer that it was only applying a low, "non-frivolous" standard to the plaintiffs' claims and theories of liability, it is nonetheless significant that (1) the Ninth Circuit found that plaintiffs' discrimination claim and vicarious liability theories were not frivolous, and (2) in discussing vicarious liability, the Ninth Circuit made no mention of any distinction between international norms requiring state action and those which can be violated directly by private parties. Furthermore, in reaching its conclusion that vicarious liability is a non-frivolous theory under the ATS, the Ninth Circuit relied on several of the same sources discussed above – federal common law, the Restatement (Second) of Torts § 876, *Talbot v. Janson* – which support punishing aiders and abettors who do not have the same capacity to commit the crime as principals. *Rio Tinto* therefore supports reconsideration of the conclusion that claims requiring state action may not be brought against private actors through an aiding and abetting theory.[10]

---

[10] Reconsideration is also supported by *Aldana v. Del Monte Fresh Produce, Inc.*, 416 F.3d 1242 (11th Cir. 2005) and *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal 2005). The court in *Aldana* stated that the ATS "reaches conspiracies and accomplice liability." 416 F.3d at 1248

10

In sum, reconsideration of the aiding and abetting issue is warranted for several compelling reasons. First, Order 1203 relied on the incorrect general principle that a party cannot be liable for aiding and abetting a violation that it could not commit as a principal. Next, there is no case in which any court has drawn the distinction drawn by this Court. Furthermore, from a policy standpoint, there is good reason to extend liability under international law to private actors who aid and abet the violations of state actors. Finally, *Rio Tinto* explicitly held that vicarious liability is a non-frivolous theory of ATS liability, and made no suggestion that the plaintiffs could not proceed against a private company for discrimination, which under international law, requires state action. The Court therefore GRANTS plaintiffs' motion for reconsideration of the aiding and abetting portion of Order 1203.

Plaintiffs also argue that "*Rio Tinto* affirmed the district court's reliance on § 1983 jurisprudence," and "[t]his Court is therefore mistaken that utilizing 'under color of law' principles inappropriately expands the reach of the ATS in light of *Sosa*." Mot. at 5. The Court adequately addressed this argument in Order 1203, stating that "the Ninth Circuit's opinion does not discuss color of law jurisprudence, and certainly does not consider importing color of law jurisprudence into ATS claims." Order 1203 at 14:2-5. Plaintiffs add nothing new here, nor does the new version of *Rio Tinto*. The Court therefore DENIES plaintiffs' motion for reconsideration of the color-of-law portion of Order 1203.

Accordingly, the Court GRANTS IN PART plaintiffs' motion for leave to file a motion for reconsideration, and GRANTS IN PART plaintiffs' motion for reconsideration of Order 1203.[11] All of plaintiffs' ATS claims may proceed against defendants under a theory of aiding and abetting.

---

(quoting *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005)). The court went on to find that, though only "[s]tate-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the Alien Tort Act," a private corporation could be held liable for torture by its private security force if a government official's participation in the torture was sufficient to create state action. *Id.* at 1249-50. *Aldana* was decided post-*Sosa*, though it did not explicitly consider the impact of *Sosa* on color-of-law and indirect liability doctrines. In *Mujica*, the district court sought to determine whether a private corporation could be held liable under the TVPA for torture. *See* 381 F. Supp. 2d at 1173. In so determining, the court analogized the TVPA to the ATS, and stated that the ATS generally allows for aiding and abetting liability. *See id.*

[11] Plaintiffs' motion purports only to seek leave to file a motion for reconsideration. However, because both parties have extensively briefed and argued the issue, the Court finds that additional briefing is unnecessary, and therefore construes plaintiffs' motion as both a motion for leave, and a motion for reconsideration.

11

## II.  PLAINTIFFS' MOTION TO CERTIFY ISSUES FOR INTERLOCUTORY APPEAL

### A.  Legal standard

The general rule is that an appellate court should not review a district court ruling until after entry of a final judgment. *Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978); *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982), *aff'd sub nom. Arizona v. Ash Grove Cement Co.*, 459 U.S. 1190 (1983); *Fukuda v. County of Los Angeles*, 630 F. Supp. 228, 229 (C.D. Cal. 1986); *see* 28 U.S.C. § 1291. The Interlocutory Appeals Act of 1958 creates an exception to the general rule and allows for the appeal of non-final orders upon consent of both the district court and the court of appeals. The statute states, in pertinent part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals . . . may thereupon . . . permit an appeal . . . if application is made to it within ten days.

