1
2
3
4
5              IN THE UNITED STATES DISTRICT COURT
6              FOR THE NORTHERN DISTRICT OF CALIFORNIA
7

8    LARRY BOWOTO, et al.,                          No. C 99-02506 SI

9                 Plaintiffs,                        **ORDER GRANTING DEFENDANTS'
                                                     MOTION FOR SUMMARY JUDGMENT
10          v.                                       ON PLAINTIFFS' CRIMES AGAINST
                                                     HUMANITY CLAIM**
11   CHEVRON CORPORATION, et al.,

12                Defendants.
                                              /
13

14          On March 9, 2007, the Court heard argument on defendants' motion for summary judgment on

15   plaintiffs' crimes against humanity claim.  Having considered the arguments of the parties and the

16   papers submitted, and for good cause shown, the Court hereby GRANTS defendants' motion.

17

18                                    **BACKGROUND**

19          Plaintiffs filed this suit in 1999, seeking to recover for a series of brutal attacks that plaintiffs

20   allege occurred in Nigeria in mid-1998 and early 1999.  The parties vigorously dispute most of the facts

21   of this case; the Court describes the parties' versions of the relevant facts in great detail in the

22   accompanying Order re:  defendants' motion for summary judgment on plaintiffs' claims 10 through

23   17.  The Court briefly summarizes those facts here.

24          The first alleged attack occurred on May 28, 1998, at a Chevron Nigeria Ltd. (CNL) offshore

25   drilling facility known as the "Parabe platform," which consisted of an oil drilling platform and an

26   attached construction barge.  According to plaintiffs, on May 25, 1998, more than 100 representatives

27   from a community near the Parabe platform, including plaintiffs Larry Bowoto and Bassey Jeje, and

28   decedents Bola Oyinbo and Arolika Irowarinun, traveled to the barge.  These individuals occupied the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

platform and barge until May 28, 1998.  According to defendants, after three days of occupation, CNL decided to seek assistance of the Nigerian Government Security Forces ("GSF").  On May 27, 1998, CNL asked the head of the GSF in Delta State, Captain Ita, to intervene.  On the evening of May 27, according to defendants, Captain Ita sent Lieutenant Sadiq to meet with CNL.  The following day, Lieutenant Sadiq and his soldiers flew to the barge and platform in CNL helicopters, to oust the protestors.  Plaintiffs allege that Arolika Irowarinun was killed, and Jeje and Bowoto were shot, when this occurred.  Plaintiffs also allege that Bola Oyinbo was taken into custody by the GSF and tortured in the days following the event.[1]

The second set of attacks occurred on January 4, 1999.  Plaintiffs allege that on that day the GSF attacked the villages of Opia and Ikenyan, shooting civilians and burning the villages to the ground. The attacks began when GSF circled the villages in helicopters leased by CNL, and fired at the villagers for several minutes.  Later in the day, GSF in Chevron-leased "Sea Trucks" arrived at the villages by river and burned them to the ground.  In these attacks, plaintiffs allege that Timi Okoro, Kekedu Lawuru, Shadrack Oloku, and Bright Pabulogba were killed.

The instant lawsuit alleges that Chevron, acting through its Nigerian subsidiary, paid the Nigerian military to carry out the attacks on Parabe and Opia and Ikenyan.  Defendants have now brought a motion for summary judgment on plaintiffs' claim for crimes against humanity ("CAH") under the Alien Tort Statute ("ATS").

**LEGAL STANDARD**

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-

---

[1]Bola Oyinbo died three years later in Lagos, Nigeria.

1   moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that

2   there is a genuine issue for trial." *T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Association*, 809

3   F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986)).

4          In judging evidence at the summary judgment stage, the Court does not make credibility

5   determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the

6   non-moving party.  *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v.*

7   *Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

8   The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e).   Conclusory,

9   speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and

10  defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.

11  1979).

