IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY BOWOTO, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>CHEVRON CORPORATION, et al.,<br><br>    Defendants.<br>_____/ | No. C 99-02506 SI<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT ON THE ACT OF STATE DEFENSE; AND DEFENDANTS' RENEWED MOTION FOR THE COURT TO REQUEST THE VIEWS OF THE UNITED STATES** |

Presently pending before the Court are the parties' cross-motions for summary judgment on defendants' act of state defense, and defendants' renewed motion for the Court to request the views of the United States. Having considered the arguments of the parties and the briefs submitted, and for good cause shown, the Court hereby GRANTS plaintiffs' motion, and DENIES defendants' motions.

**BACKGROUND**

Plaintiffs filed this suit in 1999, seeking to recover for a series of brutal attacks that plaintiffs allege occurred in Nigeria in mid-1998 and early 1999.[1]  The first alleged attack occurred on May 28, 1998, at a Chevron Nigeria Ltd. (CNL) offshore drilling facility known as the "Parabe platform," which consisted of an oil drilling platform and an attached construction barge.  According to plaintiffs, on May 25, 1998, more than 100 representatives from a community near the Parabe platform, including plaintiffs Larry Bowoto and Bassey Jeje, and decedents Bola Oyinbo and Arolika Irowarinun, traveled to the

---

[1] The Court provides a detailed summary of the incidents giving rise to this case in the concurrently issued Order Re: Defendants' Motion for Summary Judgment on Plaintiffs' Claims 10 through 17.

barge. These individuals occupied the platform and barge until May 28, 1998. According to defendants, after three days of occupation, CNL decided to seek assistance of the Nigerian Government. On May 27, 1998, CNL asked the head of Government Forces in Delta State, Captain Ita, to intervene. On the evening of May 27, according to defendants, Captain Ita sent Lieutenant Sadiq to meet with CNL. The following day, Lieutenant Sadiq and his soldiers flew to the barge and platform in CNL helicopters, to oust the protestors. Plaintiffs allege that Arolika Irowarinun was killed, and Jeje and Bowoto were shot, when this occurred. Plaintiffs also allege that Bola Oyinbo was taken into custody by the Nigerian military and tortured in the days following the event.[2]

The second and third alleged attacks occurred on January 4, 1999. Plaintiffs allege that on that day the Nigerian military attacked the villages of Opia and Ikenyan, shooting civilians and burning the villages to the ground. In these attacks, plaintiffs allege that Timi Okoro, Kekedu Lawuru, Shadrack Oloku, and Bright Pabulogba were killed.

The instant lawsuit alleges that Chevron, acting through its Nigerian subsidiary, aided the Nigerian military in carrying out the attacks. The instant cross-motions for summary judgment seek to resolve defendants' act of state defense. Defendants also argue that this case presents non-justiciable political questions, and move for the Court to request the views of the United States on the impact of the adjudication of this lawsuit on foreign relations.

## I.  CROSS-MOTIONS RE: ACT OF STATE DEFENSE

### A.  Legal standard

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-

---

[2] Bola Oyinbo died three years later in Lagos, Nigeria.

2

moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### B. Discussion

Defendants argue that the act of state doctrine precludes plaintiffs' RICO and common law tort claims as a matter of law.[3] On counter-motion, plaintiffs argue that defendants cannot present evidence sufficient to meet the requirements of the doctrine.

"The act of state doctrine prevents U.S. courts from inquiring into the validity of the public acts of a recognized sovereign power committed within its own territory." *Sarei v. Rio Tinto*, 487 F.3d 1193, 1208 (9th Cir. 2007) (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964); *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 605-607 (9th Cir. 1977) (recounting history of doctrine)). Under the doctrine, "an action may be barred if (1) there is an 'official act of a foreign sovereign performed within its own territory'; and (2) 'the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act.'" *Id.* (quoting *Sabbatino*, 376 U.S. at 405; citing *Credit Suisse v. United States Dist. Court for Cent. Dist. of Cal.*, 130 F.3d 1342, 1346 (9th Cir. 1997)).

If these two elements are present, [the court] may still choose not to apply the act of state

---

[3]By order filed March 14, 2007, the Court granted defendants' motion for summary judgment against plaintiffs on their RICO claims.

3

> doctrine where the policies underlying the doctrine militate against its application. The Supreme Court discussed three such policies in *Sabbatino*:
>
>> [1] [T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it . . . . [2] [T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. [3] The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence.

