**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LARRY BOWOTO, et al.,                                     No. C 99-02506 SI

            Plaintiffs,                          **ORDER RE:  DEFENDANTS' MOTION
                                                         FOR SUMMARY JUDGMENT ON
  v.                                                   PLAINTIFFS' CLAIMS 10 THROUGH 17**

CHEVRON CORPORATION, et al.,

            Defendants.
_____/

On March 2, 2007, the Court heard argument on defendants' motion for summary judgment on plaintiffs' claims 10 through 17.  Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court hereby rules as follows.

## BACKGROUND

Plaintiffs filed this suit in 1999, seeking to recover for a series of brutal attacks that plaintiffs allege occurred in Nigeria in mid-1998 and early 1999.  The following is a summary of the relevant context, and of the parties' conflicting versions of the incidents giving rise to plaintiffs' lawsuit.

**I.      Nigeria**

The report of plaintiffs' expert Michael Watts is helpful in providing the general historical, cultural and geographical context of this case.  It states:

> Nigeria is unquestionably one of the most important countries on the African continent.  Located in West Africa, it has the largest population (roughly 140 million people by current estimates) [of any] African state.  It accounts for almost half of West Africa's population and 40% of the region's GDP. Nigeria is approximately 923,768 sq kms – that is to say, roughly twice the size of California.  Located north of the equator,

United States District Court
For the Northern District of California

Nigeria is fully within the tropics. . . .  The southern part of Nigeria is entirely coastal with a coastline of 853 kms; that part of the Atlantic Ocean is customarily referred to as the Bight of Benin or more expansively the Gulf of Guinea.  The coastline is dominated in its eastern part by the River Niger, which empties into the Atlantic Ocean through an enormous delta (the Niger Delta).

While Nigeria is, in climatic and ecological terms, a tropical country, the northern part of Nigeria is dry and dominated by savanna (mixed woodland and grassland), while the south is wetter, more humid and overwhelmingly forested. . . .  The Delta is . . . a monsoon regional, in which rainfall is distributed throughout the year, and in which hot and humid conditions predominate (relative humidity is always above 80%).  Mean monthly temperatures vary between 24 degrees C [(75.2 degrees F)] and 32 degrees C [(89.6 degrees F)] throughout the year.  Mean annual rainfall varies from 2000-4500 mm [(78-177 inches)].  Rain falls every month of the year with a short dry spell in January-March.

The vegetation of the Niger Delta is overwhelmingly forest of different ecological types.  In the immediate coastal regions, mangrove forests predominate. . . .  Mangrove ecosystems are integral parts of both marine life and human food systems because many types of species of fish and marine life depend upon and reproduce in the unique mangrove environment that characterizes the Niger Delta.  Like tropical rainforest environments in general, the mangrove ecosystem is particularly fragile.  The Niger Delta contains the world's third largest mangrove forest and the most extensive freshwater swamp forests in West and Central Africa.  The Niger Delta also contains one of the last and largest remaining areas of primary tropical rainforest on the African continent, and is therefore a critical region for the preservation of biodiversity.

Further inland in the Delta, in areas that are not saline, freshwater swamps and tropical rainforests interspersed with areas cleared for intensive agriculture – most in the hands of small family farmers – is the dominant vegetation type.

A key dimension of understanding the Niger Delta is understanding the balance between fresh and saltwater.  In areas close to the Atlantic Ocean, the presence of salinity (which may change seasonally in relationship to precipitation and the volume of river flow) fundamentally shapes vegetation and human livelihood strategies.  The maintenance of zones of freshwater in these areas is therefore particularly important.  The effect of changes in land use and human intervention (for example, dredging or deforestation) can fundamentally alter the balance of fresh and saltwater.  Accordingly, saltwater intrusion into freshwater areas can deleteriously affect agriculture and livelihood systems in the Delta.

The mangrove forests and the geography of the Delta make human movement difficult, and, accordingly, most people travel by boat through the many creeks, rivers and channels that constitute the Niger Delta.  Since 1960, the Nigerian government has provided modern forms of transportation infrastructure such as roads and bridges, but large parts of the Niger Delta (especially the southern and coastal regions) remain largely without road transportation and dependent upon boat traffic.

The current boundaries of Nigeria and its constitution as a modern nation-state, is a product of the so-called imperial Scramble for Africa of the last quarter of the 19th century.  In the context of intense competition between European colonial powers, Great Britain carved Nigeria out of a complex mosaic of indigenous political systems.  For example, the northern boundary of Nigeria bisected one of the largest and most powerful traditional states in West Africa.  By the early twentieth century, Britain had created two Protectorates covering the northern and southern parts of what is now Nigeria.  They

were amalgamated in 1914 and so secured the current borders of Nigeria. These borders included a vast number of different cultures, ethnic groups and traditional political systems, which, prior to this time, had no identification with an entity called "Nigeria."

According to the World Bank, Nigeria currently comprises about 200 different ethnic groups, 500 indigenous languages and two major religions (Islam and Christianity). This diversity is entirely a product of the process by which Nigeria was created as a colonial entity. To that extent, Nigeria is entirely the product of external imposition, drawing together people of very different cultural, religious and ethnic affiliation who, prior to 1900, may have had very little in common. At Independence one of its most important leaders Obafemi Awolowo, said that Nigeria was not a country but a "mere geographical expression". Nigeria is a classic case of an African multi-ethnic state created by the often violent process of colonization.

While English is Nigeria's national language (a legacy of colonial rule), the country is nonetheless characterized by enormous linguistic diversity. For most Nigerians, their first language remains their indigenous tongue. For example, as it applies to this case, the first language of the Ijaw people is Ijaw, and the first language of the Ilaje people is Ilaje. The Niger Delta is an area of especially diverse languages, perhaps the most diverse in all of Nigeria.

Nigeria was a British colony for almost 50 years after amalgamation, gaining independence in 1960. Throughout the colonial period, Nigeria was administered through colonial indirect rule. In practice, this meant that the British established regional systems of government that were associated with the largest ethnic groups and ruled through local ethnic elites; the Hausa in the north, the Yoruba in the west, the Ibo in the east. The effect of colonial rule, therefore, was to establish a strongly regional and ethnic system of politics, in which local regional ethnic elites worked on behalf of the colonial administration through systems of Native Administration. As a consequence, the many and smaller ethnic groups (in Nigerian parlance, "ethnic minorities"), were largely marginal to the process of colonial economic and political development.

At independence, the new Nigerian federal system was dominated by three powerful ethnic-religious groups. The country had a relatively weak central system of federal authority. From the moment of its birth, Nigeria was accordingly characterized by intense ethnic political competition and deep political instability. This took the form of struggles and conflicts between the regional (meaning ethnic and religious) political parties over access to government revenues and development initiatives.

At Independence Nigeria was born as a federal system comprised of five regions. In 1968, a twelve-state system came into effect and over time the number of states has grown to thirty six. This growth of states is a reflection of the attempt to create a sort of political stability by granting to key ethnic communities their own states through which they can gain access to government revenues, which after 1970 increasingly meant oil wealth.

At independence and for a decade thereafter, the primary source of government revenues, and therefore the object of political activity, were agricultural export commodities . . . . Commercial production of petroleum began in the late 1950s, but was an insignificant part of Nigeria's exports at this time (amounting to about 1% of government revenues and 1.8% of total exports).

. . . . Nigerian post-independence politics were highly unstable and quickly degenerated into crisis. Amidst a series of deep political conflicts among the regions and political parties between 1960 and 1966, the Nigerian military claimed power in a 1966

coup led by Major General Ironsi. Shortly thereafter, the eastern region, which included the Niger Delta, seceded from the nation, declaring themselves the independent state of Biafra. One of the contributory factors to the secession by the eastern region was the realization that oil located in the Niger Delta promised enormous wealth for those who controlled it. So began the bloody Nigerian civil war between 1967-1970.

The civil war, which resulted in the defeat of the Biafran forces and the reincorporation of the eastern region into the federation, marked the beginning of a long and almost uninterrupted 30-year period of military rule in Nigeria. Until the election of President Obasanjo in 1999, Nigeria was ruled over by a succession of autocratic military junta (with the exception of a brief democratic opening between 1979 and 1983). Each state in the federation was presided over by a military governor appointed by the Supreme Military Council. Elections were abolished, the military and security forces expanded, freedom of the press and of speech was radically compromised, arbitrary detention and extrajudicial killings were commonplace, and, in a number of widely-publicized cases, the military were deployed to quell popular dissent.

It is widely held in the scholarly arena that military rule under President Babangida in the [period] from 1985-1993 and especially in the 1990s during the rule of General Abacha['s] government (1993-1998), was the most violent and dictatorial in the long history of Nigerian military rule. This deepening of autocratic rule and the willingness of military government to subject all manner of political opponents to intimidation, imprisonment, torture and murder went hand in hand with a proliferation of state mismanagement and increasing corruption.

Watts Expert Report (Hoffman Decl. 185) ¶¶ 15-30.

## II.    The history of oil production in Nigeria

In the wake of Biafra's defeat, oil output increased markedly. . . .  Especially after 1973, when world oil prices increased dramatically as a result of the actions of OPEC, of which Nigeria is a member, Nigerian oil revenues exploded. In 1970, government revenue from oil was 66 million Naira (the Nigerian currency then roughly equal to one US$); by 1980 it was 10 billion naira. As a consequence, Nigeria was transformed from an agricultural exporting country to an oil nation. Since 1974, oil has annually produced over 90 percent of Nigeria's export income. According to UCLA Professor Michel Ross, one of the leading scholars of the oil industry, in 2000, Nigeria received 99.6 percent of its income from oil, making it the world's most oil-dependent country. [citation]. Currently, as of 2004, oil accounts for 98% of Nigerian exports, 87% of government revenues, and almost half of gross domestic product.

. . . .

The heart of Nigerian oil production is in the Niger Delta. Both Ondo State and Delta State are located in the Niger Delta.

Oil and gas exploration rapidly intensified in the 1970s, which increased the physical presence of oil companies in the Niger Delta. In practice, this meant that the region became cris-crossed by thousands of kilometers of pipeline, became the location for hundreds of well heads and numerous flow stations and rigs, and witnessed the construction of oil refineries, tankering facilities and other oil infrastructure (most recently liquefied natural gas plants). The operations of the oil companies and the oil service companies brought local communities into direct contact with all aspects of the

4

1    oil industry.

2            . . . .

3            It is estimated by the World Bank that 80 percent of the oil revenue is accounted
     for by 1 percent of the Nigerian population.  Almost three quarters of Nigerians live on
4    roughly $1 per day according to the World Bank.

5    *Id.* ¶¶ 32-37.

6            [T]he oil-producing region of Nigeria is known as the Niger Delta, which
     encompasses eight states within the Nigerian federation, including Ondo and Delta
7    states, where the plaintiffs in this case are primarily located.

8            The population of the Delta is difficult to estimate because of a lack of reliable
     census data.  According to the 1991 census, the population of the main oil states – Ondo,
9    Delta, Rivers, Bayelsa – was roughly 12 million.  While roughly one-third of the
     population reside in large industrial centers . . . , the majority of the population is rural.

10
            . . . . Only 30% of inhabitants of the Delta region have access to potable water;
11   primary and secondary school attendance in the riverine areas is well below the national
     average; and child and maternal mortality rates are exceptionally high. [citation].  Most
12   rural Delta inhabitants depend for their livelihoods on small scale agriculture, fishing,
     artisanal and trading activities.

13
            Unemployment in the remote areas of the Niger Delta is high.  . . .
14   [U]nemployment estimates in the riverine areas of Delta state vary, but can be as high
     as 90 or 95 percent in areas. [citation].  Particularly for the region's youth, employment
15   opportunities are nonexistent.  According to information provided by the state
     development agencies, youth unemployment rates are, on average, in excess of 75
16   percent [citation].