28 U.S.C. § 1292(b). The party seeking certification of an interlocutory appeal has the burden to show the presence of those exceptional circumstances. *Coopers & Lybrand*, 437 U.S. at 474-75, 98 S. Ct. at 2461; *Fukuda*, 630 F. Supp. at 229.

Section 1292 identifies three factors that must be present in order for the Court to certify an appeal. First, the issue to be certified must involve a controlling issue of law. The Ninth Circuit has ruled that an issue is "controlling" if "resolution of the issue on appeal could materially affect the outcome of the litigation" in the district court. *In re Cement Antitrust Litig.*, 673 F.2d at 1026 (citing *United States Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966)); *see Shurance v. Planning Control Int'l, Inc.*, 839 F.2d 1347, 1347-48 (9th Cir. 1988).

Second, there must be a substantial ground for difference of opinion on that issue. A party's strong disagreement with the Court's ruling is not sufficient for there to be a "substantial ground for difference"; the proponent of an appeal must make some greater showing. *Kern-Tulare Water Dist. v. Bakersfield*, 634 F. Supp. 656, 667 (E.D. Cal. 1986), *aff'd in part and rev'd in part on other grounds*, 828 F.2d 514 (9th Cir. 1987).

Third, an interlocutory appeal must be likely to materially speed the termination of the litigation.

If an interlocutory appeal would actually delay the conclusion of the litigation, the Court should not certify the appeal. *See Shurance*, 839 F.2d at 1348 (refusing to hear certified appeal where trial is scheduled to begin 5 months later).

### B.     Discussion

Plaintiffs seek an order certifying Orders 1202 and 1204 for interlocutory appeal. For the following reasons, the Court agrees with plaintiffs that both Orders meet the first two requirements for interlocutory appeal under section 1292; they involved controlling issues of law, and there exist substantial grounds for difference of opinion on the issues decided.

With respect to the Order 1202 (TVPA), defendants argue that even if the Ninth Circuit were to disagree with this Court's ruling, "the TVPA claims and damages are redundant of the state tort law claims" (Opp. at 6:20), and therefore resolution of the TVPA issue could not "materially affect the outcome of the litigation" in the district court, *In re Cement Antitrust Litig.*, 673 F.2d at 1026. Plaintiffs convincingly respond by pointing to several ways in which a TVPA claim differs from the surviving state law tort claims. For example, the statute of limitations under the TVPA is longer than that of the state law tort claims. Furthermore, there are more defenses available to common-law tort claims than to TVPA claims. Finally, different damages may be available under state law tort claims and TVPA claims. For example, defendants have suggested that punitive damages are unavailable under Nigerian tort law; in contrast, under the TVPA, courts "have awarded significant compensatory and punitive damages for extrajudicial killing." *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1158 (E.D. Cal. 2004). Therefore, the TVPA claims are not "redundant" of the remaining state law tort claims, and simply put, it matters whether the TVPA claims should be in the case. The Court's Order dismissing the TVPA claims therefore decided "controlling" issues for purposes of section 1272. With regard to the second factor, this Court's own switch in opinion – first holding in its July 14, 2004 Order that corporations can be liable under the TVPA, then reversing course in the Order at issue – demonstrates that there are substantial grounds for jurists to disagree.

The choice-of-law Order (1204) also meets the first two factors. What law the Court applies to the claims is, beyond doubt, a controlling issue. With respect to the second factor, the Court has already

acknowledged that whether the torts involved in this case constituted maritime torts, and whether admiralty jurisdiction exists over the events occurring on the barge, "is a close question" (Order 1204 at 5-6), "complicated [by] the fact that it involves an unusual relationship between the tortfeasor and the injured parties, as well as an unusual injury" (*Id.* at 7:19-20).