12

13                                      **DISCUSSION**

14  **I.       Crimes against humanity is a valid claim under the Alien Tort Statute**

15         Defendants first argue that crimes against humanity is not a valid claim under the Alien Tort

16  Statute.  For the following reasons, the Court disagrees.

17         The ATS gives aliens a federal cause of action for violations of international law.  *See Kadic v.*

18  *Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995) ("[The ATS] confers federal subject-matter jurisdiction when

19  the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of

20  the law of nations (i.e., international law).").  Not all violations of international law are actionable under

21  the ATS, however; in order to state a claim under the ATS, a party must allege a violation of a definite

22  and accepted norm of international law.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 732, 738, 124 S.

23  Ct. 2739 (2004) ("[W]e are persuaded that federal courts should not recognize private claims under

24  federal common law for violations of any international law norm with less definite content and

25  acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.");

26  *see also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984) (Edwards, J.,

27  concurring).  Thus, courts have rejected claims brought under the ATS involving allegations that a

28  defendant violated such norms as "right to life," "right to health," or "intranational pollution."  *See*

3

United States District Court
For the Northern District of California

*Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 254-65 (2d Cir. 2003); *see also Sosa*, 542 U.S. at 735-38 (finding that arbitrary arrest and detention was not an actionable international norm).

Defendants here argue that because courts differ over the precise definition of a CAH claim, CAH does not meet *Sosa*'s requirement that an ATS claim be "defined with a specificity" comparable to certain paradigmatic 18th century norms.  The Court disagrees.  Every court that has addressed the issue, both before and after *Sosa*, has concluded that CAH claims are generally accepted and are defined with the specificity required by *Sosa*.  *See Sarei v. Rio Tinto, Plc.*, 487 F.3d 1193, 1202  (9th Cir. 2007) ("Plaintiffs here have alleged several claims asserting jus cogens violations that form the least controversial core of modern day [ATS] jurisdiction, including allegations of war crimes, crimes against humanity and racial discrimination."); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154 (11th Cir. 2005); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005); *United States v. Yousef*, 327 F.3d 56, 105 & n.40 (2d Cir. 2003) ("Following the Second World War, the United States and other nations recognized 'war crimes' and 'crimes against humanity,' including 'genocide,' as crimes for which international law permits the exercise of universal jurisdiction."); *Flores*, 414 F.3d 233, 244 n.18 ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II."); *Kadic*, 70 F.3d at 236 ("[W]e hold that . . . Karadžić may be found liable for genocide, war crimes, and crimes against humanity in his private capacity."); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1183 (C.D. Cal. 2205); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1154 (E.D. Cal. 2004) ("The prohibition of crimes against humanity has been defined with an ever greater degree of specificity than the three 18th-century offenses identified by the Supreme Court and that are designed to serve as benchmarks for gauging the acceptability of individual claims under the ATCA.").

The vast weight of the authority thus falls against defendants.  *Rio Tinto* alone is binding, post-*Sosa* authority from which this Court cannot diverge.  *See* 2007 WL 1079901, at *5.  CAH claims are actionable under the ATS.

## II.     The elements of a claim for crimes against humanity

A crimes against humanity claim is divided into two parts:  (1) a set of required general

4

elements, referred to as the *chapeau*; and (2) a list of acts, such as murder, extermination, enslavement, rape, and torture.  Any of the acts committed in the context of the *chapeau* elements are crimes against humanity.  The *chapeau*, though enumerated slightly differently in different instruments, generally consists of two elements:  (1) a widespread or systematic attack; (2) directed against any civilian population. There also must be a nexus between the acts of the defendant and the *chapeau*.  *See Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005); Statute of the International Tribunal for Rwanda (adopted November 8, 1994, by United Nations Resolution 955) ("The International Tribunal for Rwanda shall have the power to prosecute persons responsible for [crimes including murder, enslavement, deportation, imprisonment, torture, and rape] when committed as part of a widespread or systematic attack against any civilian population").

**III.    Plaintiffs' cannot meet the *chapeau* elements**

    **A.    Rules and definitions**

       The parties agree that the act underlying a CAH claim must be part of a "widespread or systematic" attack.  "The attack must be either widespread or systematic, the requirement being disjunctive rather than cumulative.  The term 'widespread' refers to the large scale nature of the attack and the number of victims, while the phrase 'systematic' refers to the organised nature of the acts of violence and the improbability of their random occurrence." *Prosecutor v. Limaj*, Judgment, No. ICTY-03-66-T (Nov. 30, 2005) ¶ 183.