*Id.* at 1208-09 (quoting *Sabbatino*, 376 U.S. at 428).

The principal issue dividing the parties on these motions is whether there is an "official act of a foreign sovereign" at issue. Plaintiffs argue that the acts at issue, though committed by the Nigerian Government Security Forces ("GSF"), were not committed or ordered by anyone with authority to exercise sovereign power; defendants contend that they were.

### 1. Whether the acts of low-level military officials constitute "official acts"

Plaintiffs claim that defendants cannot raise a triable issue as to whether the attacks at Parabe, and Opia/Ikenyan constituted official, sovereign acts. Defendants argue that the conduct at issue was committed by on-duty Nigerian law enforcement officers, and "[m]ilitary or police responding to reports of violent criminal behavior are unquestionably conducting 'public or governmental acts,'" and are therefore official sovereign acts. Defs.' Mot. at 11:22-24.

In response, plaintiffs argue that an actor's status as a government official is insufficient to establish that the action taken was an official one. First, according to plaintiffs, acts committed solely by "subordinate government official[s]," acting outside of a chain of authority, cannot be official acts of state. *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1546 (N.D. Cal. 1987). According to plaintiffs, defendants have presented no evidence that any high-ranking Nigerian officials were involved in the conduct, nor that the low-level soldiers involved had authority to act on behalf of the Nigerian government. Second, plaintiffs argue that even if the acts were committed by "an official with authority to exercise sovereign powers," there must also be "evidence that the government acted in its sovereign capacity," *Siderman*, 965 F.2d at 713, i.e., consistent with the laws and policies of the state.

Plaintiffs' explanation of the official act requirement is the correct one. The party seeking to

establish an act of state defense must make two showings: First, the acts must be taken by one with authority to bind the state. *See Restatement (Third) of Foreign Relations Law of the United States* § 443 comment i (1987) ("An action . . . by an official may qualify as an act of state, but only upon a showing (ordinarily by the party raising the issue) that the official had the authority to act for and bind the state. . . . The burden of establishing the act and its character as an act of state is on the party invoking the doctrine."). Second, the acts must be made pursuant to the policies and laws of the state. The first requirement is easily met where the acts at issue are taken by high-level officials, who have some policy-making authority. As discussed below, however, even in the case of high-level officials, and even heads of state, the defendants may not meet the second requirement if the acts violate the polices and law of the foreign state. In the case of low-level officials, the two requirements intertwine: A low level official has only narrow authority to bind the state, defined by the duties and responsibilities of the office and any specific orders coming from those with authority to establish the policies of the state. Thus, to meet both requirements, defendants must establish (1) that the low-level official acted pursuant to an order; (2) that the order originated from an official with the authority to bind the state; and (3) that the order was consistent with the laws and policies of the sovereign. In other words, defendants must establish that the acts were taken in response to orders coming down through a valid chain of command.

The Ninth Circuit explained application of the act of state defense to high-level officials in the Ferdinand Marcos cases. In those cases, the circuit court "rejected the argument that Marcos' actions were 'official' or 'public' acts when [the circuit court] reversed the dismissal of the actions against Ferdinand Marcos on the 'act of state doctrine.'" *In re: Estate of Ferdinand Marcos*, 25 F.3d 1467, 1471 (9th Cir. 1994). "It is only when officials having sovereign authority act in an official capacity that the Act of State Doctrine applies." *Id.* (quoting *Jiminez v. Aristeguieta*, 311 F.2d 547, 557-58 (5th Cir. 1962), *cert. denied*, 373 U.S. 914 (1963)). "[T]he illegal acts of a dictator are not 'official acts' unreviewable by federal courts." *Id.* Thus even though Ferdinand Marcos allegedly "under color of law, ordered, orchestrated, directed, sanctioned and tolerated the continuous and systematic violation of human rights of plaintiffs and the class through the military, para-military and intelligence forces he controlled," his acts were not official acts of state. *Id.* at 1471 n.4 (quoting complaint).