17           . . . .

18           Although accurate date on poverty rates in the Niger Delta does not exist, one
     estimate is that the GNP per capita is below the national average of USD 260, and even
19   lower in the riverine and coastal areas. [citation].

20           Statistics provided by the Nigerian government show that . . . the average life
     expectancy at birth in the Delta is around 40 years, which is substantially lower than the
21   national average of 46.7 years.

22           . . . .

23           Transportation infrastructure in the rural areas is extremely undeveloped.  There
     are very few roads linking rural communities. Rural electrification for the most part does
24   not exist.  Hospitals and pharmacies are typically under-equipped and understaffed. . .

25   *Id.* ¶¶ 65-74.

26

27

28   \\\

United States District Court
For the Northern District of California

III.     **Plaintiffs' version of the incidents giving rise to their claims**

A.        **The context of the attacks at issue**

According to plaintiffs, during the military regimes governing Nigeria in the 1990s, Nigerian government security forces regularly engaged in the use of excessive force in repressing any perceived threat to oil production in the Niger River Delta region of Nigeria.  Plaintiffs' expert, Professor Watts, states in his declaration that:

> during the successive military regimes of the 1990s, and especially in the period of the Abacha government between 1993 and 1998, the Nigerian government security forces engaged in a course of conduct involving a pattern of violent repression of individuals and communities who organized to oppose or protest aspects of petroleum development in the Niger Delta, and of individuals and communities who were alleged or perceived to be associated with such opposition. . . .  A number of military and paramilitary activities . . . caused untold personal harm, large-scale physical displacement of communities, the destruction of property, large numbers of deaths (including extra-judicial killings) and instituted what can only be called a culture of terror. . . . I believe this is widely recognized and understood by the vast majority of scholars of Nigeria and by the human rights and foreign policy establishment.

Watts Decl. ¶ 18 (citations omitted).

In 1999, the Nigerian civilian government formed the "Human Rights Violations Investigation Commission" (the "Oputa Commission"), to investigate human rights abuses committed by prior military regimes.  The Commission was headed by Justice Chukwudifu A. Oputa.  *See* Watts Decl. ¶ 19.  The Commission held a series of public hearings, in "five centers" throughout the country, on the issues it was investigating.  *See* Oputa Comm. Report (Watts Decl., Ex. 1), Vol. I ¶ 2.123.  Many of the hearings were nationally televised.  *See id.*, Vol. I ¶ 2.124-2.125.  The Commission also enlisted "reputable research Centres and other experts drawn from equally reputable civil society organizations and the academia" to conduct "fieldwork" over a period of nine months in the year 2000.  *See id.,* Vol. III, "Introduction."  In the Niger Delta, an area populated by approximately 12 million people, according to the report, the Commission employed twelve researchers.  *See id.*, Vol. III at 30.

On the basis of its investigation, the Oputa Commission concluded that the oil companies' "interests became 'State interest,' which must be protected.  This logically led to the *systematic and generalized violations and abuses*, which occurred in the Niger-Delta during the dark period of military rule in the country, as detailed in . . . this Report."  *Id.*, "Overview" ¶ 1.50 (emphasis added).  The report also states that "[t]he politics of oil foregrounds the historical narration of rights violations in Nigeria's

6

Niger Delta (South-South), *the standard practice being the use of maximum force against the people of this region* by an alliance of Trans National Oil Corporations, the state and the indigenous elite." *Id.*, Vol. 3 at 9 (emphasis added).  The report also noted

> [i]nhuman treatment, violence and repression meted out to communities when they protest against environmental degradation, and neglect of their area by the Nigerian state and the oil-producing companies.  The violence, which is usually effected by the police or the military, may be at the instance of the state or the oil multinational corporations.  The latter often prefer inviting the security agencies whenever their operations are threatened by the local people, rather than engaging them in genuine dialogue.
>
> . . . .
>
> In virtually all parts of the Niger-Delta, an army of occupation is stationed by the federal government to "keep peace" and facilitate the oil exploitation by the oil companies.  These fierce-looking military officers largely deny the rights of the citizens to free movement, association and speech.  In several instances, those forces unleash terror on the local people.  They kill, maim, rape and destroy properties in those communities in the real tradition of an army of occupation.

*Id.*, Vol. 3 at 43-44.

In addition to these general conclusions from various sources regarding the systematic and widespread nature of government security forces ("GSF") attacks on civilian communities, plaintiffs also present evidence of several emblematic attacks.  For example, in the fall of 1990, GSF killed eighty people and destroyed almost 500 houses in repressing protests at a Shell Oil facility near the village of Umuechem, Rivers State.  *See* Watts Decl. ¶ 25; Oputa Comm. Report, Vol. III at 50; Watts Decl., Ex. 19 at 2-3; Watts Decl., Ex. 35 at 69.  A Nigerian Judicial Commission of Enquiry investigated the Umuechem incident, and concluded that the protest was peaceful, the demonstrators were neither violent nor armed, and the GSF displayed "a reckless disregard for lives and property."  *See* Chomsky Decl., Ex. 15.  In another incident, in 1992, "one person was killed, 30 shot and 150 beaten when local villagers from Bonny demonstrated against Shell."  Watts Decl., Ex. 7 at 19; Ex. 13 at 33.

As another example of the violence characterizing the Niger Delta during the period, Professor Watts describes Ogoniland in the 1990s as one of "three main theatres in which human rights violations by the army and security occurred."  Watts Decl. ¶ 26.  "[I]t is clear that thousands were displaced, and many hundreds killed and arrested" in Ogoniland, as a result of military repression of oil protestors in the 1990s.  *Id.*; *see generally* Plaintiffs' Corrected Affirmative Statement of Facts in Opposition to Defendants' Motion for Summary Judgment on Crimes Against Humanity ("PASOF") (Docket No.

7

1418)  ¶¶ 93-116.  The Oputa Commission received over 8,000 complaints concerning human rights abuses in Ogoniland.  Watts Decl. ¶ 26.  In November 1999, GSF attacked the community of Odi in Bayelsa State, and killed between 250 and 2483 civilians.  Watts Decl. ¶ 28.

**B.      Parabe (plaintiffs' version)**

In 1998, defendants' Nigerian subsidiary, Chevron Nigeria Ltd. ("CNL"), operated the Parabe offshore platform in Nigerian territorial waters approximately 15 kilometers off the coast of the Niger Delta. (Undisputed).  Adjacent to the platform was a construction barge, the CBL-101, which was being used for a project to upgrade the platform. (Undisputed).

The group involved in the Parabe incident, the Ilaje, are a small tribe of Nigerians most of whom live in relatively remote swamplands and river areas in the southwest delta region of Nigeria, in Ondo State.  Plaintiffs' Corrected Opposition to Defendants' Statement of Facts (hereinafter "Docket 1417") at 13.  The vast majority of people living in these rural Ilaje communities traditionally make their living and feed their families by agriculture and by fishing from the sea, rivers, swamps and swamplands of the Niger Delta.  *Id.* at 13-14.  The coastal communities immediately surrounding or close to the Parabe platform were in the catchment area and were Ilaje.  *Id.* at 14.  The traditional way of living and working in Ilajeland has been severely disrupted by the work of CNL in the region.  CNL's activities have depleted the supply of fish and other seafood, have caused erosion and pollution of agricultural lands, and have destroyed sources of fresh water.  *Id.*  Around the time of the protests, CNL employed only two Ilaje workers out of approximately 2,500 Nigerian employees, despite the fact that as much as 20% of CNL's oil production came from Ilajeland or sites immediately off the coast thereof.  *Id.*

In 1998, members of 42 Ilaje communities affected by CNL's activities formed a group called the Concerned Ilaje Citizens ("CIC").  Hoffman Decl., Ex. 125 (Declaration of Ola-Judah Ajidibo) ¶ 8.  The CIC wrote to CNL on several occasions, detailing the problems facing the communities.  *Id.* ¶ 10.  After further meetings, the Ondo State Government Administrator joined with the CIC in requesting that CNL meet with the CIC.  CNL failed to attend any of the meetings.  *Id.*  After holding a series of meetings, without any response from CNL, the CIC decided to conduct a peaceful protest at the Parabe platform in order to draw attention to their grievances.  *Id.* ¶ 12.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

On May 25, 1998, more than 100 members of the CIC boarded the Parabe platform. Hoffman Decl., Ex. 127 (Bowoto Decl.) ¶ 15. According to one of the leaders of the CIC, Ola-Judah Ajidibo:

> Before the men left for the Parabe Platform, they were given instructions by the elders and by me at the direction of the elders. The elders and I told them that no one was to carry any firearms or other weapons onto the platform, that no one was to drink alcohol or use other drugs, and that the protest was to be orderly and entirely peaceful. Bola Oyinbo was appointed to lead those men who traveled out to the platform in boats on May 25, 1998. With the approval of the chiefs and leaders, I told Bola that he was to speak with the naval security on the Parabe Platform at his arrival, explain the reason for the protest, and provide the naval officers with copies of our recent letters to Chevron. Again with the approval of the chiefs and elders, I told Bola that he was then to request a meeting with whomever was in charge for Chevron on the platform and that he was to ask that individual to contact [CNL managing director] George Kirkland in order to set up a meeting between Mr. Kirkland and the elders and chiefs onshore.

*Id.* ¶ 13.

The first group of Ilaje, comprised of approximately 25 people, arrived in one speedboat, and five smaller "motorized local boats." *Id.* ¶ 14. None of them were armed. Approximately five Nigerian Naval officers and four Nigerian Mobile Police were stationed on the platform when the Ilaje arrived; the officers were armed. *Id.* As instructed, the first group of Ilaje to arrive at the platform spoke with the naval security and explained the reasons for the protest. *Id.* ¶ 15. They gave Lieutenant Afolayah copies of the recent letters to Chevron. After speaking with the Ilaje and reviewing the letters, Lieutenant Afolayah allowed the protestors to board the platform. *Id.* The Ilaje then asked the CNL employee in charge to contact George Kirland to arrange a meeting. *Id.*

The following day, May 26, CNL personnel Deji Haastrup and James Neku arrived at the platform along with military personnel. *Id.* ¶ 14. CIC leaders who had remained ashore traveled to the platform to meet with Haastrup and Neku. *Id.* Deji agreed on CNL's behalf to a meeting with the CIC leadership on land, at Ikorigho, the following day. *Id.* On May 27, as arranged, Haastrup and another CNL employee met with community leaders at Ikorigho. The community leaders continued to pressure CNL for a direct and personal response from Mr. Kirkland. At the end of the meetings at Ikorigho, Deji agreed to return to Ikorigho on May 29 with a final response from Mr. Kirkland. *Id.* ¶ 17. Based on this progress, the community elders instructed Ajidibo to tell Deji that the protestors would leave the barge on May 28. Ajidibo did so. Ajidibo and several others then traveled to the barge to tell the protestors to leave the following morning, May 28. *Id.*

**United States District Court**
For the Northern District of California

At no time during the protest did the Ilaje take any hostages.  Hoffman Decl., Ex. 127 ¶ 18.  The protestors told the CNL workers that they were free to leave.  *Id.*  At some point during the protests, a CNL employee fell ill, and a CNL helicopter arrived and took him away, without incident.  *Id.*  None of the protestors were armed, and none threatened or harmed any of the workers.  *Id.* ¶ 19.