The principal point of contention on this motion for certification is the third prong of the section 1292 test: whether "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Plaintiffs' main argument is that because this is a complicated case, involving a massive record and potential trial witnesses from around the world, there is an extremely compelling interest in attempting to resolve all issues in one trial, and minimize the risk of having to hold a second trial if the Court's interlocutory orders are overturned on post-trial appeal. Defendants counter that rather than "advancing the ultimate termination of the litigation," interlocutory appeals will likely delay the end of this litigation. Furthermore, defendants argue that "there are several scenarios in which no appeal from the rulings at hand will ever be necessary." Opp. at 2:17-18. For the following reasons, the Court cannot determine whether interlocutory appeal will truly benefit the litigation until the currently pending motions for summary judgment are fully resolved.

As an initial matter, the Court is convinced that interlocutory appeal may, at some point, be necessary. Defendants argue that "if plaintiffs proceed to trial and lose on all their remaining claims, it will not matter that their ATS and TVPA claims had already been dismissed. That is, if they cannot win on a simple battery claim, they could not possibly have won on a summary execution or torture claim." Opp. at 2:11-14. As plaintiffs point out, however, if the Court has applied the wrong choice-of-law analysis, and subsequently applies the wrong law to plaintiffs' "simple battery claim," a decision on the state law claims will not preclude an ATS or TVPA claim. Furthermore, as discussed above, while a common law battery claim might intuitively appear to be a "lesser-included offense" of a TVPA or ATS claim, there are differences between the claims, such as differences in the statute of limitations. Those differences may create situations where a state law battery claim will fail but a TVPA or ATS claim will not.

Defendants also argue that "if plaintiffs proceed to trial and recover damages for their alleged injuries, they would have no need to appeal the dismissed claims." Opp. at 2:14-16. However, as

discussed above, the recovery available in the dismissed claims may differ from the recovery available under those remaining at trial. For example, while punitive damages may not be available under Nigerian tort law, they are available under the TVPA. *See Doe v. Saravia*, 348 F. Supp. 2d at 1158. The Court is thus unconvinced by defendants' assertion that "there are several scenarios in which no appeal from the rulings at hand will ever be necessary." Opp. at 2:17-18.

In the alternative, defendants argue that if interlocutory appeals are appropriate, they should be deferred until after the Court decides the remainder of the dispositive motions. The Court agrees. As discussed, there are compelling reasons to resolve the issues plaintiffs seek to appeal before holding a lengthy and complicated trial, should one be necessary. However, delaying trial, at this point, before even knowing what issues will remain for trial, does not seem the most prudent course. Along with this Order, the Court is issuing a series of critical motions which will certainly alter the contours of the case. When orders on all of the substantive motions have issued, the parties, and the Court, will have a much clearer sense of whether it is worth proceeding immediately to trial. Plaintiffs may decide, at that point, that they do want to proceed with trial, despite their hope that the Ninth Circuit will restore some of their previously dismissed claims. Plaintiffs' stance at the hearing on this motion suggests that they have considered this possibility; they failed, despite pressure from defendants, to unequivocally represent that they would not want to go to trial before these issues are resolved. As discussed, the only reason for certifying these issues for interlocutory appeal would be to avoid holding a potentially incomplete or misguided trial; interlocutory appeal would sacrifice a prompt trial in exchange for assurance of a complete trial. If the parties are not willing to commit to this sacrifice, neither is the Court.

After all the pending summary judgment motions have been decided, the parties and the Court can look at the remaining issues, and determine whether, and for how long, trial should be delayed. If the parties decide to proceed to trial, interlocutory appeal will be unnecessary and unwarranted. If the trial is stayed, then these interlocutory appeals may go forward, along with appeals of any other critical issues arising since plaintiffs filed this motion. The Court therefore DENIES plaintiffs' motion for certification for interlocutory appeal, without prejudice to revisiting the question at the conclusion of all pending motion practice.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART plaintiffs' motion for leave to file a motion for reconsideration (Docket No. 1219), and DENIES WITHOUT PREJUDICE plaintiffs' motion for certification of Orders 1202 and 1204 for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (Docket No. 1216).

**IT IS SO ORDERED.**

Dated: August 13, 2007

SUSAN ILLSTON
United States District Judge

**United States District Court**
For the Northern District of California