       "The concept of 'widespread' may be defined as massive, frequent, large-scale action, carried out collectively with considerable seriousness and directed against a multiplicity of victims." *Prosecutor v. Akayesu*, Judgement, No. ICTR-96-4-T (Sept. 2, 1998) § 6.4.[2]  "The term 'widespread'

---

[2]Both parties rely heavily on the case law of the International Criminal Tribunal for Rwanda ("ICTR"), and the International Criminal Tribunal for Yugoslavia ("ICTY").  However, case law from the ICTR provides little guidance for the application of the *chapeau* elements, apparently because there was little dispute that the mass slaughter of Tutsis and their sympathizers constituted a widespread or systematic attack on a civilian population.  In *Prosecutor v. Musema*, No. ICTR-96-13-A (Trial Chamber, Jan. 27, 2000) ¶ 943, for example, the court stated:

United States District Court

For the Northern District of California

requires large-scale action involving a substantial number of victims . . . ."  Darryl Robinson, *Developments in International Criminal Law: Defining 'Crimes against Humanity' at the Rome Conference*, 93 A.J.I.L. 43, 47 (1999).  "A widespread attack is one conducted on a large scale against many people."  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. at 479-80.

"[T]he term 'systematic' requires a high degree of orchestration and methodical planning." Robinson, 93 A.J.I.L. at 47.  "The concept of 'systematic' may be defined as thoroughly organized and following a regular pattern on the basis of a common policy involving substantial public or private resources."  *Akayesu*, § 6.4.   "[T]he phrase 'systematic' refers to the organized nature of the acts of violence and the improbability of their random occurrence.  Patterns of crimes, in the sense of the non-accidental repetition of similar criminal conduct on a regular basis, are a common expression of such systematic occurrence."  *Prosecutor v. Blaskic*, No. IT-95-14-A, ¶ 101 (ICTY Appeals Chamber, July 29, 2004).

> [T]he assessment of what constitutes a "widespread" or "systematic" attack is essentially a relative exercise in that it depends upon the civilian population which, allegedly, was being attacked.  A Trial Chamber must therefore "first identify the population which is the object of the attack and, in light of the means, methods, resources and result of the attack upon the population, ascertain whether the attack was indeed widespread or systematic".  The consequences of the attack upon the targeted population, the number of victims, the nature of the acts, the possible participation of officials or authorities or any identifiable patterns of crimes, could be taken into account to determine whether the attack satisfies either or both requirements of a "widespread" or "systematic" attack vis-à-vis this civilian population.

*Limaj* ¶ 183 (quoting *Kunarac* ¶ 95)

"[A]n 'attack directed against any civilian population' involves some degree of scale, as well as a policy element . . . ."  Robinson, 93 A.J.I.L. at 48.  "The term 'population' 'is intended to imply crimes of a collective nature and thus exclude single or isolated acts.'"  *Id.* (quoting *Prosecutor v. Tadic*, Opinion and Judgment, ICTY No. IT-94-1-T, ¶ 652 (May 7, 1997)).

---

> The Chamber notes that the Defence has made certain admissions inter alia:  that the Tutsi were either a racial or ethnic group; that there were widespread or systematic attacks throughout Rwanda, between the period 1 January and 31 December 1994 and these attacks were directed against civilians on the grounds, ethnic affiliation and racial origin. The Chamber finds that the Prosecutor is discharged of the burden of proving these elements in respect of crime against humanity

*See also Prosecutor v. Akayesu*, No. ICTR-96-4-T (Trial Court, Jan. 22, 2004) ¶ 173.

United States District Court
For the Northern District of California

6

United States District Court
For the Northern District of California

> [T]he use of the word 'population' does not mean that the entire population of the geographical entity in which the attack is taking place must have been subjected to that attack. It is sufficient to show that enough individuals were targeted in the course of the attack, or that they were targeted in such a way as to satisfy the Chamber that the attack was in fact directed against a civilian 'population,' rather than against a limited and randomly selected number of individuals.