Similarly, the Fifth Circuit rejected the act of state defense brought by a Venezuelan dictator who was accused of murder and various financial crimes committed while acting head of state. *See Jimenez*, 311 F.2d at 547. The circuit court stated: "Appellant's acts were not acts of Venezuelan sovereignty. They constituted common crimes committed by the Chief of State *done in violation of his position and not in pursuance of it.*" *Jimenez*, 311 F.2d at 557-58 (quoted and followed by *Estate of Ferdinand Marcos*, 25 F.3d at 1471) (emphasis added). The Second Circuit echoed these principles in *Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995), stating: "we doubt that the acts of even a state official, taken in violation of a nation's fundamental law and wholly unratified by that nation's government could properly be characterized as an act of state." The acts in *Kadic* were various atrocities carried out by Bosnian-Serb military forces at the behest of defendant, one of the former "Presidents" of the self-proclaimed Bosnian-Serb republic within Bosnia-Herzegovina. *See id.* at 236-37.

The case of *Galu v. Swissair*, 873 F.2d 650 (2d Cir. 1989), illustrates the act of state doctrine's application to low-level officials and a "chain of command" theory. In *Galu*, defendant, an airline, acted in cooperation with Swiss police officials to forcibly expel a United States citizen living in Switzerland, to the United States. *See id.* at 651. After being detained by Swiss police, plaintiff Galu was "driven by the police to the Geneva airport and placed in a cell there. One of the police officers who first apprehended Galu entered the cell, showed her an expulsion order, and asked her to sign it." *Id.* at 652. Galu refused to do so, and "[t]he police then forcibly carried Galu onto a Swissair plane destined for New York City." *Id.* Galu had requested that she be expelled to Paris, and believed that the plane was headed there. *See id.* at 651-52.

The district court dismissed Galu's claim concerning her forcible removal, based on the act of state doctrine. *See id.* at 654. The circuit court upheld in part, and reversed in part. The circuit court stated:

> [T]here can be no doubt, as the District Court ruled, that the expulsion order was an exercise of the sovereign power of Switzerland, precluding assessment of its validity by a United States court. Less certain, however, is the applicability of the act of state doctrine to the actions of the Geneva police officers in placing Galu on an airplane bound for New York City. On this issue, [the district judge] stated, after correctly ruling that the expulsion order must be presumed to be legal:
>
>> So must any action taken by Swiss officials in furtherance of that order that were permitted by Swiss law. I have no doubt that Swiss law

6

> permits the use of reasonable force in carrying out governmental orders, and plaintiff does not allege otherwise. To the extent that SwissAir employees did no more than cooperate with Swiss officials in carrying out, with reasonable force, the expulsion order, SwissAir is immune from liability.
>
> . . . . The District Judge appears to have assumed that the Geneva police officers, armed with the expulsion order, were entitled to carry out that order by placing Galu on a plane bound for New York City. We are not so sure. . . .
>
> . . . .
>
> . . . . [W]e do not know if an expulsion order confers such discretion upon local police officers, nor what steps are required to invoke the immediate removal authority apparently conferred by the applicable statute. . . .
>
> The issue that requires further exploration is not whether the police officers may have slightly exceeded their authority in carrying out a decision of their government. *The issue is whether the action taken against Galu in removing her to the United States was an action that had been ordered in the exercise of the sovereign authority of Switzerland, or whether it was simply an* ad hoc *decision of local police officers.* The burden is on the defendant to establish foreign law to the extent necessary to establish its entitlement to the act of state defense. Evidence of foreign law is required not to determine whether the forcible removal of Galu was lawful but whether it was in fact an act of state.

*Id.* at 653-54 (emphasis added; footnotes omitted).

A case from this district, *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1546 (N.D. Cal. 1987), also illustrates the proper approach to an act of state defense where the actors are low-level officials. In that case, plaintiffs brought a civil action against a former Argentine general for torture, murder, and arbitrary detention, committed during Argentina's "dirty war" in the latter half of the 1970s. *Id.* at 1535-36. As part of a motion to dismiss, defendant argued that the act of state doctrine precluded plaintiffs' claims. As the district court summarized:

> Defendant maintains that all of the challenged acts were taken pursuant to the "state of siege" declared by the constitutional government and reaffirmed by the military junta. Thus, defendant argues, he was a government official acting under policies promulgated by the junta, and this Court cannot adjudicate the question of his liability without also passing on the question of the legality of the acts of the Argentine government.

*Id.* at 1544. After discussing the origins of the act of state defense, the district court determined that the defendant had not met his burden, stating: "plaintiffs allege acts by a subordinate government official . . . . These are not the public official acts of a head of government, nor is it clear . . . to what extent defendant's acts were 'ratified' by the *de facto* military government." *Id.* at 1546. *Forti* thus suggests the same requirements set out in *Galu*: a subordinate government official must show that his or her acts

7

were pursuant to orders made by, or "ratified by," those with authority to make state policy.