The Ilajes did not request that work on the platform be stopped, and did not attempt to stop work on the platform.  Docket 1417 at 17.  Oil continued to flow from Parabe during most of the protest.  *Id.* at 18.  Communications within CNL and between CNL and Chevron USA reflected that the Parabe protest was peaceful.  *See id.*  Armed members of the Navy and military police remained on the barge and in control at all times.  *See id.* at 19.  At some point during the protests, additional military personnel arrived at the platform in a "Dolphin Flyer" boat.  The navy lieutenant in charge on the platform told them they were not needed, and the boat left.  Hoffman Decl., Ex. 297 (Boyo Dep.) at 61-64.  Workers and protestors played games, shared meals, watched videos, fished, chatted together, and established friendships during the three-day protest.  Docket No. 1417 at 20.

Very early on the morning of May 28, while many Ilaje were still asleep, and before they had begun to leave the platform, CNL security personnel and GSF arrived in several CNL-leased helicopters and attacked the protestors.  *Id.* ¶ 21.  One of the helicopter pilots testified that the GSF began firing from his helicopter before it even landed on the barge helideck.  Hoffman Decl., Ex. 302 (Crowther Dep.) at 150:20-152:2, 154:18-156:9.  To escape, the Ilaje ran towards shelter or jumped into the sea.  Teukolsky Decl. (re: claims 10-17), Ex. 18 at 76:6-16; Ex. 30 at 604:14-605:21.  Boats had already left the Ilaje villages on shore to pick up the protestors, as planned, when the attacks began.  *See* Hoffman Decl., Ex. 293 at 115-116.

The GSF and CNL personnel involved in the attack flew to the Parabe platform in helicopters leased by CNL.  The helicopter pilots who flew to Parabe received their instructions from the CNL personnel on board, and not the GSF.  *See* Hoffman Decl., Ex. 328 (Ogunjobi Dep.) at 211:1-212:17; Ex. 302 at 79:21-80:8.  CNL Escravos Security Coordinator James Neku flew in one of the helicopters.  Hoffman Decl., Ex. 325 (Neku Dep.) at 250:21-251:25.  In his report on the incident, Neku stated that the GSF were "closely supervised by CNL security."  *Id.*, Ex. 84 (C50-53) at C51.  When the helicopters landed on the helideck at Parabe, Neku opened the boot of his helicopter and gave the soldiers whatever

1  was in there, then directed the GSF towards the helideck stairs. *See id.*, Ex. 321 at 63:19-64:4.  Neku

2  then went up to the radio room, and gave the soldiers directions using an electric bullhorn. *See id.*, Ex.

3  338 (Peace Dep.) at 65:6-11, 67:6-68:6.

4  Two individuals, including decedent Arolika Irowarinun, were shot and killed by the GSF at

5  Parabe.  Mr. Irowarinun was not attacking the soldiers or posing any threat when he was shot.  Docket

6  1417 at 38-39.  He was shot in the side of the chest, which is consistent with turning away from the

7  gunfire before being shot.  Teukolsky Decl., Ex. 29 at 55:11-59:13, 65:3-68:10.

8  Two other plaintiffs, Larry Bowoto and Bassey Jeje, were also shot.  Jeje was shot in the arm,

9  and subsequently was hit with a rifle butt.  Filios Decl. (filed Nov. 13, 2006), Ex. 2 (Jeje Dep.) at

10  366:17-22, 492:2-15.  Bowoto was shot while running towards the GSF, with his hands up, screaming

11  that they were all peaceful protestors, and screaming "What's going on?  What's going on?"  *See id.*,

12  Ex. 3 (Bowoto Dep.) at 597:4-7, 607:22-608:22.

13  Many of the protestors were subsequently arrested and beaten by the GSF.  One group of 11

14  protestors was locked in a small container, and beaten with gun buts and horse whips.  *See* Hoffman

15  Decl., Ex. 363 at 78-82.  They were then taken by the GSF to Escravos by boat.  During the boat ride,

16  a GSF told them they were going to be killed.  *See id.* at 92:12-94:1.  Many of the prisoners were crying

17  during the boat ride.  *See id.* at 94:2-8.  From Escravos, the prisoners were taken by boat to Warri.  *See*

18  *id.* at 94:9-16; *see also* Hoffman Decl., Ex. 313 (Irowarinu Dep.) at 141:18-142:13, 144:11-153:6.  After

19  arriving at Warri, the prisoners were placed in a jail cell at a naval base, and told to remove their clothes.

20  *Id.*, Ex. 363 at 94:17-96:8.  After removing their clothes, the GSF beat the prisoners with horse whips

21  and gun butts.  *Id.* at 97:7-16.  After the beating, the prisoners were placed together in a small room,

22  where they were kept for three days.  *Id.* at 97:17-24.  The GSF then took the prisoners to Akungba, then

23  to Akure.  *Id.* at 106:16-107:9; Ex. 313 at 163:4-8, 163:23-164:13.  At Akure, the GSF continued to beat

24  the prisoners, and pressured them to confess to crimes.  *Id.*, Ex. 363 at 111-115.  Among those beaten

25  was Bola Oyinbo, on whose behalf several claims are brought in this case.[1]

26

27

28         [1]Bola Oyinbo died three years later in Lagos, Nigeria.

C.      Opia and Ikenyan (plaintiffs' version)

Opia and Ikenyan are two small villages located in the Niger Delta.  (Undisputed).  In late 1998, the Searex drilling rig, under contract to CNL, was located in the general vicinity of Opia and Ikenyan. (Undisputed).  On January 3, 1999, members of the Opia village went to the Searex rig to demand compensation for pollution caused by CNL in the community; none of the plaintiffs were among this group.  *See* Hoffman Decl., Ex. 367 at 257:4-9, 258:3-259:24; Ex. 360 at 318:4-25, 321:19-24, 340:2-5. The villagers were unarmed.  The GSF stationed at the rig detained and beat the villagers with whips and guns.  *See id.*, Ex. 304 at 169:20-170:1; Ex. 352; Ex. 353; Ex. 360 at 340, 344; Ex. 367 at 257-259.

The following day, another group of villagers from Opia went to the Searex rig.  A group of women approached the rig first, and were told by GSF on the rig to go back.  *See id.*, Ex. 317 (Lawuru Dep.) at 408.  Behind the women was a group of community leaders.  As one of the community leaders stood in his canoe to identify the group, the GSF fired gunshots.  *See id.* at 409-412; Ex. 314 (Iteimor Dep.) at 235-236; Ex. 306 (Edekou Dep.) at 94, 97.

Apparently having heard of the incident at the Searex rig, GSF Captain Kaswe demanded the use of CNL-leased helicopters to take him and his men to the area from Escravos.  *See* Hoffman Dec., Ex. 339 (Pell Dep.) at 120:12-121:19.  The Captain and his men were extremely agitated, and strongly demanded that CNL transport them.  *See id.*; Ex. 304 at 135:24-136:4.  The CNL personnel informed the Captain that he and his men could not be transported until any violence at the Searix rig dissipated. *See id.*, Ex. 339 at 123-124.

One or two hours later, at around 12:30 p.m., a CNL-leased helicopter was dispatched by CNL to fly to the Searex rig.  Hoffman Decl., Ex. 323 (Meier Dep.) at 32.  The helicopter, piloted by Alan Meier, picked up Captain Kaswe and his men from the airstrip, along with Reuben Osazuwa, a high-level CNL security employee.  Osazuwa sat in the co-pilot's seat.  *Id.*, Ex. 282 (Meier Dep.) at 126.  The GSF onboard were fully armed, despite a CNL policy or practice requiring GSF traveling in CNL-leased helicopters to place all ammunition in the boot of the helicopter.  *Id.* at 37-38; Ex. 335 (Osazuwa Dep.) at 175.

The Searex rig was located about 5 to 7 miles from Escravos.  During the flight towards the rig, Osazuma instructed Meier to deviate from the course and fly over a river.  *See id.*, Ex. 323 at 40.  The

passengers then spotted three canoes on the river.  Osazuma exclaimed "they are hiding, they are hiding," and he instructed Meier to circle around the canoes and slow down.  *Id.* at 41-42; Ex. 282 at 148.  Captain Kaswe then fired five to seven shots in rapid succession.  *See id.*, Ex. 282 at 155; Ex. 323 at 42; Ex. 88.  Osazuwa's report on the incident stated that the shots were fired immediately after "flying through Opia" and "observ[ing] people . . . hurrying out of the village in their canoes."  *Id.*, Ex. 65 at C116; Ex. 335 at 233.  Villagers observed the helicopter over the village, and fled into the bush when shots were fired from the helicopter.  *See* Hoffman Decl., Ex. 317 at 426.

Later in the day, a military gun boat and a "sea truck attached to the military" left Escravos for the Benin River.  The military engaged in a "mopping up exercise with their gun boat," during which they went to both Opia and Ikenya.  *Id.*, Ex. 65 at C117-119.  Sea Truck is a company from which CNL leased boats during the relevant time period.  *Id.*, Ex. 307 at 24:19-24.  The Sea Truck involved in the mopping up exercise was stationed at CNL's Escravos facility.  Fourteen or fifteen GSF boarded the Sea Truck and told the boat crew that they were going on patrol.  *Id.* at 5:23-7:9; Ex. 315 at 36:9-38:25.  The crew contacted CNL and received approval to take the GSF on patrol.  Hoffman Decl., Exs. 315 & 359 at 39-40, 65-66; Ex. 307 at 7-23.  The boat went first to the Searex rig, then to Opia.  The boat docked at Opia and the GSF exited and went into the village with their rifles.  The GSF were gone for over an hour.  The Sea Truck crew heard shooting in the village and observed smoke and fire coming from the village.  *See* Hoffman Decl., Ex. 315 at 44-47; Ex. 307 at 11-14.  The crew also observed a man "lying down," not moving, not far from the water's edge.  *See id.*, Ex. 315 at 68; Ex. 307 at 19.

The GSF shot unarmed villagers, killing at least four – Timi Okoro, Kekedu Lawuru, Shadrack Oloku, and Bright Pabulogba – and burned the villages of Opia and Ikenyan to the ground.  *See* Hoffman Decl., Ex. 317 at 426, 435-438, 442, 492; Ex. 314 at 169, 190, 192; Ex. 306 at 104, 112-113, 206, 277, 306; Ex. 337 at 280, 283, 313, 345-349, 350, 358, 360-361; Ex. 312 at 123, 373-374, 379, 386-387; Ex. 294 at 62-65, 67-69, 74-75.

At the time of the attack, Opia had approximately 200 to 300 inhabitants and between 50 to 100 houses.  *See* Hoffman Decl., Ex. 360 at 91; Ex. 367 at 117, 333; Ex. 358 at 40-41.  Ikenyan had 200 to 300 inhabitants, and approximately 80 to 100 houses.  *See id.*, Ex. 364 at 51-52.

13

**United States District Court**
For the Northern District of California

**IV.     Defendants' version of the facts**[2]

**A.     Parabe**

Prior to the incident at issue in this case, in March 1998, a group of more than 100 members of the Itsekeri tribe overtook the Parabe barge. Rodriguez Decl., Ex D. ¶¶ 8-9; Ex. E ¶¶ 16-17; Ex. F ¶¶ 7-8; Filios Decl., Ex. 1 at 56-58, 98-99. CNL requested GSF assistance to prevent the Itsekiri from taking over the platform, and the siege ended peacefully. Rodriguez Decl., Ex. A ¶¶ 7-8; Kollios Decl., Ex. 75 at C22873-C22874; Ex. 76 at MB005-MB006. CNL and the construction contractor provided additional jobs to the Itsekiri and, to head off similar action by the rival Ilaje tribe, voluntarily provided additional jobs to the Ilaje as well. Rodriguez Decl., Ex. B ¶¶ 4-5; Kollios Decl., Ex. 77 at C24529-C24530; Ex. 76 at MB005-MB006.