*Kunarac* ¶ 90. "[T]he concept of 'civilian population' should be broadly defined." Mettraux, 43 Harv. Int'l L.J. at 257-58 (citing *Prosecutor v. Tadic*, Case No. IT-94-1, Opinion and Judgment, P643 (May 7, 1997); *Prosecutor v. Kupreskic*, Case No. IT-95-16, Judgement, P547 (Jan. 14, 2000)).

> It has been emphasised in the jurisprudence of this Tribunal that the word "population" does not mean that the entire population of the geographical entity in which the attack is taking place must have been subjected to that attack. It is established that the targeting of a select group of civilians – for example, the targeted killing of a number of political opponents – cannot satisfy the requirements of [CAH]. It is sufficient to show that enough individuals were targeted in the course of the attack, or that they were targeted in such a way as to satisfy the Chamber that the attack was in fact directed against a civilian "population", rather than against a limited and randomly selected number of individuals.

*Limaj* ¶ 187.

**B.     Cases**

Defendants cite *Limaj*, ICTY-03-66-T (Nov. 30, 2005), as a case in which a court "rejected claims of CAH in cases of significantly greater magnitude" than this case. Mot. at 12:2. In *Limaj*, the defendants were charged "with crimes allegedly committed by them and other members of the Kosovo Liberation Army ('KLA') from May to around 26 July 1998 against Serbian civilians and Kosovo Albanian civilians who were perceived as Serbian collaborators in the Llapushnik/Lapusnik area in central Kosovo." *Id.* ¶ 1. The KLA was a loosely organized guerrilla army that fought against Serbian forces during the Kosovo conflict. "The KLA supported a solution of the Kosovo question through an active armed resistance to the official regime. . . . It was viewed by the Serbian authorities and some observers as a terrorist organisation, while for its supporters the KLA was a guerrilla liberation movement targeting the Serbian police and army in Kosovo." *Id.* ¶ 45.

The specific acts at issue in *Limaj* were the abductions of 35 ethnic Serbs by the KLA during a three month period of 1998, occurring in one town. The prosecutor alleged that the abductions constituted CAH because they were part of a broader attack by the KLA against the Serbian civilian

population of the region during that time period. *See id.* ¶ 192.  In analyzing the claims, the court began by noting that

> The nature of the "attack" alleged by the Prosecution in this case covers a set of circumstances considerably different from those considered previously by this Tribunal when dealing with [CAH].  Due to structural factors and organisational and military capabilities, an "attack directed against a civilian population" will most often be found to have occurred at the behest of a State.  Being the locus of organised authority within a given territory, able to mobilise and direct military and civilian power, a sovereign State by its very nature possesses the attributes that permit it to organise and deliver an attack against a civilian population; it is States which can most easily and efficiently marshal the resources to launch an attack against a civilian population on a "widespread" scale, or upon a "systematic" basis.  In contrast, the factual situation before the Chamber involves the allegation of an attack against a civilian population perpetrated by a non-state actor with extremely limited resources, personnel and organisation.

*Id.* ¶ 191.

The court went on to find that, over the course of 1998, throughout the entire Kosovo region, the KLA engaged in the abduction of a limited number of ethnic Serbs (and Kosovo Albanians suspected of ties to the Serbian authorities).  *See id.* ¶¶ 208-209.  Though the court did not give a specific number, the sources upon which it relied estimated that the abductions numbered between 100 and 140.  *See id.* ¶ 209.  Based on these findings, the court concluded that:

> even if it be accepted that those civilians of whatever ethnicity believed to have been abducted by the KLA in and around the relevant period were in truth so abducted, then, nevertheless, in the context of the population of Kosovo as a whole the abductions were relatively few in number and could not be said to amount to a "widespread" occurrence for the purposes of [CAH].
>
> The evidence discloses that there was at most a "systematic" attempt by the KLA to target Kosovo Albanian individuals believed to be, or suspected of, collaborating with the Serbian authorities, but no attempt to target a civilian population as such.

*Id.* ¶¶ 210-211.