Here, plaintiffs contend that defendants have failed to produce any evidence that the soldiers involved acted pursuant to the policies and laws of the Nigerian government. In response, defendants argue that the acts taken by the soldiers were "not *ad hoc* decisions of local officers, but authorized operations conducted within the chain of command of the Nigerian military." Defs.' Mot. at 15:28-16:1. Defendants contend, for example, "that the GSF went to Parabe under the command of Lieutenant Sadiq who was sent by Captain Ita – the head of Government Forces in Delta State – in response to reports of a three-day hostage crisis. Similarly, as to Opia/Ikenyan, CNL allowed Captain Kaswe to use a helicopter and a boat to bring troops under his command to the Searex rig to reinforce soldiers under armed attack." *Id.* at 15:24-28.

These examples, however, fail to demonstrate that the acts flowed from a sovereign authority via a valid chain of command. Defendants fail to provide evidence of who sent the soldiers, what the soldiers were sent to do, and whether the soldiers ended up doing what they were sent to do. In *Galu*, for example, the officers were clearly granted authority, appropriately and by those with authority to do so, to carry out an expulsion order. The critical inquiry was whether the officers' actions were consistent with the authority granted them by the expulsion order. *See Galu*, 873 F.2d at 653-54. Here too, defendants must show not only that the soldiers had valid orders, but also that their actions were consistent with those orders; defendants must show that the soldiers were authorized the take the actions alleged by plaintiffs. They fail to do so.

With regard to the incidents on the Parabe barge, defendants present evidence only of the following:

> On May 27, 1998, CNL asked Captain Ita – the head of Government Forces in Delta state – to intervene to rescue the workers. On the evening of May 27, Captain Ita sent Lieutenant Sadiq to meet with CNL. The next morning, Government forces led by Lieutenant Sadiq flew to the barge and platform in helicopters leased to the joint venture. They set the worker free and, according to plaintiffs, two Ilajes were shot and killed and two others were injured by the Government Forces.

Defs.' Mot. at 5:3-9 (citations omitted). This evidentiary showing fails to meet defendants' burden for several reasons. First, it assumes that Captain Ita's orders constitute a valid act of state. The fact that he was a captain, in charge of one state, does not itself establish that his actions were that of the state.

8

*See, e.g., Forti*, 672 F. Supp. at 1531 (the acts of an Argentinian *general* were not necessarily official acts). Second, Captain Ita only "sent Lieutenant Sadiq to meet with CNL." *Id.* Defendants present no evidence that Captain Ita authorized Lieutenant Sadiq to fly to the barge, set workers free, or shoot anybody. Defendants thus fail to present evidence that the conduct of the soldiers at Parabe constituted official acts of the Nigerian government. As a matter of law, therefore, the act of state doctrine does not shield defendants from liability stemming from the soldiers' actions at Parabe.

With regard to the alleged attacks on Opia and Ikenyan, defendants present absolutely no evidence that the alleged acts were taken pursuant to authority granted by the central government. They merely suggest that because Captain Kaswe was in charge of the operation during which Opia and Ikenyan were allegedly attacked, the acts were official. *See* Defs' Mot. at 15:24-28. This is insufficient. Defendants must show that the soldiers who ultimately committed the attacks were acting pursuant to orders from Captain Kaswe, and that Captain Kaswe had authority to issue such orders. Defendants urge that the acts were "not *ad hoc* decisions of local officers, but authorized operations conducted within the chain of command of the Nigerian military," yet they fail to present evidence of the "chain of command" at work. Defs' Mot. at 15:28-16:1.

Moreover, the cases defendants cite in support of their argument are distinguishable. Defendants argue that here, as in *Oetjen v. Central Leather Co.*, 246 U.S. 297, 303 (1918), "we have a duly commissioned military commander of . . . the legitimate government . . . conducting active operations," and therefore we have a nonjusticiable act of state. The act at issue in *Oetjen* was the seizure of cow hides "by order of General [Pancho] Villa," who was given "independent command" over all of Northern Mexico by General Carranza, leader of the revolutionary forces that ultimately gained control of the Mexican government. *Id.* at 300. General Villa ordered the hides seized for failure to pay an assessment "for the support of [General Villa's] army." *Id.* Thus, unlike in the instant case, in *Oetjen* the act was clearly carried out pursuant to a direct order by an official with authority to make such an order, on behalf of the state. Here, defendants provide no evidence of a Pancho Villa.