Plaintiff Larry Bowoto and a group of other Ilajes were dissatisfied with the manner in which their leaders allocated the jobs. Filios Decl., Ex. 6 at 434-441; Ex. 7 at B16-B17. Bowoto and his group complained to CNL that the Itsekiri had "pirated" and held the CBL-101 for ransom and that the Itesekiri had no reason to claim any jobs. *Id.*, Ex. 8 at C12-C14. The representatives of the Ilaje communities advised CNL that Bowoto's group was not authorized to represent the Ilajes. *Id.*, Ex. 9 at C24033.

On May 25, 1998, more than 100 Ilaje tribesmen took over the CBL-101 barge, the Parabe platform and the Cheryl Ann tug. CNL reported the invasion to the Nigerian authorities, as it was required to do by law. *Id.*, Ex. 19 at 206-207, 226-227; Babalakin Decl. ¶¶ 39-45. The workers believed they were being held hostage. Filios Decl., Ex. 2 at 70-75; Ex. 20 at 55-58; Ex. 21 at 78-79; Ex. 22 at 61-63; Ex. 23 at 370-371; Ex. 24 at 35-37. The Ilajes did not have permission for over 100 Ilajes to board and stay for three days. *Id.*, Ex. 27 at 32-35; Ex. 28 at 492-493; Ex. 29 at 326-327, 452. Work on the barge and platform ceased because the Ilajes' presence endangered the workers' safety. *Id.*, Ex. 17 at 67; Ex. 18 at 90; Ex. 4 at 52-53; Ex. 3 at 48-49. The Ilajes blocked the barge and platform helidecks and threatened to burn the barge and tugboat. *Id.*, Ex. 24 at 43; Ex. 21 at 55; Ex. 27 at 100;

---

[2]Most of the following language is taken directly from defendants' statement of facts in support of defendants' motion for summary judgment on plaintiffs' claim for crimes against humanity (Docket No. 1261). As with plaintiffs' various summaries of fact, the Court has reviewed the evidence cited by defendants and omitted any unsupported propositions and irrelevant citations.

Ex. 20 at 61; Ex. 30 at 47-48.  Some of the Ilajes engaged in violence against the workers.  *Id.*, Ex. 2 at 70, 74, 374; Ex. 24 at 30-31, 252; Ex. 22 at 47, 63.

After three days of negotiations, CNL's crisis management team decided to seek the assistance of the Nigerian GSF to free their workers, based on reports that the workers on the barge were being held hostage, they were under emotional strain and had been subjected to physical abuse, and CNL's negotiator had been threatened and briefly held hostage by the Ilaje.  *Id.*, Ex. 1 at 232-240, 269; Rodriguez Decl., Ex. A ¶ 17.  On May 27, 1998, CNL reported the situation to Captain Ita, the head of GSF in Delta State.  Filios Decl., Ex. 19 at 227-228, 238.  Lieutenant Sadiq told James Neku that he needed use of CNL-leased helicopters to travel to the barge and platform.  *Id.* at 243.

On the morning of May 28, 1998, approximately seventeen Nigerian military and police led by Lieutenant Sadiq flew to the barge in three helicopters.  *Id.* at 243-262; Kollios Decl., Ex. 78 at C21798; Ex. 79 at C21806-C21807; Ex. 80 at C21799.  CNL employee James Neku flew to the barge with Lieutenant Sadiq to observe the situation, but he did not have authority to control Lieutenant Sadiq or his men.  Filios Decl., Ex. 19 at 237-238, 250; Ex. 32 at 228-229.

CNL requested that the hostages' rescue be handled peacefully and thought it would be handled peacefully.  Rodriguez Decl., Ex. A at ¶¶ 19, 21; Ex. D ¶¶ 15-18, 21-24; Filios Decl., Ex. 19 at 248-249.  The two Ilajes who were shot to death were advancing on the military with pipe spools raised above their heads in a threatening manner.  Filios Decl., Ex. 23 at 69-71; Ex. 22 at 74-82; Ex. 27 at 87-92; Ex. 20 at 86-90.

**B.     Opia and Ikenyan**

On December 11, 1998, the Ijaws issued the so-called Kaiama Declaration ordering CNL and other oil companies to vacate all the territories claimed by the Ijaws.  Rodriguez Decl., Ex. A ¶ 24; Filios Decl., Ex. 43 at C0257.   In late 1998, CNL withdrew its operating employees and contractors from, among other places, the Searex rig.  CNL also suspended operations at the Searex rig.  Filios Decl., Ex. 1 at 128; Kollios Decl., Ex. 85 at C46646.

On January 3, 1999, villagers from Opia came to the Searex rig demanding money from CNL.  Rodriguez Decl., Ex. A ¶ 26; Filios Decl., Ex. 41 at 44-46; Ex. 44 at 322-327; Ex. 45 at 147-151; Ex.

15

46 at 259; Ex. 47 at C284; Ex. 85 at C20361-C20362.  On January 4, 1999, CNL's operations manager in Escravos, Scott Davis, heard an SOS call from the Searex rig.  Filios Decl., Ex. 1 at 135.  The CNL employee stationed at the Searex rig reported that armed villagers were attacking the GSF providing security for the rig, and that at least one attacker was armed with a gun and dynamite, threatening to blow up the rig and set it ablaze.  *Id.*, Ex. 47 at C284.

The GSF demanded that CNL immediately provide them with helicopters to take military reinforcements to the rig.  *Id.*, Ex. 1 at 135-136; Ex. 42 at 120-121; Rodriguez Decl., Ex. A ¶¶ 27-28; Ex. 48 at 22-24; Ex. 49 at 27.  CNL persuaded the GSF to wait until the gunfire had stopped at the Searex rig before allowing the GSF to use helicopters to transport reinforcements to Searex.  Filios Decl., Ex. 1 at 135-140; Ex. 42 at 121-127; Rodriguez Decl., Ex. A ¶ 27.  Around 12:30 p.m., on January 4, a Nigerian Army Captain fired five to ten rounds out of a CNL-leased helicopter enroute to the Searex rig without any direction or prior knowledge on behalf of CNL.  Filios Decl., Ex. 50 at 41-45; Ex. 51 at 171-175; Rodriguez Decl., Ex. A ¶¶ 28, 31-37; Ex. G ¶¶ 7-8; Kollios Decl., Ex. 86 at C21985.  The helicopter was not near any village when the shots were fired.  Filios Decl., Ex. 50 at 41-45; Ex. 51 at 172.

No employee of defendants or CNL was present at Opia or Ikenyan on January 4, 1999.  Rodriguez Decl., Ex. A ¶ 27; Ex. B ¶ 36; Ex. C ¶ 26; Ex. G. ¶ 12.  No employee of defendants or CNL intended, requested or authorized any person, including the Nigerian authorities, to discharge any firearm from a helicopter, to attack or burn the villages of Opia or Ikenyan, or to shoot or injure any of their residents.  *Id.*, Ex. A ¶¶ 31, 34; Ex. B ¶ 36; Ex. C ¶ 26; Ex. G ¶ 12; Ex. H ¶ 13; Ex. I ¶ 17.

**LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

On a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes

demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir.), *cert. denied*, 479 U.S. 949 (1986).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2nd Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980). The party who will have the burden of proof must persuade the Court that it will have sufficient admissible evidence to justify going to trial.

## DISCUSSION

### I. Secondary liability

The first dispute between the parties is whether, and to what extent, plaintiffs can hold CNL liable for the actions of the GSF. Plaintiffs present several theories of secondary liability.

#### A. Aiding and Abetting

"California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted." *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145 (Cal. Ct. app. 2005). Under Nigerian law, aiding and abetting liability similarly "requires actual knowledge of the crime being committed and intent to facilitate commission of that crime." Mot. at 4:13-15, citing Babalakin Decl. ¶¶ 167-170.

17

Defendants contend that CNL had no intent or knowledge that the GSF would engage in the alleged attacks at Parabe or Opia and Ikenyan.  In response, plaintiffs present a large quantity of circumstantial evidence, showing that:

(1)  CNL knew of the GSF's general history of committing abuses, including against oil protestors, *see* Plaintiffs' Corrected Affirmative Statement of Facts in Opposition to Defendants' Motion for Summary Judgment on Crimes Against Humanity ("PASOF") (Docket No. 1418) ¶¶ 183-254; *see also supra* BACKGROUND section.

(2)  CNL brought the GSF to Parabe even though the protestors had already agreed to leave, *see id.* ¶¶ 301-304;

(3)  CNL failed to adhere to its practice of requiring GSF to place ammunition in the "boot" of the helicopter, *see* Docket 1417 at 36:13-26, 50:27-51:10;

(4)  One of the GSF, Captain Kaswe, who boarded the helicopters bound for Opia and Ikenyan was "in a high state of agitation," and was "hot-headed," *id.* at 50:15-26;

(5)  CNL personnel, specifically James Neku, "closely supervised" the GSF who landed at Parabe, *see id.* at 8:2-9:22;

(6)  CNL personnel, specifically Reuben Osazuwa, directed the pilot of one of the Opia and Ikenyan helicopters to approach and circle canoes present on the river around the villages; GSF onboard the helicopter subsequently fired at those canoes, *see id.* at 51:11-24; PASOF ¶¶ 337-339;

(7)  CNL paid the GSF generally, and for their services in connection with the incidents at issue, *see* PASOF ¶¶ 458-474; Docket 1417 at 58:10-59:9;

(8)  CNL only paid GSF for services that were "incidental to normal CNL activities" and requested by a CNL "end-user," *see* Docket 1417 at 39:25-40:16;

(9)  Later on the day that GSF fired from the helicopter on Opia and Ikenyan, CNL authorized the GSF to use the CNL-leased Sea Trucks to travel to Opia and Ikenyan, *see* Docket 1417 at 58:10-14; PASOF ¶¶ 342-350; and

(10)  CNL provided transportation to the GSF for all of the incidents at issue here, *see* PASOF ¶¶ 327-328, 343-350, 437-457; Docket No. 1417 at 8:2-9:2.

18

The Court finds that a jury could reasonably infer from this evidence that CNL knew the GSF intended to, and would, commit the torts at issue here. Plaintiffs' aiding and abetting liability theory therefore survives summary judgment.

### B.    Conspiracy

Under California law, conspiracy requires knowledge of a plan to engage in the specific wrongful conduct at issue, and agreement to participate in that plan. *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995). "[T]he requisite concurrence and knowledge 'may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.'" *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 785 (Cal. Sup. Ct. 1979) (quoting case).

Defendants argue that, as with the aiding and abetting theory, plaintiffs cannot show that CNL knew of any plan or intent on the part of the GSF to commit the acts at issue, and cannot show that CNL agreed to such a plan. Plaintiffs argue that the same evidence of aiding and abetting, discussed above, would allow a jury to reasonably infer knowledge and agreement. The Court agrees with plaintiffs. As discussed, plaintiffs present evidence that CNL personnel were directly involved in the attacks; CNL transported the GSF; CNL paid the GSF; and CNL knew that GSF were prone to use excessive force. These facts, among, other, are sufficient to raise a triable issue as to whether CNL knew that GSF planned to attack, and whether CNL agreed with that GSF should commit the attacks.

### C.    Agency

The parties also dedicate a great deal of briefing to the issue of whether CNL can be held vicariously liable for the actions of the GSF through a *respondeat superior* theory.

To establish actual agency a party must demonstrate the following elements: "(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking." *Rubin Bros. Footwear, Inc. v. Chemical Bank*, 119 B.R. 416, 422 (S.D.N.Y.1990). "There is no agency relationship where the alleged principal has no right of control

United States District Court
For the Northern District of California

over the alleged agent." *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 657 F. Supp. 1475, 1481 n. 2 (S.D.N.Y.1987); *see also Rubin Bros*, 119 B.R. at 422.