The court also found that "the effect of the evidence is to indicate that the KLA had a policy of targeting only those who were believed to have, or suspected of having, links with the Serbian regime. . . . [W]hether these perceived or suspected collaborators were correctly identified or not, they were targeted as individuals rather than as members of a larger targeted population." *Id.* ¶ 217.  With respect to the "civilian population" requirement, the court therefore ultimately concluded that:

> What has been established in respect of those abducted and detained, indicates that the abductions occurred in diverse geographic locations, were relatively limited in number and involved relatively few abductees in comparison to the civilian population of Kosovo, such that it is not possible to discern from them that the civilian population

United States District Court
For the Northern District of California

1

2

> itself was the subject of an attack, or that Kosovo Albanian collaborators [(with the Serbian authorities)] and perceived or suspected collaborators and other abductees were of a class or category so numerous and widespread that they themselves constituted a "population" in the relevant sense.

3

*Id.* ¶ 226.

4

5

6

7

8

> The means and methods used by the KLA in the period relevant to the Indictment, in the abduction of Serbian and Kosovo Albanian civilians (whether considered together or separately) do not evince characteristics of an attack directed against a civilian population. At least in most cases of which there is evidence, the individuals who were abducted and then detained were singled out as individuals because of their suspected or known connection with, or acts of collaboration with, Serbian authorities - and not because they were members of a general population against which an attack was directed by the KLA.

9

*Id.* ¶ 227.

10

11

12

13

14

15

16

The "civilian population" inquiry in *Limaj* thus appears to have turned on two factors: (1) the raw number of victims in proportion to the overall civilian population of the region (the abductions "were relatively limited in number and involved relatively few abductees in comparison to the civilian population of Kosovo"), and (2) the level of precision with which the attackers selected their targets (the detainees "were singled out as individuals because of their suspected or known connection with, or acts of collaboration with, Serbian authorities - and not because they were members of a general population against which an attack was directed"). *See* ¶¶ 226-227.

17

18

19

20

21

22

Defendants also cite *Prosecutor v. Galic*, ICTY-98-29 (Dec. 5, 2003), as evidence that the facts of this case do not amount to CAH. In *Galic*, the ICTY trial chamber considered a "case which concerns events surrounding the military encirclement of the city of Sarajevo in 1992 by Bosnian Serb forces." *Id.* ¶ 1. The particular act at issue was "a protracted campaign of sniping and shelling against civilians in Sarajevo" between September of 1992 and August of 1994. *Id.* ¶ 3. The court summarized the central factual dispute as follows:

23

24

25

26

27

28

> The Prosecution alleges that "for forty-four months, the Sarajevo Romanija Corps implemented a military strategy which used shelling and sniping to kill, maim, wound and terrorise the civilian inhabitants of Sarajevo. The shelling and sniping killed and wounded thousands of civilians of both sexes and all ages, including children and the elderly". The Defence submits that the "City was neither shelled, nor targeted from snipers. When the SRK units acted, they always acted in self-defence, and only and exclusively on legitimate military targets in the city and on enemy's firing position". It argues that a war was being waged in an urban setting, which "always includes collateral damages, especially when one side is not respecting its own obligations, like it was the case with the Muslim side, namely the obligation to remove civilians from the zone of military activities", and "despite all precautions, it is not possible to control the opening

9

1    of fire and the firing in urban conditions to avoid civilian casualties".

2    *Id.* ¶ 206.

3        The indictment listed 24 particular sniping attacks and 5 particular shelling attacks as "a small

4    representative number of individual incidents for specificity of pleading." *Id.* ¶ 3 (quoting indictment).

5    The trial court considered, in great detail, evidence surrounding the incidents identified in the

6    indictment, as well as general evidence of the sniping and shelling of Sarajevo during the relevant

7    period.  The court explained that it did so because:

8            [i]t would be implausible to claim that 24 sniping attacks and 5 shelling attacks
             amounted to a 'campaign', in the sense above.  The [court] makes no such claim. Spread
9            out over a period of two years, the total of proved attacks, if any, could not in itself
             represent a convincing "widespread" or "systematic" manifestation of sniping and
10           shelling of civilians.

11   *Id.* ¶ 208.