Similarly, in *Underhill v. Hernandez*, 168 U.S. 250 (1897), the act at issue was perpetrated by *the commander* of the military of the winning side in Venezuela's civil war. Unlike this case, there was therefore no doubt that the act was an official act of the ultimate and eventual sovereign. In *United*

9

*States ex. rel. Von Heymann v. Watkins*, 159 F.2d 650, 652 (2d Cir. 1947), the circuit court assumed that the "acts of the Costa Rican government in causing [appellant's] arrest, detention, and delivery to agents of this country within Costa Rica were all lawful," citing act of state cases. The case fails to provide any details of the acts, however, and is therefore of little help. There is no indication that the Costa Rican officials were, like the actors in this case, low-level officials acting without clear orders.

In *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032 (W.D. Wash. 2005), the district court applied the act of state defense where the acts were the bulldozing of Palestinian homes (and protestors) by the Israeli army. The court gave minimal explanation, stating only: "plaintiffs claim that Israel's official policy violates international law and also that orders were given to a bulldozer operator to continue with the demolitions even when protestors were present. Military orders are official acts of the sovereign." *Id.* The court thus indicated that, unlike in this case, the acts were taken pursuant to the state's "official policy," and that the acts were taken pursuant to direct orders. Defendants provide no evidence that the alleged acts here were consistent with Nigeria's official policy, nor do they provide evidence that the alleged acts were taken pursuant to direct orders.

In *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1190 (C.D. Cal. 2005), a case somewhat factually analogous to this one, the district court determined that the "case involves official acts because 'the governmental action here could not have been taken by a private citizen.' Private citizens do not generally have the ability to maintain an air force and authorize the use of military force." *Id.* (citing *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 408 (9th Cir. 1983)). The legal standard used by the district court is incomplete. Under its reasoning, essentially any military operation would be deemed an official act. As discussed above, binding Ninth Circuit precedent establishes that this is not so; military operations are not necessarily official acts. *See In re: Estate of Ferdinand Marcos*, 25 F.3d at 1471 n.4; *see also Jiminez v. Aristeguieta*, 311 F.2d at 557-58. Furthermore, the district court ultimately rejected the act of state defense, determining that the *Sabbatino* factors weighed against allowing the defense. *See* 381 F. Supp. 2d at 1191.

In *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1075 (C.D. Cal. 1999), the act at issue was an order by a low-level commanding officer of the Burmese military, forcing the plaintiff, a conscripted soldier, to perform construction work (digging a ditch), without pay. The district court determined that

the order was an official act, finding that "[f]irst, an examination of Burma law reveals than an order to undertake public works construction by a military officer does not conflict with Burma law." *Id.* at 1078-79. "Second, an order given by a military officer has traditionally been viewed as an official act of a sovereign for purposes of the act of state doctrine. . . . [I]f a court determines the military officer acted on behalf of a recognized government and if the lawsuit turns on a challenge to the officer's order, then the act of state doctrine bars adjudication of the matter." *Id.* at 1079. In contrast to *Roe*, here defendants present no evidence that the acts at issue occurred pursuant to an order. Moreover, the order at issue in *Roe* – digging a ditch – is far different from an order to attack unarmed civilians. The former is far more likely to flow down a legitimate chain of command.

Defendants' final argument is that plaintiffs' allegations of a history of widespread abuses by the Nigerian police and military, similar to the events alleged in this case, establish that the acts were official. *See* Eighth Amended Complaint ("EAC") ¶¶ 68 ("Chevron took such action despite the fact that it knew or should have known of the Nigerian military and/or police's long history of committing serious human rights abuses in connection with oil and gas exploitation in the Niger Delta region."), 94 ("Defendants knew or should have known that the Nigerian government and its army and police committed human rights abuses . . . in connection with exploitation of oil and gas in the Niger Delta."). According to defendants, through these sections of the EAC, plaintiffs allege that the acts here were consistent with the widespread practice and policy of the Nigerian government itself. Thus plaintiffs cannot here argue, defendants contend, that the acts were not taken pursuant to the official policy and practices of the Nigerian government.