Plaintiffs here argue that there is sufficient evidence for a jury to find that the GSF who committed the alleged atrocities at issue in this case were the agents of CNL, rather than traditional, independent, military and police officers.  Defendants counter that, at all times, the GSF acted as independent government security, and were not under the control of CNL.  Plaintiffs' evidence shows the following:

- "Chevron regularly made decisions about where GSF officers should provide protection and the number of GSF needed for each assignment."  Opp. at 25:5-6, citing PASOF ¶¶ 540-548.

- "Chevron had the power to require its assigned GSF officers to attend training and did so when it served the company's purposes."  Opp. at 25:8-9, citing PASOF ¶ 399.

- CNL decided when the GSF would be permitted to use CNL-leased boats and helicopters, and when they would not.  PASOF ¶¶ 387-398.

- Communications with Nigerian officials after the Parabe incident suggest that the GSF involved acted under the control of the CNL, and not superior military or government authority.  For example, a Nigerian military advisor "chewed out" CNL mangers after the Parabe incident for three hours.  Hoffman Decl., Ex. 304 at 335:13-336.  Similarly, at a June 26, 1998 meeting between CNL managers and Nigerian government officials, the government officials "frowned at the use of force rather than dialogue in all conflict resolutions," and "appealed to CNL to involve Government Agencies in any future dialogue with the communities . . . ."  Hoffman Decl., Ex. 211.

- In a March 11, 1998 letter from CNL's managing director, George Kirkland, to a Human Rights Watch investigator, Kirkland stated that when CNL utilizes GSF, "CNL Security insists on exercising reasonable control over those deployed to assist, ensuring that no more than the minimum force required to bring a situation under control is applied."  Hoffman Decl., Ex. 169, at C28912 ¶ 9.

- CNL security personnel often reported "leading" or "supervising" GSF in the course of

various operations, including the Parabe operation. *See e.g.*, plaintiffs' opposition to defendants' statement of facts ("POSOF") (Docket No. 1417) at 7-10.

• CNL paid the GSF for their services, above and beyond their government salaries.

• CNL "had the power to rid itself of incompetent or problematic officers and . . . it did so on several occasions." Opp. at 23-25, citing Hoffman Decl., Ex. 335, Osazuwa Dep., at 42:24-43:13 (On whether or not a police official was an employee of CNL: "I won't say that he is an employee, I will not say that he is not an employee. . . . We can't sack him, if he does anything bad, if we were to discipline him we turn him back to the police. . . . We can't fire him, we return him."); *see also* POSOF at 5-6.

• CNL provided food and lodging to the GSF.

In response to plaintiffs' evidence, defendants first argue that "[p]laintiffs cite no case holding that a law enforcement agency responding to reports of unlawful conduct can be found to be the agent of the private person who requested intervention." Reply at 12:8-10. In support of their argument, defendants cite *O'Quin v. Baptist Memorial Hospital*, 201 S.W.2d 694, 697 (Tenn. 1947), in which a Tennessee court ruled that a police officer "cannot be adjudged the agent of one who calls him to aid in preventing a breach of the peace, even though it may be threatened upon private premises." This argument relies on an inaccurate characterization of the relationship between the GSF and CNL. It is apparent that CNL and GSF had a much closer relationship than the traditional relationship between private parties and law enforcement officials in this country. The GSF were on the CNL payroll, and engaged in extensive security work for CNL. CNL did not simply "dial 911."

Another case cited by defendants, *Mahon v. Bethlehem Musikfest Assoc.*, 898 F. Supp. 310 (E.D. Penn. 1995), is instructive. In *Bethlehem*, plaintiff sued a music festival organizer, the City of Bethlehem, and Bethlehem police officers who worked security at the music festival, for injuries arising out of his arrest for disorderly conduct at the music festival. On summary judgment, the court addressed the issue of "whether Musikfest is vicariously liable for the Police Officer Defendants' actions due to an agency or independent contractor relationship." *Id.* at 312. The court made the following factual determinations: "Musikfest paid the City for the Police Officer Defendants' services"; the officers "knew that Musikfest paid the City for their police services of crowd control and safety"; "Musikfest

had certain rules of its own . . . that the Police Officer Defendants were supposed to enforce . . . along with local and state ordinances and laws"; each officer's "Musikfest work assignment was made via a roster system by the Fraternal Order of Police and the Police Department"; and "Musikfest did not have discretion over enforcement decisions, and . . . the [officers] did not have to report or clear arrests with Musikfest." *Id.* The court concluded that "[n]one of this evidence . . . indicates that Musikfest had any control over the manner in which the Police Officer Defendants performed their duties." *Id.* at 312-13. The court did find, however, "that there are genuine issues of material fact as to whether Musikfest hired the Police Officer Defendants as independent contractors," in which case, in some circumstances, Musikfest could still be vicariously liable for the officers' actions. *Id.* at 313.

Notably, the court in *Bethlehem* did not rule, as defendants suggest the Court should do here, that hiring police officers to enforce the law can never form an agency relationship. To the contrary, *Bethlehem*'s analysis suggests that under certain circumstances, even on-duty police officers can become agents of private parties. Furthermore, there are more facts in this case suggesting an agency relationship than in *Bethlehem*. Unlike in *Bethlehem*, here there is evidence that CNL determined the work schedules and assignments of the GSF. Also, there is evidence that CNL had the discretion to decide if, when, *and how* the GSF would participate in security operations. In *Bethlehem*, it appears that the festival hired the officers to conduct security, then let the officers do so how they desired, exercising their own discretion. Unlike in *Bethlehem*, here there is "evidence . . . indicat[ing] that [CNL] had [] control over the manner in which the [GSF] performed their duties." *Id.* at 312-13. *Bethlehem* therefore does not compel the Court to find an absence of agency.

Defendants also argue that "if it were possible to make an entire police department or branch of the military one's agent, no evidence exists that CNL did so." Reply at 12:19-20. Again, defendants mischaracterize plaintiffs' argument. Plaintiffs do not seek to show, and are not required to show, that the entire Nigerian military served as CNL's agent. Plaintiffs seek only to show that the particular GSF members CNL paid, housed, and allegedly controlled, were agents of CNL, rather than traditional, independent government security forces. As discussed above, plaintiffs have provided evidence of such a relationship. The Court finds that plaintiffs have raised a triable issue of fact as to whether CNL had "a right of control" over the GSF it hired. Plaintiffs' agency theory therefore survives.

**United States District Court**
For the Northern District of California

## II.      Law enforcement reporting privilege

Defendants' second overarching argument is that CNL's communications with, and support of, the GSF, are absolutely privileged under California law.  Defendants are correct that under California law, "the overwhelming majority of cases conclude that when a citizen contacts law enforcement personnel to report suspected criminal activity and to instigate law enforcement personnel to respond, the communication also enjoys an unqualified privilege under section 47(b)" of the California Civil Code.  *Hagberg v. Cal. Fed. Bank FSB*, 32 Cal. 4th 350, 364 (Cal. Sup. Ct. 2004).  This privilege also appears to apply to communications with foreign law enforcement personnel.  *See Beroiz v. Wahl*, 84 Cal. App. 4th 485 (Cal. Ct. App. 2000).  However, unqualified immunity applies in the foreign context only "to police reports that may trigger proceedings governed by adequate procedural safeguards. Absent such safeguards, only reports made in good faith, and without malice, merit protection as privileged."  *Id.* at 496.

This California Civil Code section 47 privilege is an affirmative defense.  Here, defendants have made no showing that CNL's communications with, and support of, the GSF, "trigger[ed] proceedings governed by adequate procedural safeguards."  Defendants also fail to make any showing that their interactions with the GSF were "in good faith, and without malice."  As such, the Court cannot grant summary judgment for defendants based on the law enforcement reporting privilege defense.

## III.     Claims 11 and 12:  assault and battery

### A.      Parabe (Nigerian law)

Nigerian law applies to the incidents that occurred on the Parabe barge.  The parties appear to agree that under Nigerian law, assault is intentionally putting another person in fear of an imminent battery, and battery is the intentional application of force to another person.  The parties disagree, however, about the burden of proof.  Defendants contend that even in civil cases, the plaintiff must prove assault and battery beyond a reasonable doubt.  Plaintiffs respond that the burden of proof is simply a preponderance of evidence.  Defendants appear to be correct.  In *Okuarume v. Obabokor*, NSCC 286, ¶¶ 35-40 (1965), the Supreme Court of Nigeria held that the plaintiff, seeking damages in

United States District Court
For the Northern District of California

a civil suit for assault, had to prove the assault beyond a reasonable doubt, based on the Nigerian Evidence Act.[3]  *See* Defs.' Appendix of Foreign Authorities, Ex. 15.  The provisions of the Nigerian Evidence Act relevant to this case state:

> 138.  (1) If the commission of a crime by a party to any proceeding is directly in issue in any proceeding civil or criminal it must be proved beyond reasonable doubt.
>
> (2) The burden of proving that any person has been guilty of a crime or wrongful act is, subject to the provisions of section 141 of this Act, on the person who asserts it . . . .

Teukolsky Decl., Ex. 28.  It thus appears that, under Nigerian law assault and battery must be proved beyond a reasonable doubt.

Defendants here do not contend that plaintiffs cannot make out a prima facie case of assault and battery.  Instead, they focus on various defenses available to the GSF under Nigerian law.  *See* Mot. at 12-14.  Nigerian Police Force Order No. 237 states:

> 3.      A Police may use firearms under the following circumstances:
>
> (a)    When attacked and his life is in danger and there is no other way of saving his life;
>
> (b)    When defending a person who is attacked and he believes no [sic - on?] reasonable grounds that he cannot otherwise protect that person attached [sic] from death;
>
> (c)    When necessary [to] disperse rioters or to prevent them from committing serious offences against life and property; N.B. Remember that 12 or more people must remain riotously assembled beyond a reasonable time after the reading of the proclamation before the use of firearms can be justified;
>
> . . . .

---

[3]This Court respectfully disagrees with the Nigerian Supreme Court's holding in *Okuarume*, as it appears to be inconsistent with the Nigerian court's explanation of the relevant provision of the Nigerian Evidence Act in *Ikoku v. Oli*, All N.L.R. 194, 199-200 (1962).  *See* Defs.' Appendix of Foreign Authorities, Ex. 2 at 205 (quoting passage from *Ikoku*).  Nonetheless, *Okuarume* appears to be controlling Nigerian law.

The Court is also troubled by the fact that defendants did not cite *Okuarume* until the reply brief.  In their motion, defendants stated that "[a]ssault and battery must be proved beyond reasonable doubt, even in civil cases," and cited the Babalakin Declaration in support.  The Babalakin Declaration did not cite *Okuarume*, or any equivalent case.  Thus, while defendants technically raised this legal argument in the original motion, the Court is troubled that they did not cite *Okuarume*, which is clearly on point, until the reply.  It is, of course, possible that defendants did not become aware of *Okuarume* until after filing their motion.  If, however, defendants were aware of *Okuarume* at the time they filed this motion, withholding it for reply would be unfair and improper.

24

(e)     If he cannot by any other means arrest a person who takes to flight in order to avoid arrest; provided the offence is such that accused may be punished with death or imprisonment for 7 years or more.

4.     With regard to 3(a) above, a Police Officer would have to prove that he was in danger of losing his life or of receiving an injury likely seriously to endanger his life. It would be most difficult to justify the use of firearms if attacked by an unarmed man. . . .  If attacked by an individual with a heavy stick or machets [sic], he would have to prove that he could not disable him with his baton or rifle butt and that other means available to him were not sufficient to protect his life.

. . . .

6.     Fire should be directed at the knees of the rioters. . . .

. . . .

8.     As to 3(c) [sic - 3(e)] above, . . . . firearms should only be used if there are not other means of effecting his arrest, and the circumstances are such that his subsequent arrest is unlikely.  A constable who cannot effect such a criminal's arrest by any other means should warn the criminal that unless he stops and surrenders, he will fire upon him.  If the criminal fails to stop, the constable is then justified in firing at the criminal.