12       After exploring all of the evidence, the court determined that there was "widespread or

13   systematic shelling and sniping of civilians resulting in civilian death or injury." *Id.* ¶ 583.  "[C]ivilians

14   in ABiH-held areas of Sarajevo were directly or indiscriminately attacked from SRK-controlled territory

15   during the Indictment Period, and that as a result and as a minimum, hundreds of civilians were killed

16   and thousands others were injured."  *Id.* ¶ 591.  "The evidence, especially in relation to the nature of the

17   civilian activities targeted, the manner in which the attacks on civilians were carried out and the timing

18   and duration of the attacks on civilians, consistently shows that the aim of the campaign of sniping and

19   shelling in Sarajevo was to terrorise the civilian population of the city." *Id.* ¶ 592.  Based upon these

20   findings, the court concluded that "the required elements under [the CAH provision of the] Statute that

21   there must be an attack, that the attack must be directed against any civilian population, and that the

22   attack be widespread or systematic have been satisfied.  The Trial Chamber also finds that the crimes

23   committed in Sarajevo during the Indictment Period formed part of an attack directed against the civilian

24   population and this would have had been known to all who were positioned in and around Sarajevo at

25   that time."  Id.  ¶ 598.

26       Thus in *Galic*, the "civilian population" was the entire civilian population of large portion of a

27   large city.  That the attack was "widespread or systematic" was proved by showing that civilians were

28   directly targeted by the SRK (as opposed to simply being collateral damage to the armed conflict),

United States District Court
For the Northern District of California

1   resulting in death to hundreds, and injury to thousands, over a two-year period.

2

3       **D.      Application**

4       Plaintiffs here argue that "[t]he attacks against Plaintiffs occurred in the context of large-scale

5   attacks against oil protesters in the [Niger River] Delta, which targeted thousands of people and killed

6   at least hundreds." Opp. at 5:11-13.  Plaintiffs define the relevant "civilian population" as "everyone

7   and every community associated with opposition to petroleum development in the Niger Delta." Opp.

8   at 7:23-25.  As discussed in the accompanying Order re:  defendants' motion for summary judgment on

9   plaintiffs' claims 10 through 17, plaintiffs present copious evidence of attacks by GSF in the Niger Delta

10  in the years surrounding the acts at issue.  *See* Plaintiffs' Affirmative Statement of Facts ("PASOF") ¶¶

11  77-254 (and sources cited therein).

12      For example, plaintiffs' expert, Professor Watts, states in his declaration that

13      during the successive military regimes of the 1990s, and especially in the period of the
        Abacha government between 1993 and 1998, the Nigerian government security forces
14      engaged in a course of conduct involving a pattern of violent repression of individuals
        and communities who organized to oppose or protest aspects of petroleum development
15      in the Niger Delta, and of individuals and communities who were alleged or perceived
        to be associated with such opposition. . . .  A number of military and paramilitary
16      activities . . . caused untold personal harm, large-scale physical displacement of
        communities, the destruction of property, large numbers of deaths (including extra-
17      judicial killings) and instituted what can only be called a culture of terror. . . .  I believe
        this is widely recognized and understood by the vast majority of scholars of Nigeria and
18      by the human rights and foreign policy establishment.

19  Watts Decl. ¶ 18 (citations omitted).

20      Plaintiffs also rely to a great extent on the findings of Nigeria's "Oputa Commission."  On the

21  basis of its investigation, the Oputa Commission concluded that the oil companies' "interests became

22  'State interest,' which must be protected.  This logically led to the *systematic and generalized violations*

23  *and abuses*, which occurred in the Niger-Delta during the dark period of military rule in the country,

24  as detailed in . . . this Report." Oputa Comm. report (Watts Decl., Ex. 1), "Overview" ¶ 1.50 ("emphasis

25  added").  The report also states that "[t]he politics of oil foregrounds the historical narration of rights

26  violations in Nigeria's Niger Delta (South-South), *the standard practice being the use of maximum force*

27  *against the people of this region* by an alliance of Trans National oil Corporations, the state and the

28  indigenous elite." *Id.*, Vol. 3 at 9 (emphasis added).  The report also noted

11

[i]nhuman treatment, violence and repression meted out to communities when they protest against environmental degradation, and neglect of their area by the Nigerian state and the oil-producing companies. The violence, which is usually effected by the police or the military, may be at the instance of the state or the oil multinational corporations. The latter often prefer inviting the security agencies whenever their operations are threatened by the local people, rather than engaging them in genuine dialogue.