The flaw in defendants' argument is that it equates a history of abuse in one region of a large country with an official government policy. As discussed above, defendants fail to provide any evidence that the acts here flowed from a military chain of command, originating with an official or group of officials with the power and authority to create state policy. Plaintiffs' allegations of similar events are not evidence that such a chain existed. Plaintiffs' allegations may, in fact, eventually prove just the opposite: that there was no coherent chain of command in the Nigerian military, and therefore

11

local bands of soldiers were free to commit, and did commit, frequent human rights abuses.[4]

Defendants thus fail to meet their burden of presenting evidence of the first requirement of an act of state defense, that "there is an 'official act of a foreign sovereign performed within its own territory.'" *Sarei v. Rio Tinto*, 487 F.3d 1193, 1208 (9th Cir. 2007)(citing cases). Defendants' act of state defense therefore fails, as a matter of law.

### 2. The impact of *Rio Tinto*

In *Rio Tinto*, the Ninth Circuit held that the act of state doctrine cannot provide a defense to acts constituting violations of *jus cogens* norms.[5] The court stated:

> Acts of racial discrimination are violations of *jus cogens* norms. [citation] The complaint alleges 'systematic racial discrimination' and 'policies of racial discrimination' in Rio Tinto's operation of the mine, and that race was a motivating factor in several of the other alleged abuses. These allegations, which must be accepted as true at this stage, constitute *jus cogens* violations. Therefore, because 'international law does not recognize an act that violates *jus cogens* as a sovereign act,' the alleged acts of racial discrimination cannot constitute official sovereign acts, and the district court erred in dismissing these claims under the act of state doctrine.

*Id.* at 1209-10 (quoting *Siderman de Blake v. Argentina*, 965 F.2d 699, 718 (9th Cir. 1992)).

Plaintiffs contend that, based on *Rio Tinto*, defendants' act of state defense necessarily fails, because acts constituting violations of *jus cogens* norms underlie all of plaintiffs' claims. In response, defendants argue that *Rio Tinto* only exempts "ATS [(Alien Tort Statute)] causes of action predicated on *jus cogens* norms" from the act of state doctrine. According to defendants, "[u]nder plaintiffs' theory, the court would have to decide whether the Nigerian government violated international laws not otherwise at issue in this case before it could determine whether it has authority to decide if the Nigerian

---

[4] Furthermore, defendants cannot argue that a history amounts to a policy, because in their motion for summary judgment on the crimes against humanity claim, they argue that there is no evidence of any state policy to commit the attacks on Parabe or Opia and Ikenyan. *See* Defs' Mot. (Docket No. 1260) at 14-15 & n.19 ("Plaintiffs cannot carry their burden of showing that Parabe or Opia/Ikenyan were part of a state policy to attack civilians." "That the GSF was acting in an official capacity in responding to the Parabe hostage crisis and the attack at the Searex rig provides no evidence of any policy of the Nigerian government to engage in [crimes against humanity].").

[5] "A *jus cogens* norm 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'" *Rio Tinto*, 487 F.3d at 1198 n.2.

12

government violated the RICO and state laws that are at issue." Defs.' Opp. at 5:12-15. "[T]his Court would be compelled to conduct a bench trial to determine whether the Nigerian government violated *jus cogens* norms before it could proceed to jury trial to determine whether the Nigerian government violated RICO and tort laws." *Id.* at 5 n.3.

Since the Court has found that defendants failed to meet their burden of demonstrating that the actions in this case were "official act[s] of a foreign sovereign performed within its own territory," there is no compelling reason to reach the *jus cogens* questions at this time.

## II. POLITICAL QUESTION DOCTRINE

Defendants also briefly contend that this suit presents a non-justiciable political question. The political question doctrine arises out of Article III's "case or controversy" requirement and has its roots in separation of powers concerns. *See Baker v. Carr*, 369 U.S. 186, 210 (1962). The political question doctrine is based on the tenet that "certain political questions are by their nature committed to the political branches to the exclusion of the judiciary." *United States v. Mandel*, 914 F.2d 1215, 1222 (9th Cir. 1990). In *Baker v. Carr*, the Supreme Court discussed six criteria to be considered in determining whether a case is a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. at 217. Where one of these formulations is inextricable from a case, a federal court should dismiss the case on political question grounds. *Id.* Despite "sweeping statements to the effect that all questions touching foreign relations are political questions . . . . it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 211.