Babalakin Decl., Ex. 36.

The Nigerian Criminal Procedure Act provides, in relevant part:

3.     In making an arrest the police officer or other person making the same shall actually touch or confine the body of the person to be arrested, unless there be a submission to the custody by word or action.

. . . .

53.     (1) Every police officer may interpose for the purpose of preventing, and shall to the best of his ability prevent, the commission of any offence.

Babalakin Decl., Ex. 34.

The Nigerian Criminal Code Act provides, in pertinent part:

69.     When three or more persons, with intent to Carry out some Common purpose, assemble in such a manner or, being assembled, conduct themselves in such a manner, as to cause persons in the neighbourhood to fear on reasonable grounds that the persons so assembled will tumultuously disturb the peace, or will by such assembly needlessly and without any reasonable occasion provoke other persons tumultuously to disturb the peace, they are an unlawful assembly.

. . . .

72.     Any magistrate or, in his absence, any police officer, of or above the rank of assistant superintendent, or any commissioned officer in the Naval, Military or Air Forces of Nigeria in whose view a riot is being committed, or who apprehends that a riot is about to be committed by persons assembled within his view, may make or cause to be made a proclamation in the name of the Federal

United States District Court

For the Northern District of California

Republic in such form as he thinks fit, commanding the rioters or persons so assembled to disperse peaceably.

Dispersion of rioters after Proclamation made.

73.  If upon the expiration of a reasonable time after such proclamation made, or after the making of such proclamation has been prevented by force, twelve or more persons continue riotously assembled together, any person authorised to make proclamation, or any police officer, or any other person acting in aid of such person or police officer, may do all things necessary for dispersing the persons so continuing assembled, or for apprehending them or any of them, and if any person makes resistance, may use all such force as is reasonably necessary for overcoming such resistance, and shall not be liable in any criminal or civil proceeding for having, by the use of such force, caused harm or death to any person.

. . . .

261.  It is lawful for a person . . . in making any arrest, and for any person lawfully assisting him, to use such force as may be reasonably necessary to overcome any force used in resisting such execution or arrest.

271.  When a peace officer or police officer is proceeding lawfully to arrest, with or without warrant, a person for an offence which is a felony, and is such that the offender may be arrested without warrant, and the person sought to be arrested takes to flight in order to avoid arrest, it is lawful for the peace officer or police officer and for any person lawfully assisting him, to use such force as may be reasonably necessary to prevent the escape of the person sought to be arrested, and, if the offence is such that the offender may be punished with death or with imprisonment for seven years or more, may kill him if he cannot by any means otherwise be arrested.

. . . .

276.  It is lawful for any person to use such force as is necessary to suppress a riot, and is reasonably proportioned to the danger to be apprehended from its continuance.

. . . .

277.  It is lawful for a peace officer to use or order to be used such force as he believes, on reasonable grounds, to be necessary in order to Suppress a riot, and is reasonably proportioned to the danger which he believes, on reasonable grounds, is to be apprehended from its continuance.

. . . .

279.  When any person, whether subject to military law or not believes on reasonable grounds, that serious mischief will arise from a riot before there is time to procure the intervention of a peace officer, it is lawful for him to use such force as he believes, on reasonable grounds, to be necessary for the suppression of the riot and as is reasonably proportioned to the danger which he believes on reasonable grounds, is to be apprehended from [] its continuance.

. . . .

1       280.    It is lawful for a person who is bound by the laws in force relative to the armed forces of Nigeria or to the police forces to obey the lawful commands of his superior officer, to obey any command given him by his superior officer, in order to the suppression of a riot, unless the command is manifestly unlawful. Whether any particular command is or is not manifestly unlawful is a question of law.

Babalakin Decl., Ex. 25.

Section 239 of the Nigerian Armed Forces Act provides:

No action, prosecution or other proceeding shall lie against a person subject to service law under this Act for an act done in pursuance or execution or intended execution of this Act or any regulation, service duty or authority or in respect of an alleged neglect or default in the execution of this Act, regulation, duty or authority, if it is done in aid to civil authority or in execution of military rules.

Babalakin Decl., Ex. 3.

With respect to the incidents on the Parabe barge, defendants contend that "in each shooting on the barge, the [victims] were approaching the military, screaming, running or with raised objects in their hands. In the context of a riot, that conduct is sufficiently threatening to justify the military's decision to shoot. Plaintiffs cannot establish to [sic] contrary beyond a reasonable doubt." Mot. at 13:21-24. This argument misconstrues the burdens of the parties. Under Nigerian law, defendants have the burden of proving self-defense. *See* Nigerian Evidence Act § 141(1) (Teukolsky Decl., Ex. 28) ("Where a person is accused of any offence the burden of proving the existence of circumstances bringing the case within any exception or exemption from, or qualification to, the operation of the law creating the offence with which he is charged is upon such person.").

Moreover, defendants' self-defense theory relies on the fact that plaintiffs were engaged in a riot, or unlawful assembly. Just as plaintiffs must prove assault and battery beyond a reasonable doubt, so must defendants prove the crime of unlawful assembly beyond a reasonable doubt. At this stage, therefore, defendants have the burden of establishing that there is no issue as to whether the GSF acted properly in self-defense, in the context of a riot.[4] Under Nigerian Law, to establish that the protest on the barge constituted a "riot," defendants must establish that the protestors caused reasonable fear that

---

[4]Defendants also mistake the burdens with respect to Bassey Jeje, stating "Jeje cannot show that the military did not believe that he posed a threat when they found him hiding." Mot. at 13:24-25. It is defendants' burden to establish that the GSF believed Jeje to be a threat justifying use of force. *See* Nigerian Evidence Act § 141(1) (Teukolsky Decl., Ex. 28).

United States District Court
For the Northern District of California

they would "tumultuously disturb the peace . . . ."  *See* Criminal Code Act § 69 (Babalakin Decl., Ex. 25).  Defendants have not provided the Court with a definition of "tumultuously disturb the peace," under Nigerian law.  Furthermore, the parties clearly dispute whether the protestors on the barge were peaceful.  *See, e.g.*, Docket 1417 at 21:15-23:5, 26:12-27:28.  This alone prevents a finding of summary judgment in favor of defendants on the basis of their affirmative defense.

Moreover, even if defendants can establish that the protest on the barge constituted a riot, they also have the burden of establishing that the GSF only "used such force as he believes, on reasonable grounds, to be necessary in order to Suppress a riot, and is reasonably proportioned to the danger which he believes, on reasonable grounds, is to be apprehended from its continuance."  Criminal Code Act § 277 (Babalakin Decl., Ex. 25).  Again, the parties provide conflicting evidence as to whether the force used by the GSF was "necessary" and "reasonably proportioned to the danger."  *See, e.g.*, Docket 1417 at 36:27-37:14, 38:12-39:2; PASOF ¶¶ 268-270.

For example, with respect to Arolika Irowarinun, who was shot and killed by the GSF, defendants contend that the undisputed evidence establishes that he was shot while "advancing with [a] metal bar[] raised in a 'strike position.'"  Reply at 5:5-6.  Plaintiffs respond with evidence that Irowarinun was shot in the side of the chest, "from which a jury could infer that the was turning away from impending gunfire just before being shot."  Opp. at 7:19-21.  Defendants reply with evidence that Irowarinun was "moving in on the soldier at an angle" when the soldier shot him.  Reply at 5:14 (citing evidence that the "military man was facing 'at a different angle' and turned just in time to fire," and that the victim came "in from the military person's 'right side.'").  That he was shot in the side, defendants contend, is therefore consistent with the self-defense theory.  However, defendants' interpretation of the evidence is not the only reasonable one.  The only way Irowarinun could have been shot in the side while running at the shooter is if he was running sideways, which is unlikely.  That he was approaching the shooter "at an angle," suggests only that the shooter had to pivot in order to shoot him.  Plaintiffs have thus raised a triable issue as to whether the GSF acted in self-defense when they shot Irowarinun.

With respect to Larry Bowoto, it appears undisputed that he was unarmed when the soldiers shot him.  Even taking as true defendants' assertion that Bowoto "ran toward the soldiers with arms extended screaming," Reply at 7, there is a triable issue as to whether this justified the GSF's use of force against

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

him under the Criminal Code Act and other provisions of Nigerian law discussed above.

It also appears that under Nigerian law, before force is used to disperse rioters, a "proclamation" must be made.  *See* Criminal Code Act §§ 72-73 (Babalakin Decl., Ex. 25).  Defendants here present no evidence of any such proclamation.  There are, therefore, many issues of material fact which preclude summary judgment.

Defendants also argue that, as to the alleged beating of Bola Oyinbo by the GSF after he was arrested on the barge, plaintiffs present no evidence connecting CNL to the beatings.[5]  The Court finds that the evidence discussed above, in the general aiding and abetting discussion, is sufficient to allow a jury to reasonably conclude that CNL had knowledge that arrested protestors would be abused.

In sum, defendants have failed to establish that there is no issue of material fact as to their law enforcement privilege and self-defense affirmative defenses, and summary judgment is therefore inappropriate.

### B.     Opia and Ikenyan (California law)

California law applies to the tort claims arising from the incidents at Opia and Ikenyan.  *See* Order 1204.  The parties agree that California law on assault and battery mirrors that of Nigeria, except that California law's burden of proof is only a preponderance of the evidence.

#### 1.     John Ikenyan, Smart Iteimor, Benson Edekou, Henry Pabulogba and Anthony Lawuru

Defendants argue that the claims of John Ikenyan, Smart Iteimor, Benson Edekou, Henry Pabulogba and Anthony Lawuru are time barred.  In the concurrently pending motions to dismiss and strike portions of plaintiffs' Eighth Amended Complaint ("EAC"), defendants make the same argument, except as to John Ikenyan.  The Court addresses this issue in the Order on those motions.  This issue is therefore moot with respect to all but John Ikenyan.  As to John Ikenyan, the Court agrees with defendants that his claims are time-barred, for the same reasons discussed in the concurrent Order with

---

[5]The parties discuss the beating of Oyinbo under the Nigerian law section.  Though probably irrelevant at this point, it appears to the Court that California law should apply to the alleged beating of Oyinbo, as it occurred on land.  *See* Order 1204.

**United States District Court**
For the Northern District of California

1    respect to the other four individuals.

2

3                    **2.    Survival claims**

4           Defendants argue that only personal representatives can bring survival claims on behalf of the

5    decedents. The Court addresses and rejects this argument in the Order on defendants' motion to dismiss

6    and strike portions of the EAC.

7           Defendants also contend that there is no evidence of an assault and battery on decedent Timi

8    Okoro.  In opposition, plaintiffs present evidence that Benson Edekou (Timi Okoro's brother) saw

9    Okoro in a canoe as the Sea Trucks carrying the GSF approached Opia and Ikenyan (which were

10   subsequently burned to the ground by the GSF in the Sea Trucks). Edekou then fled into the bush in

11   fear. *See* Teukolsky Decl., Ex. 23 at 300:1-22, 323:25-324:23.  Okoro was never seen again. *Id.* at

12   348:2-349:13, 344:1-346:21; Filios Decl., Ex. 47 at 126-132, Ex. 17 at 542-543.  This evidence,

13   plaintiffs contend, coupled with general evidence of the attacks by the GSF on Opia and Ikenyan, is

14   sufficient to allow a reasonable jury to infer that the GSF in the Sea Trucks were responsible for Okoro's

15   death or disappearance.  The Court agrees.  *See, e.g., People v. Scott*, 176 Cal. App. 2d 458 (Cal. Ct.

16   App. 1959) (upholding a murder conviction based solely on circumstantial evidence, where the victim's

17   body was not recovered, there was no confession, and no other direct evidence of death or murder).