. . . .

In virtually all parts of the Niger-Delta, an army of occupation is stationed by the federal government to "keep peace" and facilitate the oil exploitation by the oil companies. These fierce-looking military officers largely deny the rights of the citizens to free movement, association and speech. In several instances, those forces unleash terror on the local people. They kill, maim, rape and destroy properties in those communities in the real tradition of an army of occupation.

*Id.* Vol. 3 at 43-44.

Watts also relies in his declaration on research done by Human Rights Watch ("HRW"), a non-governmental organization that "conducts regular systematic investigations of human rights abuses" around the world. Hoffman Decl., Ex. 379 at B4007. HRW has extensively reported on Nigeria, particularly the Niger-Delta region. According to a report published by HRW in 1999, and relied on by Professor Watts,

Virtually every oil producing community – on the basis of Human Rights Watch's own investigations and on reports from human rights and environmental activists working in the region – has experienced an incident along the following lines. Community members stage a protest demanding compensation for oil company activities (often stated to have been promised in prior agreements) in the form of cash, development projects, or employment, or calling for environmental cleanup; in response to the protest, members of the Mobile Police or other security forces come to the scene; the security forces carry out indiscriminate beatings, arrests and detentions; the protest is then abandoned.

Human Rights Watch, *The Price of Oil: Corporate Responsibility and Human Rights Violations in Nigeria's Oil Producing Communities* 134 (1999) (Watts Decl., Ex. 2).

In addition to these general conclusions from various sources regarding the systematic and widespread nature of GSF attacks on civilian communities, plaintiffs also present evidence of several emblematic attacks. For example, in the fall of 1990, GSF killed eighty people and destroyed almost 500 houses in repressing protests at a Shell Oil facility near the village of Umuechem, Rivers State. *See* Watts Decl. ¶ 25; Oputa Comm. Report, Vol. III at 50; *Price of Oil* at 123; Watts Decl., Ex. 19 at 2-3; Watts Decl., Ex. 35 at 69. A Judicial Commission of Enquiry investigated the Umuechem incident, and concluded that the protest was peaceful, the demonstrators were neither violent nor armed, and the GSF

12

displayed "a reckless disregard for lives and property." *See* Chomsky Decl., Ex. 15. In another incidence, in 1992, "one person was killed, 30 shot and 150 beaten when local villagers from Bonny demonstrated against Shell." Watts Decl., Ex. 7 at 19; Ex. 13 at 33.

According to Professor Watts, Ogoniland in the 1990s was one of "three main theatres in which human rights violations by the army and security occurred." Watts Decl. ¶ 26. "[I]t is clear that thousands were displaced, and many hundreds killed and arrested" in Ogoniland, as a result of military repression of oil protestors in the 1990s. *Id.*; *see generally* PASOF ¶¶ 93-116. The Oputa Commission received over 8000 complaints concerning human rights abuses in Ogoniland. Watts Decl. ¶ 26. In November 1999, GSF attacked the community of Odi in Bayelsa State, and killed between 250 and 2483 civilians. *Id.* ¶ 28.

The Court finds that plaintiffs have submitted sufficient evidence to raise a genuine issue of fact as to whether the GSF engaged in a pattern of violent repression of civilian oil protestors during the 1990s, resulting in the death of at least hundreds, and the injury of thousands. The core legal issue at this stage, therefore, is whether such a pattern constitutes a "widespread or systematic attack" directed at a "civilian population," for CAH purposes. The Court finds that it does not.

As discussed above, the number of victims, in relation to the overall population, is a key inquiry for both the "widespread" and the "civilian population" requirements. Here, plaintiffs present evidence of attacks by the GSF resulting in hundreds of deaths and thousands of injuries, over a roughly ten-year period, in a region containing roughly 14 million inhabitants. In *Galic*, there were hundreds of deaths, and thousands of injuries, over a two year period in a single city. *See Galic* ¶ 591. This case therefore does not reach *Galic*, with respect to the percentage of the population affected.