Rather than attempting to show how, or even which of, the six *Baker v. Carr* criteria apply to this case, defendants merely make the conclusory statement that "there is ample evidence that continued adjudication of this case presents serious threats to vital U.S. interests." Mot. at 22:8-9. Nonetheless,

13

the Court will briefly examine the potentially relevant *Baker v. Carr* factors to determine if this case presents political questions.

### A.  Factor one: constitutional commitment to another branch

According to the Ninth Circuit in *Rio Tinto*, "the resolution of claims brought under the [ATS] has been constitutionally entrusted to the judiciary." 487 F.3d at 1204 (citing *Alvarez-Machain*, 331 F.3d at 615 n.7). Furthermore, defendants present no evidence of any treaty or executive agreement addressing the claims involved in this case. *See Mujica*, 381 F. Supp. 2d at 1194. This case is factually analogous to *Rio Tinto* and *Mujica*, in which this factor did not support application of the political question doctrine. *See id.*; *Rio Tinto*, 487 F.3d at 1204. The Court therefore finds that this factor does not support application of the political question doctrine.

### B.  Factor two: lack of judicially discoverable and manageable standards

"The crux of this inquiry is . . . not whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint." *Mujica*, 381 F. Supp. 2d at 1193 (quoting case). "Rather, courts must ask whether they have the legal tools to reach a ruling that is principled, rational, and based upon reasoned distinctions." *Id.* (quoting case). Defendants do not explain, and the Court fails to see, how the courts lack the necessary legal tools to deal with this dispute. Many of plaintiffs' claims rest on "federal statutes, common law, state law, and well-established case law that provide concrete legal bases for courts to reach a reasoned decision." *Id.* (citing case). With respect to plaintiffs' ATS claims, "[w]hile there is not yet 'well-established' case law on several aspects of this federal statute, the Court cannot conclude that there are not 'judicially discoverable and manageable standards' for this type of claim. After all, in *Sosa*, the Supreme Court recently concluded that the ATS provided a substantive cause of action and set out the framework discussed above for discerning cognizable theories under that statute." *Id.; see also Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230, 92 L. Ed. 2d 166, 106 S. Ct. 2860 (1986) ("it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts").

### C. Factors four, five and six: interference with a coordinate branch[6]

As the Ninth Circuit stated in *Rio Tinto*, "[t]he fourth, fifth and sixth *Baker* factors are relevant in an [ATS] case 'if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests.'" 487 F.3d at 1204 (quoting *Kadic*, 70 F.3d at 241).

Defendants fail to show any "prior decision taken by a political branch" with which resolution of this case would conflict. Defendants point to a State Department press briefing in which a spokesman stated: "We've made clear to Nigerian authorities they have a responsibility to keep the peace in that area, keep for the sake of the people, as well as for the safety of American citizens and property." Supp. Wallach Decl., Ex. 40. Addressing alleged human rights abuses is essential to "keep[ing] the peace," and adjudication of this case is therefore fully consistent with the State Department spokesman's statement. According to defendants, adjudication of this suit would also conflict with the United States' ongoing programs to help train the Nigerian Military. Surely any such training involves instruction on how to avoid situations such as that alleged here. Defendants also point to the fact that the United States considers Nigeria, as an oil producing nation outside of the Middle East, an important trading partner. However, there is ample evidence that the executive branch is equally, if not more, concerned with Nigeria's human rights record than it is with its oil producing status. *See, e.g., Nigeria: Security Assistance*, U.S. Department of State, Bureau of Political-Military Affairs, http://www.state.gov/t/pm/64687.htm ("Our over-arching national interests in Nigeria are promoting democracy and human rights, combating poverty and ensuring a cooperative partnership on regional stability, and trade."); 22 U.S.C. § 2304(a)(1) (1994) ("a principal goal" of U.S. foreign policy is "to promote the increased observance of internationally recognized human rights."). The fourth, fifth, and sixth *Baker v. Carr* factors do not support application of the political question doctrine.

---

[6] Defendants do not suggest, and the Court fails to see, how the third *Baker v. Carr* factor, "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion," might apply to this case. *Cf. Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997) (wrongful death claims resulting from a military training exercise raised nonjusticiable political questions because a decision would require "a policy determination regarding the necessity of simulating actual battle conditions").

15

**III. DEFENDANTS' RENEWED MOTION FOR THE COURT TO REQUEST THE VIEWS OF THE UNITED STATES**

Defendants argue that the views of the United States government "are key to evaluating the political question and act of state doctrines." Mot. at 2:1-2.