18          In support of summary judgment on Timi Okoro's claim, defendants cite *Wolf v. Reynolds Elec.*

19   *and Eng'g Co.*, 304 F.2d 646 (9th Cir. 1962), in which the Ninth Circuit upheld the trial court's entry

20   of judgment of dismissal in favor of defendants.  In *Wolf*, the plaintiff sought to recover damages for

21   personal injuries arising from a collision between plaintiff's truck and defendant's flatbed truck, upon

22   which a crane was sitting.  After plaintiff put on his case to the jury, defendant moved for entry of

23   judgment pursuant to Federal Rule of Civil Procedure 41.  The court granted defendant's motion.  On

24   appeal, the Ninth Circuit stated:

25              Each of appellant's contentions is predicated upon the assumption that the crane must
                have protruded beyond the left side of defendants' truck and trailer and thereby caused
26              the accident.  Before plaintiff may recover, however, there must be substantial proof that
                the crane did in fact protrude and cause the accident.  True, this may be established by
27              circumstantial evidence; but we agree with the trial court that there was insufficient
                evidence, either direct or circumstantial, to justify a finding by a jury that the accident
28              was caused in this manner.

                                                   30

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> The most a jury could conclude from the evidence was the possibility that the accident was caused by something overhanging from defendants' trailer. There is evidence which tends to negative that possibility. The marks and scratches on the front outside dual and the trailer bed, as well as the lack of evidence of any marks or damage to the crane or the steel I-beam structure, are inconsistent with appellant's theory. The evidence suggests other possibilities equally as credible as that advanced by appellant. The finding of negligence by a jury would be a choice of possibilities based on a foundation of speculation and conjecture.

*Id.* at 649.

Wolf is distinct from this case. In *Wolf*, there was evidence "tend[ing] to negative" the inference plaintiff wished the jury to draw from the circumstantial evidence. In contrast, here defendants have provided no evidence inconsistent with the reasonable inference that the Sea Trucks seen driving past Timi Okoro's canoe caused her death or disappearance. Plaintiffs' circumstantial evidence is therefore sufficient to defeat summary judgment.

## IV.     Negligence (Claims 14 and 15)

Plaintiffs' claim 14 alleges negligent infliction of emotional distress; claim 15 alleges negligence and negligence per se. Under California law, "[i]n order to prevail in an action based upon a defendant's alleged negligence, a plaintiff must demonstrate that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of his or her injuries." *Morris v. De La Torre*, 36 Cal. 4th 260, 264 (Cal. Sup. Ct. 2005). Here, plaintiffs' negligence claims proceed under two general theories: (1) that CNL is directly liable for its own negligent actions – its direct participation in the attacks and its hiring of the GSF; and (2) that CNL is vicariously liable for the negligent actions of the GSF.

### A.     Duty

Defendants' principal argument is that plaintiffs cannot establish that defendants owed plaintiffs any duty. In determining whether a defendant owed a plaintiff a duty, courts in California look at several factors.

> These factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and

1   consequences to the community of imposing a duty to exercise care with resulting

2   liability for breach, and the availability, cost, and prevalence of insurance for the risk
    involved."

3   *Id.* at 276 (quoting *Rowland v. Christian*, 69 Cal. 2d 108, 113 (Cal. Sup. Ct. 1968)).

4          Defendants do not explicitly argue these factors, but instead focus on a largely policy-based

5   argument that "the law imposes no duty to refrain from reporting crime or providing assistance to the

6   law enforcement authorities."[6]  Mot. at 16:20-21.  Under California law, however, it appears that in

7   certain circumstances, a defendant may have a duty to "refrain from reporting crime."  As the Supreme

8   Court of California explained in *Morris*, 36 Cal. 4th at 277, "neither a business proprietor nor his or her

9   employees have an absolute obligation to call 911 in the face of ongoing criminal conduct:  in some

10  situations, doing so actually might increase the danger to customers or invitees or might unreasonably

11  place proprietors or their employees in danger."  Thus the act of seeking help from, or providing help

12  to, law enforcement, under circumstances where doing so "might increase the danger" to those to whom

13  a duty is owed, might constitute negligence.

14         This conclusion, however, does not answer whether defendants had any duty towards plaintiffs.

15  With respect to the Parabe protestors, defendants argue that they owed plaintiffs no duty "because

16  [under Nigerian law] the occupier of premises owes no duty of care to trespassers save to refrain from

17  deliberately or recklessly causing harm."  Mot. at 15-16.  Defendants' argument, however, stops there.

18  They do not argue that plaintiffs have failed to present evidence that defendants "deliberately or

19  recklessly" caused harm to plaintiffs.  There is therefore a genuine issue as to whether defendants

20  deliberately or recklessly caused harm to plaintiffs by seeking the assistance of, and providing assistance

21  to, the GSF in relation to the Parabe incident.

22         Defendants also attack plaintiffs' allegation that CNL negligently supervised and failed to train

23  the GSF.  *See* EAC ¶ 186.  Defendants argue that plaintiffs cannot show that a private party has a legal

24  obligation to supervise and train public law enforcement personnel.  Defendants also argue that plaintiffs

25  cannot show that CNL's alleged failure to adequately train or supervise the GSF proximately caused

26  plaintiffs' injuries.  In opposition, plaintiffs blend the supervision and training issues into their argument

27

28  [6]Though defendants frame this argument as relating to whether they had a duty to plaintiffs, it
    relates also to the question of breach.

United States District Court
For the Northern District of California

that defendants negligently hired and retained the GSF.  In order for this theory to succeed, plaintiffs must establish that CNL had hiring and supervisory power over GSF.  As discussed above, plaintiffs present evidence that the GSF were the equivalent of employees or private security contractors for CNL.  CNL paid the GSF, housed them, supervised them, transported them, and had the authority to train them and remove particular individual soldiers from service.  *See* PASOF ¶¶ 437-460, 475-503, 387-399; Docket 1417 at 5:15-6:25, 7:3-12:4.  From this evidence, a jury could conclude that CNL had the power to hire, supervise, and train the GSF, and that CNL did so, or failed to do so, negligently.  A jury could also conclude from this evidence, and all of the evidence related to the attacks, that CNL's hiring, and failure to properly train and supervise, the GSF, proximately caused the alleged injuries of the victims.

### B.      Negligence per se

Plaintiffs base their negligence per se theory on a provision of the Nigerian Civil Aviation Regulations which requires that all "weapons of war and munitions of war" be "[s]towed in the aircraft in a place which is inaccessible to passengers during flight; and . . . unloaded . . . ."  Teukolsky Decl., Ex. 36.  In response, defendants contend, and the Court agrees, that the Nigerian Armed Forces Act exempts soldiers from the Civil Aviation Regulations.[7]  Section 237 of that Act provides:  "A member of the Armed Forces shall for the purposes of the Armed Forces be exempt from a provision of any enactment relating to the storage, possession or transmission of firearms, explosives, gun-powder or ammunition of war."  *See* Babalakin Decl., Ex. 3.  The Court therefore GRANTS defendants' motion for summary judgment on plaintiffs' negligence per se theory.

### C.      Negligent Infliction of Emotional Distress (NIED)

Under California law, "there is no duty to avoid negligently causing emotional distress to another."  *Potter v. Firestone Tire and Rubber Co.*, 6 Cal. 4th 965, 984 (Cal. Sup. Ct. 1993).  "[D]amages for emotional distress are recoverable only if the defendant has breached some other duty

---

[7]Defendants also complain that as evidence of the Regulations, plaintiffs have provided only an excerpt from the Pan African Airlines operating manual, rather than a copy of the actual Regulation.  This argument is moot.

United States District Court
For the Northern District of California

to the plaintiff." *Id.* In other words, a negligent infliction of emotional distress ("NIED") claim is a negligence claim, where the breach of duty proximately causes emotional distress. "The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element." *Id.* "[U]nless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests." *Id. Potter* thus established two ways in which a plaintiff can establish NIED: (1) a "direct" claim, where the defendant assumes a duty to avoid causing emotional distress (such as in a psychiatrist-patient relationship); and (2) an "indirect" claim, where the defendant breaches some other duty, and that breach proximately causes emotional distress (such as a "bystander" case). Defendants here challenge plaintiffs' ability to proceed under either theory.

With respect to "direct" claims, the Court agrees with defendants that plaintiffs have not presented evidence that defendants owed plaintiffs a special duty toward their emotional condition. The Court finds that plaintiffs, have, however, provided sufficient evidence to proceed under a bystander theory of NIED. To establish a claim for emotional distress caused by observing the negligently inflicted injury of a third person, plaintiffs must prove: (1) that plaintiffs are closely related to the victim; (2) that plaintiffs were present at the scene of the injury-producing event, at the time it occurred, and were then aware that it was causing injury to the victim (as opposed to learning of the accident from others after its occurrence); and (3) that as a result, plaintiffs have suffered serious emotional distress beyond that which would be experienced by a disinterested bystander. *See Thing v. LaChusa*, 48 Cal. 3d 644 (1989).

Defendants first argue that defendants owed no duty to the victims whose injuries were witnessed. As discussed above, this argument fails. Defendants also argue, generally, that "plaintiffs still cannot recover for witnessing the injury of someone other than their 'relatives residing in the same household, or parents, siblings, children or grandparents.'" Mot. at 23:20-22. Defendants' argument, however, stops there. Defendants do not identify which claims, of which plaintiffs, fail to meet this element. As such, defendants have not met their burden of production, "of identifying for the court

34

United States District Court
For the Northern District of California

those portions of the materials on file that it believes demonstrate the absence of any genuine issues of

material fact." *T.W. Elec. Service*, 809 F.2d at 630.  Plaintiffs' NIED claim therefore survives.[8]

**V.      Intentional Infliction of Emotional Distress (IIED)**

Under California law, "the elements of the tort of intentional infliction of emotional distress

[("IIED")] are (1) extreme and outrageous conduct by the defendant with the intention of causing, or

reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe

or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the

defendant's outrageous conduct . . . .  The defendant must have engaged in 'conduct intended to inflict

injury or engaged in with the realization that injury will result.'" *Christensen v. Superior Court*, 54 Cal.

3d 868, 903 (1991) (*quoting Davidson v. City of Westminster*, 32 Cal. 3d 197, 209-10 (1982).  "It is not

enough that the conduct be intentional and outrageous.  It must be conduct directed at the plaintiff, or

occur in the presence of a plaintiff of whom the defendant is aware."  *Christensen*, 54 Cal. 3d at 903.

In order for conduct to be considered "extreme and outrageous," the "[c]onduct [] must be so

extreme as to exceed all bounds of that usually tolerated in a civilized community."  *Cervantez v. J. C.

Penney Co.*, 24 Cal. 3d 579, 593 (Cal. Sup. Ct. 1979).  This standard sets a very high bar; it is "the

California rule that 'it is not enough that the defendant has acted with an intent which is tortious or even

criminal, or that he has intended to inflict emotional distress, or even that his conduct has been

characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive

damages for another tort.'"  *Pardi v. Kaiser Permanente Hosp., Inc.*, 389 F.3d 840, 852 (9th Cir. 2004)

(quoting case).  This "rule is of course easy to state but only can be applied with certainty in light of the

holdings in decided cases which have determined that the questioned conduct before them was or was

not outrageous."  *Soto v. Royal Globe Ins. Co.*, 184 Cal. App. 3d 420 (Cal. Ct. App. 1986).