*Lujic* also suggests, as discussed above, that the Court should inquire into the basis upon which the victims were targeted. *See Lujic* ¶ 217. If they were targeted based on individualized suspicion of engaging in certain behavior, then the attack was not "directed at a civilian population," and was less likely to be "widespread." *See id.* ¶¶ 226-227. In *Lujic*, the victims were specifically targeted because they were suspected of having collaborated with the Serbian authorities. *See id.* This weighed against finding a CAH "attack." *See id.* In *Galic*, in contrast, the victims were targeted merely because they were civilians, and lived in Sarajevo. The only motive behind the attack was to put civilians in Sarajevo

United States District Court
For the Northern District of California

in fear.  There was thus an "attack" directed at a "civilian population."  *See Galic* ¶ 592.  Here, as in *Lujic*, the victims of the GSF were targeted because they were oil protestors, or because they were associated with oil protestors.  Though the evidence indicates that the GSF were not particularly selective in choosing their targets, the victims of the GSF were not targeted, as they were in *Galic*, simply because they were civilians.

The evidence provided by plaintiffs does not rise to level of the atrocities described in *Galic*, or any of the other cases cited by the parties or reviewed by the Court in which any court found CAH.  All of the international cases relied upon by the parties arose out of the Holocaust, the Rwandan genocide, and the ethnicity-motivated warfare in the former Yugoslavia.  This case does not rise to the level of the atrocious attacks committed in those three settings.  This case also does not rise to the level of the atrocious attacks involved in the few domestic cases that have reached the merits of CAH claims.  In *Cabello*, 402 F.3d at 1148, a jury found CAH liability in a case involving the "Caravan of Death," a Chilean military unit that "traveled to many cities in northern Chile where the military officers engaged in acts of extrajudicial killing, torture, and abuse of various individuals who were incarcerated due to their alleged opposition to the military junta."  *Id.* at 1152.  Though *Doe v. Saravia*, 348 F. Supp. 2d at 1112, was decided on default judgment and is therefore of little use, it also dealt with the atrocities committed by military "death squads."  *See id.* at 1156 ("The death squad which perpetrated the murder of Archbishop Romero acted as part of a calculated strategy by the military to terrorize the civilian population into submission.  The decision to kill Romero was implemented to silence his criticism of the state security forces and state implemented repression.  At or about the same time other priests were being murdered by the military and death squads to deter their practice of liberation theology").  Similarly, *Chavez v. Carranza*, 2006 U.S. Dist. LEXIS 63257, *2 (W.D. Tenn. 2006), in which a jury found defendants liable for CAH, dealt with "Salvadoran security forces that carried out widespread human rights abuses against the civilian population during the country's civil war."  *See also Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1344 (N.D. Ga. 2002) (finding CAH liability on default judgment for acts involved in "ethnic cleansing" in the former Yugoslavia).

While the Court agrees with plaintiffs that attacks need not necessarily amount to a holocaust or ethnic cleansing to be actionable under CAH, all of the available CAH cases involve attacks of a

14

United States District Court
For the Northern District of California

1  more atrocious degree than acts at issue here.  Plaintiffs do not cite any analogous case, in which

2  sporadic episodes of violence against communities perceived to be engaging in protest, over a very long

3  period and among an extremely large population, met the CAH *chapeau* elements.

4      Plaintiffs put forward evidence that Nigerian GSF, over the course of the 1990s, often used

5  excessive force against oil protestors and their communities.  However, even drawing all reasonable

6  inferences in plaintiffs' favor, no reasonable jury could find that the GSF engaged in a campaign of

7  terror of the type contemplated by the CAH claim.  Plaintiffs therefore fail to raise a triable issue as to

8  whether the *chapeau* elements are met.

9

10                              **CONCLUSION**

11      For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants'

12  motion for summary judgment on plaintiffs' crimes against humanity claim.[3]  [Docket No. 1260]

13

14      **IT IS SO ORDERED.**

15

16  Dated: August 13, 2007                        _____

17                                               SUSAN ILLSTON
                                                 United States District Judge

18

19

20

21

22

23

24

25

26

27      [3]The Court OVERRULES the parties' evidentiary objections as moot.  Even fully crediting
    plaintiffs' evidence, they fail to meet the *chapeau* elements.  Defendants' evidence was irrelevant to the
28  Court's conclusions.  [Docket Nos. 1405, 1489]