As discussed above, in the act of state context, the views of the executive branch only become material if defendants can first establish that, "(1) there is an 'official act of a foreign sovereign performed within its own territory'; and (2) 'the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act.'" *Rio Tinto*, 487 F.3d at 1208 (quoting cases). Defendants have failed to meet their burden of presenting evidence that the acts at issue constitute official acts of a foreign sovereign. Their act of state defense therefore fails to reach the stage at which the Court might weigh the impact of the case on the foreign relations of the United States.

The Court is similarly unpersuaded that the views of the executive branch are necessary to adequately address the political question doctrine. The policies of the political branches of the United States in relation to oil production, the conduct of domestic corporations in foreign countries, and promotion of human rights, are clear. As discussed above, defendants fail to show how adjudication of this case might conflict with those policies. There is thus no need for additional input from the executive branch, at this point.[7]

The Court also notes that on May 29, 2007, the United States filed a statement of interest in the state court case between plaintiffs and defendants. The substance of that statement of interest supports the Court's decision here. Superior Court Judge Kevin McCarthy invited the State Department to "submit a Statement of Interest, setting forth its official views, if any, on whether adjudicating this action or granting the relief that plaintiffs seek would adversely affect the diplomatic efforts of the United States, and, if so, the nature and significance of such effect." Letter from Robert Mittelstaedt

---

[7]*Rio Tinto* supports this conclusion. In *Rio Tinto*, the State Department did submit a "Statement of Interest" ("SOI"), which strongly discouraged continued adjudication of the case in the district court. 487 F.3d at 1198-99. Nonetheless, the Ninth Circuit found that the SOI did not justify dismissal under the political question doctrine. *See id.* at 1206-07. Applying this standard, even a strongly-discouraging SOI from the State Department would not likely affect the rejection of defendants' political question doctrine argument in this case.

16

(Docket No. 1629), Ex. A, at 1. In response to this broad invitation, the United States limited its statement to requesting that the court "decline to enter injunctive relief, in the form requested by the plaintiffs or otherwise, that would have the effect of mandating compliance, on pain of judicial enforcement and contempt, of the Voluntary Principles on Security and Human Rights." *Id.* at 2:3-5. The Voluntary Principles are a set of standards to be used by multinational corporations to ensure that their operations do not impinge on fundamental human rights and freedoms. Chevron is a participant in the Voluntary Principles initiative, as is the United States government. In the statement of interest submitted in Superior Court, the United States takes the position that the success of the initiative hinges on the fact that the Principles are voluntary; therefore, if the court were to enter injunctive relief forcing compliance with the Principles, doing so would have a "chilling effect" on participation in the initiative, and would thereby "interfere with an important foreign policy initiative of the Executive Branch." *Id.* at 7:3-8. The United States explicitly limits the statement of interest to this Voluntary Principles issue, stating:

> Before proceeding further, it is important to note the limitations of the United States' submission. The United States does not herein take a position with respect to whether the defendants are properly held liable for the claims raised against them, or as to any other legal issue presented by this case; nor does it take a position with respect to whether, if defendants are held liable, injunctive relief, or any other kind of relief, is available or appropriate, nor as to what form such relief would take, apart from the judicially-compelled implementation of the Voluntary Principles.

*Id.* at 2:22-3:2.

Thus, despite a broad invitation to comment on the impact of litigating the Parabe and Opia and Ikenyan incidents in courts in the United States, the Executive Branch voiced only concern with the Voluntary Principles. The Voluntary Principles do not appear to be at issue in this case, in this Court. As such, and as the Court determined above, the views of the Executive Branch would likely contribute little, if anything, to the Court's analysis of the act of state and political question doctrines.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS plaintiffs' motion (Docket No. 1278) and DENIES defendants' motion for summary judgment on defendants' act of state defense (Docket No. 1286), and DENIES defendants' renewed motion for the Court to request

17

the views of the United States (Docket No. 1290). The Court also OVERRULES defendants' objections to plaintiffs' statement of facts, the declaration of Richard Herz, and the supplemental declaration of Richard Herz, as moot; the objected-to evidence is immaterial to the Court's findings (Docket Nos. 1341, 1316, 1343).

**IT IS SO ORDERED.**

Dated: August 13, 2007

SUSAN ILLSTON
United States District Judge