Defendants first argue that the conduct of CNL, alone, does not constitute "extreme and

---

[8]In the concurrent Order regarding the EAC, the Court dismisses the Parabe plaintiffs' claims for NIED, IIED, civil conspiracy, and loss of consortium.  As discussed above, the Court holds in that Order that the tort claims of John Ikenyan, Smart Itiemor, Anthony Lawuru, Henry Pabulogba, and Benson Edekou are time barred.  Plaintiffs also concede that Ola Oyinbo does not assert an NIED claim. *See* Opp. at 23 n.28.

outrageous" conduct.  Neither party cites any case to which they claim CNL's conduct is analogous.[9] Applying the plain language of the "extreme and outrageous" rule, as described by the courts, the Court finds that plaintiffs have presented sufficient evidence for a reasonable jury to find that CNL's conduct "exceed[ed] all bounds of that usually tolerated in a civilized community."  As discussed, plaintiffs present evidence that CNL provided the GSF with food, money, transportation, and supervision, all while knowing that the GSF were likely to engage in the use of excessive force against civilians.  A civilized community does not tolerate actively helping others, even law enforcement officials, to perpetrate unnecessary violence against innocent civilians – and plaintiffs have presented sufficient evidence to allow a jury to find that this is what CNL did.

Defendants also argue that plaintiffs cannot establish the requisite intent for IIED liability.  IIED liability attaches where the defendant intended to cause emotional distress, or "when the defendant is aware, but acts with reckless disregard, of the plaintiff and the probability that his or her conduct will cause severe emotional distress to that plaintiff."  *Christensen*, 54 Cal. 3d at 905.  "It is enough that defendant 'devoted little or no thought' to the probable consequences of his conduct."  *KOVR-TV, Inc. v. Superior Court*, 31 Cal. App. 4th 1023, 1031-32 (Cal. Ct. App. 1995) (quoting case).  Here, defendants submit the statements of CNL employees involved in the incidents, swearing that they did not intend for anyone to be injured.  In opposition, plaintiffs argue that they have presented sufficient evidence for a jury to find that CNL acted in "reckless disregard," or "devoted little or no thought to the probable consequences" of their conduct.  The Court agrees with plaintiffs.  As discussed, plaintiffs present evidence that CNL knew of the likelihood that the GSF would respond with unnecessary violence, and despite this knowledge, CNL provided active support to the GSF.

A reasonable jury could also find that the conduct of the GSF itself was "extreme and outrageous."  Plaintiffs' claim therefore also survives based on secondary liability theories, as discussed above.

---

[9]In their Reply brief, defendants cite *Davidson v. City of Westminster*, 32 Cal. 3d 197, 210 (1982), in support of their argument that CNL's conduct was not extreme and outrageous.  In *Davidson*, however, the court found there was no "extreme and outrageous" conduct because the defendants did not intend to harm the plaintiff.  Here, as discussed below, there is evidence of intent.  Furthermore, the defendants in *Davidson* were accused of merely failing to prevent a crime that was occurring; they were not accused, as here, of aiding in the commission of the crime.

United States District Court
For the Northern District of California

1

**VI.     Loss of consortium**

2          In light of the concurrently issued Order re: plaintiffs' Eighth Amended Complaint, this issue

3  appears to be moot.

4

5  **VII.    Survival Actions**

6          **A.      The Irowarinuns (Nigerian law)**

7          Defendants argue that under Nigerian law, because the actions of defendants caused Arolika

8  Irowarinun's death, the damages recoverable for his death through the survival claims are limited to

9  funeral expenses. Under the Administrations of Estates Law (AEL) of Ondo State, damages recoverable

10 for the benefit of the decedent "shall not include any exemplary damages." Babalakin Decl., Ex. 84,

11 § 15(2)(a). Furthermore, "where the death of that person has been caused by the act . . . which gives

12 rise to the cause of action," then damages "shall be calculated without reference to any loss or gain to

13 his estate consequent on his death, except that the sum in respect of funeral expenses may be included."

14 *Id.* § 15(2)(c). Both parties also cite Chapter 34 of *McGregor on Damages*, in which the author

15 confirms that, with the exception of funeral expenses, in a survival action the estate cannot collect for

16 "losses of the deceased which are still in the future at the time of his death . . . ." Babalakin Decl., Ex.

17 169 ¶ 1251.

18         However,  although the estate cannot recover loss of prospective earnings, loss of prospective

19 amenities of life, or loss of prospective expectation of life, the estate can collect for damages to the

20 decedent accruing between the time of the injury and death. *See id.* ¶¶ 1251-1264;  Babalakin Decl.,

21 Ex. 84, § 15. Here, plaintiffs present evidence that Arolika Irowarinun was not immediately killed when

22 the GSF shot him. An eyewitness, Damilohun Osupayojo, testified at deposition that he saw Irowarinun

23 get shot, then saw him grasp the clothes on his chest, and fall. *See* Teukolskly Decl., Ex. 18 at 70:18-

24 71:25, 72:12-17. In reply, defendants contend that Osupayojo testified that he did not actually see

25 Irowarinun get shot, but only saw him grasp his clothes and fall. Osupayojo also testified that he did

26 not immediately recognize the person who he saw grasp his clothes and fall. Instead, Osupayojo

27 identified the person as Irowarinun only after Osupayojo emerged from his hiding place. *See* Filios

28 1/19/07 Decl., Ex. 205 at 589:12-22. The person Osupayojo saw grasp his clothes and fall, defendants

37

contend, therefore could have been the other shooting victim, Joli, who is not a plaintiff. The credibility and weight deserved by Osupayojo's testimony are determinations the jury must make. Osupayojo's testimony that he saw Irowarinun get shot, saw him grasp his chest, and saw him fall, is sufficient to raise a triable issue as to whether Irowarinun suffered any pain before he died. The Court cannot therefore grant defendants' motion for summary judgment on the Irowarinun plaintiffs' request for pain and suffering damages.

### B.    Opia and Ikenyan survival claims

Defendants first argue that plaintiffs present no evidence that Timi Okoro was injured or killed. As discussed above, there is sufficient circumstantial evidence of Timi Okoro's forced disappearance to support tort claims on her behalf. With respect to the other three individuals killed in the attacks, defendants argue that plaintiffs have no evidence that decedents did not die immediately from their wounds. As plaintiffs point out, however, there is sufficient evidence for a jury to conclude that all residents of Opia and Ikenyan, including decedents, were put in fear of battery, i.e., were assaulted, by the GSF. Plaintiffs may therefore bring survival claims for assault on behalf of the Opia and Ikenyan decedents.

Defendants also argue that plaintiffs have no evidence that any of decedents' property was destroyed before they were shot and killed. The Court agrees. Plaintiffs present evidence that houses in the villages began to catch fire as a result of the helicopter attack, *see* Teukolsky Decl., Ex. 20 at 574:21-575:3, 578:1-14; Ex. 22 at 427:20-428:5; Ex. 23 at 291:2-6, 292:1-22, 294:17-295:8, but plaintiffs' evidence does not specifically establish that decedents' houses caught on fire before they were killed. Plaintiffs cannot therefore seek damages for lost property under their survival claims.

### VIII.   Wrongful Death Claims

Defendants contend that plaintiffs' wrongful death claims fail because plaintiffs cannot show that CNL caused the deaths of decedents. As discussed above, plaintiffs have presented sufficient evidence to raise a triable issue whether CNL is liable both for its own negligence, and for the GSF's actions, which resulted in the deaths at issue. The Court therefore DENIES defendants' motion for

1    summary judgment on plaintiffs' wrongful death claims.

2

3    **IX.    Releases**

4           Defendants' final argument is that, in exchange for 450,000 Naira, Sunday Johnbull Irowarinun

5    and his family released CNL from all liability arising out of the Parabe incident.  In support of this

6    argument, defendants present a document entitled "Chevron Nigeria Limited: Receipt and Indemnity,"

7    which was signed by "Sunday Sebi Irowaninnu," on August 14, 1998.  *See* Filios Decl., Ex. 68.  The

8    document describes the Parabe incident, from CNL's perspective, then states:

9           As a result of discussions between representatives of Chevron, the Ondo State
       Government and the Ilaje Community and appeals for assistance in aid of the injured
10      youths and the bereaved families of the youths who died, Chevron has agreed to make
       an ex gratia donation to the families of the deceased.

11
       . . . .
12
       It is understood that this payment is a goodwill gesture on the part of Chevron and that
13      Chevron is not responsible for and has denied liability for the loss suffered by the
       affected families.  We hereby UNDERTAKE on behalf of the Irowarinun family that no
14      claim shall be made against Chevron as a result of this incident . . . .

15      Further, we hereby INDEMNIFY AND HOLD HARMLESS, Chevron, its contractors
       and their agents and servants from and against all proceedings, claims, expenses, liability
16      and costs (including attorney's fees) arising out of the said incident as described above.

17   *Id.*

18          There are numerous problems with defendants' contention that this document constitutes a valid

19   and enforceable release of claims.  First, it is apparent that Sunday Irowarinun does not speak or read

20   English, and certainly not to the degree necessary to understand a complex legal document such as this

21   one.  *See* Teukolsky Decl., Ex. 26 at 135:15-137:2, 141:1-10, 143:1-13, 144:7-15, 150:1-15.  Nobody

22   translated the document for him before he signed it, and CNL did not tell him that it contained a release.

23   *See id.* at 148:4-149:12, 263:2-10.  Mr. Irowarinun therefore could not have had the intent to release

24   claims against CNL.  Furthermore, there is evidence that Mr. Irowarinun signed the document under

25   duress or undue influence.  He signed the document at a meeting with Chevron, which he attended in

26   order to request the return of his son Arolika's corpse.  *See id.* at 122-134.  He testified that he was told

27   at the meeting that if he did not accept the money from CNL, his son's body would not be returned to

28   him and instead they would "just dump that corpse somewhere."  *Id.* at 129:2-6.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    Defendants also argue that, in exchange for 15,000,000 Naira and rice, beans, blankets, and other

2    relief materials, the "representatives of the Opia and Ikenyan villages released CNL from all liability

3    arising from" the attacks on Opia and Ikenyan. Mot. at 20-22, citing Filios Decl., Ex. 73. As with the

4    Irowarinun release, the Opia and Ikenyan release suffers from several serious questions as to its validity

5    and enforceability. First, though the agreement is purportedly "signed on behalf of Opia and Ikenyan

6    communities" by six community leaders, defendants present no definitive evidence that the signers of

7    the document had the authority to bind all the members of the community. In response, defendants

8    argue that the community members "ratified the releases by accepting their share of the 15 million

9    Naira," Reply at 18:20-21. However, defendants provide no legal authority for the proposition that by

10   accepting the proceeds of a purported settlement agreement, the villagers agreed to a settlement

11   agreement which they did not sign.

12   Secondly, the Opia and Ikenyan release is only an agreement by the "Communities" to release

13   Chevron from liability. *See id.* It says nothing of the claims of individual community members. The

14   document could thus be interpreted as analogous to an agreement by the City of Oakland to release its

15   claims against a corporation. Such an agreement would not constitute a release of any individual claims

16   brought by residents of the Oakland community.

17   Additionally, there is some indication that the Opia and Ikenyan release was signed under duress

18   or undue influence. As the supplies provided along with the money (blankets, pillows, and mattresses)

19   indicate, at the time the document was signed, the communities and their members may have been

20   literally fighting for survival. *See* Teukolsky Decl., Ex. 22 at 538:11-21, 540:1-6; Ex. 23 at 425:1-10;

21   Ex. 24 at 459:7-14, 497:4-12.

22   Regardless of whether Nigerian or California law applies to analyzing the validity of the

23   agreements, there are serious questions as to their enforceability. Summary judgment, based on the two

24   "releases," is therefore inappropriate.

25

26

27                              **CONCLUSION**

28   For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART

defendants' motion for summary judgment on plaintiffs' claims 10 through 17 of the Eighth Amended

Complaint, as discussed above.

**IT IS SO ORDERED.**

Dated: August 13, 2007

_____

SUSAN ILLSTON
United States District Judge