1

2

3

4

5　　　　　　　　　　IN THE UNITED STATES DISTRICT COURT

6　　　　　　　　FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8　LARRY BOWOTO, et al.,　　　　　　　　No. C 99-02506 SI

9　　　　　　　　Plaintiffs,　　　　　　**ORDER RE: DEFENDANTS' MOTION**
　　　　　　　　　　　　　　　　　　　　**FOR SUMMARY JUDGMENT ON THE**
10　　　v.　　　　　　　　　　　　　　　**REMAINING FEDERAL LAW CLAIMS**

　　CHEVRON CORPORATION, et al.,
11
　　　　　　　　Defendants.
12　　————————————————————————————/

13

14　　　　　　On March 21, 2008, the Court heard argument on defendants' motion for summary judgment

15　on plaintiffs' remaining federal law claims under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS").

16　Having considered the arguments of counsel and the papers submitted, and for good cause shown, the

　　Court hereby GRANTS IN PART and DENIES IN PART defendants' motion.
17

18

19　　　　　　　　　　　　　　　　　**BACKGROUND**

20　　　　　　Plaintiffs filed this suit in 1999, seeking to recover for a series of brutal attacks that plaintiffs

21　allege occurred in Nigeria in mid-1998 and early 1999.  Plaintiffs alleged violent attacks at the Chevron

22　Parabe oil platform in May 1998 and at the villages of Opia and Ikenyan in January 1999.  The parties

　　vigorously dispute most of the facts of this case; the Court described the parties' versions of the relevant
23
　　facts in great detail in its August 13, 2007 Order (Docket No. 1640), which addressed defendants'
24
　　motion for summary judgment on plaintiffs' claims 10 through 17.  Plaintiffs' council have recently
25
　　filed voluntary dismissals of the claims related to the January 1999 attacks at Opia and Ikenyan, leaving
26
　　only the Parabe oil platform incident at issue.  The Court briefly summarizes the facts related to the
27
　　Parabe incident here.
28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    The alleged attack occurred on May 28, 1998, at a Chevron Nigeria Ltd. ("CNL") offshore

2    drilling facility known as the "Parabe platform,"  which consisted of an oil-drilling platform and an

3    attached construction barge.  According to plaintiffs, on May 25, 1998, more than 100 representatives

4    from a community near the Parabe platform, including plaintiffs Larry Bowoto and Bassey Jeje, and

5    decedents Bola Oyinbo and Arolika Irowarinun, traveled to the barge.  These individuals occupied the

6    platform and barge until May 28, 1998.  According to defendants, after three days of occupation, CNL

7    decided to seek assistance from the Nigerian Government Security Forces ("GSF").  On May 27, 1998,

8    CNL asked the head of the GSF in Delta State, Captain Ita, to intervene.  On the evening of May 27,

9    according to defendants, Captain Ita sent Lieutenant Sadiq to meet with CNL.  The following day,

10   Lieutenant Sadiq and his soldiers flew to the barge and platform in CNL helicopters, to oust the

11   protestors. Plaintiffs allege that Irowarinun was killed, and Jeje and Bowoto were shot, when this

12   occurred.  Plaintiffs also allege that Oyinbo was taken into custody by the GSF and tortured in the days

13   following the event.  Oyinbo died three years later in Lagos, Nigeria.

14       The instant lawsuit alleges that Chevron, acting through CNL, its Nigerian subsidiary, paid the

15   Nigerian military to carry out the attacks on Parabe.  In response to prior motions, this Court dismissed

16   plaintiffs' RICO, Torture Victim Protection Act, and Crimes Against Humanity claims.  Defendants now

17   bring a motion for summary judgment on plaintiffs' remaining federal law claims brought under the

18   ATS: summary execution (1st claim), torture (4th claim), cruel, inhuman, or degrading treatment (6th

19   claim), deprivation of the rights to life, liberty and security of person and peaceful assembly and

20   association (7th claim), and consistent pattern of gross violations of human rights (8th claim). *See* Ninth

21   Amended Complaint at 27-33.

22

23                                      **LEGAL STANDARD**

24       Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and

25   admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material

26   fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In a

27   motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden

28   of identifying for the court those portions of the materials on file that it believes demonstrate the absence

2

United States District Court
For the Northern District of California

of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

Defendants' motion for summary judgment relies on a number of general arguments contesting the application of the ATS to plaintiffs' remaining federal claims. First, defendants argue that plaintiffs' claims cannot be brought under the ATS – a federal statute that permits jurisdiction over certain common law claims derived from the law of nations – because they are preempted by subsequently-enacted statutory causes of action. Second, defendants contend that a Death on the High Seas Act ("DOHSA") claim is the only proper cause of action for plaintiffs' claim of summary execution. Third, defendants argue that federal common law, derived from the law of nations, has no extraterritorial application. The fourth argument asserts, in the alternative, that the alleged norms are not actionable under the ATS because they do not meet the criteria for common law claims derived from the law of nations as described in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). Finally, defendants raise other potential bars to plaintiffs' claims involving exhaustion of local remedies, choice of law, and the statute of limitations.

**I.      Whether the Torture Victim Protection Act and DOHSA supplant the ATS**

The ATS, enacted in 1789, provides district courts with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. §1350.   The ATS does not create a substantive cause of action but instead provides jurisdiction for a "narrow set of common law actions derived from the law of nations." *Sosa*, 542 U.S. at 721.   Starting from the premise that plaintiffs' ATS claims arise out of federal common law, defendants assert that Congress has subsequently enacted legislation that occupies the field and supplants the federal common law.  Defendants argue that the Torture Victim Protection Act ("TVPA"), enacted in 1992, occupies the field for summary execution and torture and therefore plaintiffs' federal common law claims  for these actions should fall under the TVPA and not the ATS.   In addition, defendants argue that DOHSA occupies the field for deaths occurring on the high seas and therefore the death of Arolika Irowarinun on the Parabe platform is actionable under DOHSA and not the ATS.

**A.      Application of the TVPA to plaintiffs' summary execution claim**

Defendants contend that plaintiffs' cause of action for torture and summary execution[1] can only be brought under the TVPA, not the ATS.  Because this Court previously ruled that the TVPA does not apply to corporations, August 22, 2006 Order at 2 (Docket No. 1202), defendants assert that plaintiffs' claims for torture and summary execution should be dismissed.  The Court disagrees.

Section 2 of the TVPA provides the following cause of action:

(a) An individual who, under actual or apparent authority, or color of law, of any foreign nation-

> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350, note § 2(a).  Defendants, relying on the Seventh Circuit ruling in *Enahoro v.*

---

[1]The Court recognizes that both parties treat "summary execution" and "extrajudicial killing" as synonymous in their briefs.

United States District Court
For the Northern District of California

1    *Abubakar*, 408 F.3d 877, 885-86 (7th Cir. 2005), argue that the TVPA is a statutory cause of action that

2    occupies the field for claims of torture and summary execution and therefore supplants the common law

3    that previously governed such matters.  The *Enahoro* court, however, was presented with claims that

4    were clearly cognizable under the TVPA because the claims of torture or summary execution were

5    alleged against an individual.  The case at bar, by contrast, considers whether common law claims of

6    torture and summary execution can properly be pled against *corporations* under the ATS.  Importantly,

7    *Enahoro* notes that the TVPA does not supplant all causes of action previously acceptable under the

8    ATS, but instead occupies the field for pleadings of torture and killing "as provided for" in the TVPA.

9    *Id.* at 885, n. 2.  Since the TVPA does not provide a cause of action against corporations, *Enahoro* does

10    not support the argument that claims in this case, which are filed against a corporation, are subject to

11    the TVPA.

12        In contrast to *Enahoro*, the Eleventh Circuit in *Aldana v. Del Monte Fresh Produce, N.A., Inc.*,

13    416 F.3d 1242 (11th Cir. 2005), held that plaintiffs can raise separate claims for torture under the ATS

14    and the TVPA, *id.* at 1251.  The Eleventh Circuit determined that this conclusion was consistent with

15    *Sosa,* which recognized the TVPA as a clear congressional mandate to permit recovery for claims

16    "'confined to [a] specific subject matter[:]' torture and extrajudicial killing" and did not say that the

17    TVPA was the exclusive remedy for torture claims.  *Id.* (quoting *Sosa,* 542 U.S. at 728).[2]  Defendants

18    argue that the Eleventh Circuit incorrectly applied the "clear and manifest intent" standard of statutory

19    preemption, but the court's discussion of congressional intent was secondary to its finding that the

20    TVPA and the ATS provide two distinct causes of action for torture.  The Eleventh Circuit pointed out

21    that torture under the ATS is only actionable if it is done "in violation of the law of nations" whereas

22

23    [2]The Supreme Court holding in *Sosa* also provides some guidance on the relationship between
      the ATS and the TVPA.  *Sosa* cited the TVPA as congressional "legislation supplementing" previous
24    judicial determinations of torture and summary execution as enforceable international norms.  *Sosa,* 542
      U.S. at 731.  In reviewing the history of ATS cases, the Supreme Court determined the following:
25            [N]o development in the two centuries from the enactment of § 1350 [ATS] to the birth
              of the modern line of cases beginning with *Filartiga v. Pena-Irala*, 630 F.2d 876 (C.A.2
26            1980), has categorically precluded federal courts from recognizing a claim under the law
              of nations as an element of common law; Congress has not in any relevant way amended
27            § 1350 or limited civil common law power by another statute.
      *Id.* at 724-25.  The Supreme Court therefore did not find any congressional preemption of established
28    international norms under prior ATS jurisprudence.

United States District Court
For the Northern District of California

1    torture under the TVPA is actionable if it fits the statutory definition.  The court concluded that "[t]hese

2    two definitions suggest each statute provides a means to recover for torture as that term separately draws

3    its meaning from each statute." *Id.* at 1250.  The Eleventh Circuit also noted that the Supreme Court,

4    in discussing the TVPA, "did not say that the authority granted in the [TVPA] provided the exclusive

5    authority to hear torture claims."  *Id.* at 1251.  Thus, whether or not the Eleventh Circuit applied the

6    correct standard in analyzing preemption, the logic of the court's opinion provides useful guidance as

7    to whether torture persists as a viable common law claim under the ATS.

8        Decisions by other courts support the view that the TVPA does not limit the scope of ATS

9    claims for summary execution and torture.  *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254,

10   260-261 (2d Cir. 2007) (holding that plaintiffs' claims for torture and extrajudicial killings were

11   improper under the TVPA and remanded the claims for a determination of whether the plaintiffs

12   adequately pled a violation of international customary law under the ATS pending their amended

13   complaint); *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)

14   (noting that the TVPA confirms the court's holding that torture is a violation of the law of nations and

15   is actionable under the ATS); *Wiwa v. Royal Dutch Petroleum*, 2002 WL 319887 (S.D. N.Y. Feb. 28,

16   2002) ("This Court reads *Kadic I* to hold that the TVPA did not preempt torture and summary execution

17   claims under the ATCA.").[3]

18        The Court finds that plaintiffs' claims for torture and summary execution may be brought under

19   the ATS, and are not required to be brought under the TVPA.

20

21

---

22        [3]The legislative history of the TVPA reflects that Congress intended to create an unambiguous

23   cause of action in order to overcome judicial skepticism regarding jurisdiction over claims of torture and
extrajudicial killings under the ATS, referring specifically to Judge Bork's dissenting opinion in

24   *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984)(urging that a private right of action
affecting foreign relations brought under the ATS requires a specific Congressional grant). *See* S. Rep.

25   102-249, at 4-5; *see also Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir. 1995) ("Congress enacted the
[TVPA] to codify the cause of action recognized by this Circuit in *Filártiga*, and to further extend that

26   cause of action to plaintiffs who are U.S. citizens.").  As noted by the Second Circuit, the TVPA also
provided a remedy for U.S. citizens as well as aliens.  S. Rep. 102-249, at 5 ("while the Alien Tort

27   Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S.
citizens who may have been tortured abroad").  These expansive goals and language are inconsistent

28   with defendants' suggestion that Congress intended to gut ATS jurisdiction over common law claims
of torture and summary execution.

**B.      Application of DOHSA to plaintiffs' summary execution claim**

Defendants argue that plaintiffs' remedy for the death on the Parabe offshore platform is limited to DOHSA, 46 U.S.C. §§ 3031-3038.  Defendants assert that just as this Court found that DOHSA preempts state-law wrongful death actions, it also supercedes any common law claim, such as those under the ATS.  *See* Aug 22, 2006 Order at *5 (Docket No. 1204).  Plaintiffs argue that the ATS claims for summary execution are not preempted by maritime law, and that when Congress passed DOHSA, it did not intend to preempt the ATS.  The question before the Court is whether plaintiffs can bring claims both under DOHSA and the ATS for the alleged summary execution of Arolika Irowarinun on the Parabe platform.  This issue appears to be one of first impression, and the Court holds that plaintiffs are limited to DOHSA in asserting these claims.

The Supreme Court has made it clear that DOHSA (1) preempts state wrongful death and survival claims when the incident leading to death occurs on the high seas, and (2) limits recovery to pecuniary damages and prohibits litigants from supplementing their DOHSA claims with claims brought either under state law or general maritime law.  *See Higginbotham*, 436 U.S. at 624-25 (holding that damages for "loss of society" under general maritime law were preempted by DOHSA); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 232 (1986) (holding that Louisiana wrongful death statute was preempted by DOHSA); *Dooley v. Korean Air Lines Co., Ltd.*, 524 U.S. 116, 122-24 (1998) (finding that DOHSA precluded plaintiffs' attempt to recover under general maritime law for passengers' pre-death pain and suffering).

Plaintiffs argue that non-DOHSA federal statutory remedies for deaths at sea are unquestionably available.  As an example, plaintiffs cite *Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006), in which surviving family members of sailors killed in a terrorist bombing of an American warship sued the Republic of Sudan under the Foreign Sovereign Immunities Act ("FSIA"), *id.* at 474.  The family members alleged that the Republic of Sudan was liable for damages because it provided material support and assistance to the terrorist organization whose operatives planned and carried out the attack.  *Id.*  However, *Rux* was remanded to the district court, which held that even though plaintiffs had brought the suit under the FSIA, DOHSA provided the exclusive remedy in the suit.  *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 563 (E.D. Va. 2007).  The court explained that the

7

**United States District Court**
For the Northern District of California

1

2

3

4

> creation of a terrorism exception to DOHSA would not only be contrary to the text of DOHSA, it would also undermine Congress' purpose of enacting a uniform statutory remedy for wrongful death on the high seas. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 215 (1996) (stating in reference to DOHSA, "When Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is, we have generally recognized, no cause for enlargement of the damages statutorily provided.").

5   *Id.* at 564. Thus, the plaintiffs were precluded from asserting claims for wrongful death under the FSIA,

6   general maritime law and Virginia law, and were limited to recovering only pecuniary losses. *Id.* at 563.

7   The court went on to say that it greatly sympathized with plaintiffs, but

8

9

10

> is bound to follow the legal precedent before it. Congress makes the laws; courts merely interpret them. Whether to amend DOHSA to allow more liberal recovery in cases of death caused by terrorism on the high seas, as Congress did in 2000 for cases of commercial aviation accidents on the high seas, is a question for Congress alone.

11   *Id.* at 565.

12       Plaintiffs also assert that even if summary execution under the ATS is a nonstatutory cause of

13   action, the aforementioned cases only hold that DOHSA preempts nonstatutory *maritime law* remedies

14   for deaths on the high seas, not that DOHSA preempts other nonstatutory remedies. The Court is not

15   persuaded by plaintiffs' argument. The Supreme Court has already held that survivors of a person killed

16   on the high seas are barred by DOHSA from bringing an action under state statute, state common law,

17   and federal statute. *See Higginbotham*, 436 U.S. at 624-25; *Tallentire*, 477 U.S. at 232; *Korean Air*

18   *Lines Co.*, 524 U.S. at 122-24; *see also Rux*, 495 F. Supp. 2d at 563. It is reasonable to assume the same

19   logic applies to federal common law, regardless whether the claims are maritime in nature or not.

20       The Supreme Court has explained that Congress passed DOHSA in 1920 to provide a remedy

21   for wrongful death on the high seas and to achieve uniformity in the provision of such a remedy.

22   *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 398 (1970). The Court has further stated that

23   DOHSA provides guidance on "such issues as the beneficiaries, the limitations period, contributory

24   negligence, survival, and damages," and while DOHSA does not address every issue of wrongful-death

25   law, "when it does speak directly to a question, the courts are not free to 'supplement' Congress' answer

26   so thoroughly that the Act becomes meaningless." *Higginbotham*, 436 U.S. at 625. Here, Congress has

27   spoken directly to wrongful acts that cause death at sea, and thus plaintiffs' claim for the death on the

28

1  Parabe platform  must be treated as a DOHSA,[4] not an ATS, claim.[5]

2

3  ## II.        Extraterritorial application of federal common law

4             Defendants contend that the ATS gives district courts jurisdiction only over torts committed

5  within the territorial jurisdiction of the United States or when the alleged offender is a national of the

6  State exercising jurisdiction, and that creating extraterritorial federal common law would violate

7  international law.  The Court does not agree.  Courts have consistently permitted the extraterritorial

8  application of the ATS to non-U.S. nationals, provided the claims are brought under a sufficiently

9  definite and universal norm of international law, as required by *Sosa*.  *See, e.g., Marcos*, 25 F.3d at 1473

10  (torture claims against Philippine military intelligence officials against Filipinos arose under ATS and

11  were subject to federal court jurisdiction); *Doe v. Exxon Mobil Corp*., 393 F. Supp. 2d 20 (D.D.C. 2005)

12  (subject matter jurisdiction available for claims by Indonesian nationals against oil company for acts

13  committed in Indonesia if they stated a valid claim under the ATS); *Mujica v. Occidental Petroleum*

14  *Corp*., 381 F. Supp. 2d 1164 (C.D. Cal. 2005) (finding subject matter jurisdiction over claims under the

15  ATS made by Columbian citizens against oil company for actions occurring in Columbia).  It logically

16  follows that if the ATS claims are brought under a sufficiently definite and universal norm of

17  international law, there will be no violation of international law when the ATS is applied

18  extraterritorially.

19

20

21

22             [4]The Court grants plaintiffs leave to file a conforming amendment should that be necessary.

23             [5]Applying DOHSA to claims of summary execution on the high seas creates an anomalous
24  result, in that non-pecuniary damages can be recovered for summary executions committed on land but
   not on the high seas.  Nevertheless, DOHSA is this Court's primary guide as to the remedies that are
25  available for death on the high seas.  *See Higginbotham*, 436 U.S. at 624.  A decision otherwise would
   go beyond the purview of this court to "[fill] a gap left by Congress' silence," as per *Higginbotham*, *id.*
26  at 625; it is up to Congress, not the Court, to decide whether to provide an exception to DOHSA for
   cases involving human rights violations on the high seas, *see, e.g., Brown v. Eurocopter S.A.,* 111 F.
27  Supp. 2d 859, 861 (S.D. Tex 2000) (recognizing Congressional amendment providing an exception to
   DOHSA for commercial aviation accidents).  In the meantime, the Court is constrained by the Supreme
28  Court's directive that DOHSA provides the exclusive remedy for wrongful death on the high seas.

United States District Court
For the Northern District of California

### III.   Whether plaintiffs' remaining federal law claims satisfy *Sosa*

Defendants argue that *Sosa* altered federal jurisdiction under the ATS and narrowed the scope of actionable customary international norms, and that plaintiffs' remaining federal claims cannot withstand *Sosa*'s "universal and definable" requirement. *See Sosa*, 542 U.S. at 732-33. The Court will address each ATS claim in turn.

The ATS gives aliens a federal cause of action for violations of international law. *See Kadic v. Karadzic*, 70 F.3d at 238 ("[The ATS] confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law)."). The Supreme Court in *Sosa* held that the ATS is a purely jurisdictional statute and that "jurisdiction was originally understood to be available to enforce a small number of international norms that a federal court could properly recognize as within the common law enforceable without further statutory authority." *Sosa*, 542 U.S. at 729. However, this does not bar district courts from recognizing new international norms. *Sosa* held, in spite of the *Erie* presumption against federal common law, that "post-*Erie* understanding has identified limited enclaves in which federal courts may derive some substantive law in a common law way." *Id.* at 729; *see Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981). *Sosa* explicitly recognized international law as such an enclave. *Sosa*, 542 U.S. at 730 ("'International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.'") (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)); *see also The Nereide*, 9 Cranch 388, 423, 3 L.Ed. 769 (1815) (Marshall, C.J.) ("[T]he Court is bound by the law of nations which is a part of the law of the land."); *Texas Indus.*, 451 U.S. at 641 (recognizing that "international disputes implicating . . . our relations with foreign nations" are one of the "narrow areas" in which "federal common law" continues to exist). Not all violations of international law are actionable under the ATS; in order to state a claim under the ATS, a party must allege a violation of a definite and accepted norm of international law. *See Sosa*, 542 U.S. at 732; *see also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984) (Edwards, J., concurring). However, ATS claims are not restricted to violations of international law recognized in 1789, but may include contemporary norms. *Filartiga v. Pena-Irala*, 630 F.2d 876, 881 (2d Cir. 1980) (noting that

"courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today"). To establish a proper international norm, parties must look to sources that have been long relied upon. *Sosa*, 542 U.S. at 733-34. For example:

> [W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*The Paquete Habana*, 175 U.S. at 700.

### A. Generally-applicable barriers to plaintiffs' federal law claims

Defendants argue that the remaining federal law claims are not actionable under the ATS because (1) they do not carry the potential for personal liability and (2) the treaties used to establish the norms are not self-executing.

As to the first contention, this Court has already determined that defendants may be held liable for the violations alleged under a theory of aiding and abetting. August 14, 2007 Order (Docket No. 1636). Although defendants argue that the human rights violations alleged impose only collective responsibility on the State, as opposed to individual liability, there is no judicial authority to support this interpretation of the ATS and its requirements. In *Sosa*, the Supreme Court's most recent examination of the ATS, the Court did not separately discuss individual liability, but it did reaffirm the holding in *Filartiga*, which found torture to be an actionable claim against an individual under the ATS. *Filartiga*, 630 F.2d at 890.

Defendants also contend that the treaties cited by plaintiffs in support of their customary international law claims are inappropriate sources of law because they are not self executing,[6] arguing that *Sosa* prohibits the use of non-self-executing treaties to establish international norms under the ATS. However, plaintiffs have not asserted a treaty-based claim but instead rely on federal common law and

---

[6]Non-self-executing treaties "require implementing action by the political branches of government or . . . are otherwise unsuitable for judicial application." Lori Fisler Damrosch, *The Role of the United States Senate Concerning "Self-Executing" and "Non-Self-Executing" Treaties*, 67 Chi.-Kent L. Rev. 515, 516 (1991).

United States District Court
For the Northern District of California

the law of nations. The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention") and the International Covenant on Civil and Political Rights ("ICCPR"), two non-self-executing treaties, are presented as supplemental, not dispositive, evidence of the norms of customary international law, together with the numerous federal cases supporting their claims.

Nor did *Sosa* preclude such reliance. *Sosa* reaffirmed *Filartiga*, 630 F.2d at 881-82, which relied on non-self-executing treaties as evidence of customary international law. Judge Katzman's concurring opinion in *Khulumani v. Barclay Nat. Bank Ltd.* (post-*Sosa*) reiterated the pre-*Sosa* holding in *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233 (2d Cir. 2003) that non-self executing treaties can be used as evidence of customary international law, adding:

> The relevant inquiry for establishing jurisdiction under the [ATS], as our case law makes clear, is whether the conduct alleged by the plaintiffs violates a norm "that States universally abide by, or accede[ ] to, out of a sense of legal obligation and mutual concern." *Flores*, 414 F.3d at 248. Whether a treaty that embodies that norm is self-executing is relevant to, but is not determinative of, that question.

*Khulumani*, 504 F.3d at 284 (Katzman, J., concurring); *see also* Restatement (Third) of Foreign Relations Law § 102(2) (1987). Thus an international agreement that has not been executed by the United States may provide some evidence of customary international law, even if it does not directly provide a cause of action.

### B.    Plaintiffs' cause of action for summary execution

As the Court has determined that plaintiffs' summary execution claim is subject to DOHSA, the Court need not discuss summary execution under the ATS.[7]

### C.    Plaintiffs' cause of action for torture

Defendants argue that plaintiffs' torture claim is not actionable because the claim is based on the definition espoused in non-self executing treaties – the Torture Convention and the ICCPR – which,

---

[7]In addition, the Court need not address defendants' argument that plaintiffs cannot bring a summary execution claim in a survival capacity on behalf of a decedent because it has determined that DOHSA applies to plaintiffs' claims for summary execution.

United States District Court
For the Northern District of California

according to defendants, are not valid bases for claims of customary international law.  As discussed earlier, treaties that are not self-executing may be used as evidence of customary law and do not undermine the viability of a claim under the ATS.  Moreover, torture has been widely recognized as a violation of customary international law.  After evaluating various sources of customary international law, the Second Circuit in *Filartiga* found that "official torture is now prohibited by the law of nations. The prohibition is clear and unambiguous." *Filartiga*, 630 F.2d at 884; *see also Tel-Oren*, 726 F.2d at 781 (Edwards, J., concurring) (torture is violation of customary international law); *Tel-Oren*, 726 F.2d at 819-20 (Bork, J., concurring) ("the proscription of official torture [is] a principle that is embodied in numerous international conventions and declarations, that is 'clear and unambiguous' . . . and about which there is universal agreement 'in the modern usage and practice of nations'").  Congress adopted the opinion in *Filartiga* by enacting the TVPA, which recognized the status of torture as a violation of customary international law. H.R. Rep. No. 102-367, pt. 1, at 3 (1991) ("Official torture and summary execution violate standards accepted by virtually every nation. The universal consensus condemning these practices has assumed the status of customary international law.").  The opinion in *Filartiga* was also reaffirmed by the Supreme Court in *Sosa*, which held that the decision comports with the Court's standard of limiting judicial recognition of actionable ATS claims to causes of action that are just as definite and widely accepted as the historical paradigms that existed when the ATS was enacted. *Sosa*, 542 U.S. at 732-33 (noting the Second Circuit's comparison of a torturer to the pirate and slave trader as enemies of mankind).  Therefore, defendants' claims that torture is no longer an actionable claim after *Sosa* is without merit.

Defendants also argue that custody and official state policy are necessary elements of torture. The Court disagrees.  Neither of these requirements is included in the ATS jurisprudence or in  the Torture Convention.  Defendants cite the Restatement (Third) of Foreign Relations Law section 702 cmt. b (1987) for its statement that torture is a violation of customary law if committed as "official policy."  Plaintiffs, however, properly point out that this Restatement is an authority on *state violations* of international law and does not discuss *individual acts* of torture.  The TVPA, which does define a cause of action for official torture committed by an individual, only requires that the torture be committed under "actual or apparent authority, or color of law."  28 U.S.C. § 1350 note § 2(a).  The

**United States District Court**
For the Northern District of California

Torture convention defines torture as severe pain or suffering "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Torture Convention, pt. I, art. 1, 23 I.L.M. 1027 (1984), *as modified,* 24 I.L.M. 535 (1985), *entered into force* June 26, 1987, *ratified by* United States Oct. 21, 1994, 34 I.L.M. 590, 591 (1995).

Nor is a state policy requirement found in the definitions of torture used in previous ATS jurisprudence. The Second Circuit defined torture "when not perpetrated in the course of genocide or war crimes" as "proscribed by international law only when committed by state officials or under color of law." *Kadic,* 70 F.3d at 243. In *Marcos*, the Ninth Circuit held that Ferdinand Marcos could be held liable for torture even though his actions were not done pursuant to an official mandate. *Marcos,* 25 F.3d at 1471. Thus, it is not necessary for plaintiffs to prove that the torture was committed in accordance with official Nigerian policy. Instead, plaintiffs must show that the torture was committed by an official or under color of law. Plaintiffs' alleged facts – that they were severely beaten by the Nigerian Government Special Forces when the Special Forces took control of the Parabe platform – are sufficient to establish a *prima facie* case of torture for purposes of surviving summary judgment.

Defendants' motion for summary judgment on this claim is DENIED.

### D.    Plaintiffs' cause of action for cruel, inhuman and degrading treatment

Defendants argue that a definition of "cruel, inhuman and degrading treatment" has not been prescribed and thus the norm cannot pass the universal and definite standard adopted by the Supreme Court. *See Sosa*, 542 U.S. at 724-25.

The prohibition of cruel, inhuman and degrading treatment has been widely recognized in numerous sources of international law. *See* Restatement § 702(d) ("A state violates international law if . . . it practices, encourages or condones . . . cruel, inhuman, or degrading treatment"); *see also* Universal Declaration of Human Rights, Dec. 10, 1948, art. 5, G.A. Res. 217A(III), 3 U.N. GAOR Supp. No. 16, U.N. Doc. A/810 (1948) ("[N]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."); United Nations Convention Against Torture, etc., art. 16, S. Treaty Doc. No. 100-20, 23 I.L.M. 1027 (1984) ("Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which

14

United States District Court
For the Northern District of California

do not amount to torture as defined in article 1."); ICCPR, March 23, 1976, art. 7, 999 U.N.T.S. 171. Other courts have also recognized an international norm prohibiting cruel, inhuman and degrading treatment. *See Doe v. Liu Qi*, 349 F. Supp.2d 1258, 1322 (N.D. Cal. 2004); *Tachiona v. Mugabe*, 216 F. Supp. 2d 262, 281 (S.D.N.Y. 2002); *Jama v. I.N.S.*, 22 F. Supp. 2d 353, 363 (D. N.J. 1998); *Xuncax v. Gramajo*, 886 F. Supp. 162, 187 (D. Mass. 1995); *but see Forti v. Suarez-Mason*, 694 F. Supp. 707, 712 (recognizing a proscription against cruel, inhuman and degrading treatment but refusing to apply the norm absent a universally agreed upon definition).

Defendants are correct that despite these district court cases permitting claims for cruel, inhuman and degrading treatment, the Eleventh Circuit in *Aldana* held that cruel, inhuman and degrading treatment does not meet the *Sosa* standard for actionable claims under the ATS. *Aldana*, 416 F.3d at 1247 ("We see no basis in law to recognize Plaintiffs' claim for cruel, inhuman, degrading treatment or punishment."). The Eleventh Circuit is the only circuit court that has reached this question, and it remains divided over whether cruel, inhuman and degrading treatment claims may be asserted after *Sosa*.

In her dissent from the denial of rehearing *en banc*, Judge Barkett argued that the Eleventh Circuit's conclusion regarding cruel, inhuman and degrading treatment is contrary to Supreme Court precedent in *Sosa. Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 452 F.3d 1284 (Barkett, J., dissenting). The dissent pointed out that the Eleventh Circuit's analysis incorrectly asserted that cruel, inhuman and degrading treatment claims are based only on the Covenant on Civil and Political Rights which, according to *Sosa*, is not enforceable in federal courts. *Id.* at 1285; *see Aldana*, 416 F.3d at 1246-47. Instead, the dissent explained that "[w]hen one looks to the sources of international law identified in *Sosa* – treaties, judicial decisions, the practice of governments, and the opinions of international law scholars – it is clear that there exists a universal, definable, and obligatory prohibition against [cruel, inhuman and degrading treatment]." *Aldana,* 452 F.3d at 1285 (Barkett, J., dissenting). The dissent then set out an extensive analysis of the norm prohibiting cruel, inhuman and degrading treatment in various sources of international law, including restatements, declarations, treaties,[8]

---

[8] Judge Barkett lists the same conventions described earlier in this section.

United States District Court
For the Northern District of California

jurisprudence from international and regional human rights courts, U.S. law and international policy, as well as federal jurisprudence recognizing cruel, inhuman and degrading treatment as actionable under the ATS, such as the post-*Sosa* case of *Doe v. Qi*, 349 F. Supp. 2d 1258, 1286 (N.D. Cal. 2004).[9]   The dissent further noted that *Sosa* does not require the norm to be defined with categorical specificity – defining every possible instance of cruel, inhuman and degrading treatment – but instead requires a "determination of whether the facts alleged in a particular situation sit within the universal prohibition against [cruel, inhuman and degrading treatment]." *Aldana,* 452 F.3d at 1288 (Barkett, J., dissenting). The Court finds Judge Barkett's dissenting opinion more persuasive than the Eleventh Circuit panel opinion because it is consistent with *Sosa* and contains a well-reasoned analysis.

There is no widespread consensus regarding the elements of cruel, inhuman and degrading treatment.  Defendants cite the opinion (from this District) in *Forti*, written in 1988, which explained that "[a]bsent some definition of what constitutes 'cruel, inhuman or degrading treatment' this Court has no way of determining what alleged treatment is actionable, and what is not." *Forti*, 694 F. Supp. at 712.  However, the district court (from this District) in *Doe v. Qi*, written in 2004, held that cruel, inhuman and degrading treatment claims may be brought under ATS if the specific conduct alleged by the plaintiffs has been universally condemned as cruel, inhuman, or degrading. *Doe v. Qi,* 349 F. Supp. 2d at 1322.  The court in *Doe* noted that "nearly every case addressing the question subsequent to *Forti* has held that conduct sufficiently egregious may be found to constitute cruel, inhuman or degrading treatment under the ATCA." *Id.*   Similarly, the court in *Xuncax v. Gramajo* held that "[i]t is not necessary for every aspect of what might comprise a standard . . . [to] be fully defined and universally agreed before a given action meriting the label is clearly proscribed under international law . . . ." *Xuncax*, 886 F. Supp. at 187.  This standard of review is consistent with the holding in *Sosa*, which found that plaintiff's arbitrary detention for less than a day did not amount to a violation of international customary law but held open the issue of whether further detention would amount to such a violations.

[9]Judge Barkett also cited the following federal cases treating cruel, inhuman and degrading treatment as an actionable norm: *Paul v. Avril*, 812 F. Supp. 207 (S.D. Fla.1993) (entering default judgment against former Haitian military ruler on behalf of six alien plaintiffs for ATCA claims of cruel, inhuman, or degrading treatment or punishment); *de Sanchez v. Banco Central de Nicar.*, 770 F.2d 1385, 1397 (5th Cir.1985) (recognizing a "right not to be . . . subjected to cruel, inhuman or degrading punishment" as incorporated into international law).

**United States District Court**
For the Northern District of California

*Sosa*, 542 U.S. at 737 ("Any credible invocation of a principle against arbitrary detention that the civilized world accepts as binding customary international law requires a factual basis beyond relatively brief detention in excess of positive authority.").

Utilizing the standard in *Doe v. Qi* and *Xuncax*, the Court must consider whether the conduct alleged in this case has been "universally condemned as cruel, inhuman, or degrading." *Doe v. Qi*, 349 F. Supp. 2d at 1322. *Xuncax* held that cruel, inhuman and degrading treatment claims may be brought under the ATS when plaintiffs:

> witness the torture [] or severe mistreatment []of an immediate relative; (2) watch soldiers ransack their home and threaten their family [] (3) [are] bombed from the air []; or (4) have a grenade thrown at them []. I have no difficulty concluding that acts in this category constitute "cruel, inhuman or degrading treatment" in violation of international law. *See generally The Greek Case*, Y.B.Eur.Conv. on H.R. 186, 461-65 (1969) (describing cases where political detainees were subjected to acts of intimidation, humiliation, threats of reprisal against relatives, presence at torture of another, and interference with family life in violation of Article 3 of the European Convention on the Protection of Human Rights and Fundamental Freedom).

886 F. Supp. at 187.  On the other end of the spectrum, *Doe v. Qi* held that incarceration for one day and being pushed, shoved, hit, and placed in a choke-hold are not severe enough to uphold a claim of cruel, inhuman and degrading treatment under the ATS. *Doe v. Qi*, 349 F. Supp. 2d at 1325.

Plaintiffs allege that during the raid on the Parabe platform, Bowoto and Jeje were seriously wounded by gunfire at the hands of the Nigerian military, Bowoto was held on board a barge in "inhuman conditions," and Oyinbo was "hung by his wrists from a ceiling fan" by the Nigerian military. Complaint at 17.  In addition, Oyinbo was repeatedly beaten in an attempt to pressure him to confess, Jeje was beaten with a rifle butt, Bowoto's injuries were nearly fatal, and all the protestors were unarmed and confined to the platform, which was under the control of the Nigerian military.  P. Opp. to Summ. J. at 20-21.  The district court in *Wiwa v. Royal Dutch Petroleum Co.,* held that defendants' act of beating plaintiff and destroying her possessions was sufficient to constitute cruel, inhuman and degrading treatment in violation of international law. *Wiwa*, 2002 WL 319887 at *9.  The facts alleged in this case are far more egregious than those in *Wiwa* and in *Doe v. Qi* and are similar to *Xuncax*. Therefore, the Court holds as a matter of law that claims of cruel, inhuman and degrading treatment by plaintiffs are sufficient to survive a motion for summary judgment and DENIES defendants' motion on this claim.

E.      **Plaintiffs' cause of action for violation of the right to life, liberty, security of the person and peaceful assembly and association**

Defendants argue that the norm protecting the liberty and security of a person is not sufficiently defined and thus not actionable under the ATS.  Plaintiffs respond that these norms are clearly defined and inviolable and at the minimum prohibit the "use of potentially lethal force against people engaged in a peaceful demonstration and violent retaliation against those who have engaged in such peaceful protest."  P. Opp. to Mot. Summ. J. at 36.

The right to life, liberty and security of person are widely recognized as fundamental human rights. *See* Universal Declaration art. 3 (guaranteeing "life, liberty and security of person"); ICCPR, March 23, 1976, arts. 6, 7, 999 U.N.T.S. 171 ("Every human being has the inherent right to life…. No one shall be arbitrarily deprived of his life.") ("Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention."); African (Banjul) Charter on Human and Peoples' Rights, June 27, 1981, art. 4,1520 U.N.T.S.217. 21 I.L.M. 58 ("Every human being shall be entitled to respect for his life and the integrity of his person. No one may be arbitrarily deprived of this right.").  The right to assembly is also asserted in these instruments. Universal Declaration, art. 20 ("Everyone has the right to freedom of peaceful assembly and association."); ICCPR, arts. 19, 21 ("The right of peaceful assembly shall be recognized."); African Charter art. 11 ("Every individual shall have the right to assemble freely with others.").  However, these international instruments do not purport to define these rights nor is there ATS jurisprudence upholding or defining such claims.

The district court in *Kiobel v. Royal Dutch Petroleum, Co.,* 456 F. Supp. 2d 457 (S.D.N.Y. 2006), found that the right to life, liberty, security of person and peaceful assembly is not definite enough to meet the standard of actionable claims set forth by *Sosa*, *id.* at 467; *see also Flores*, 343 F.3d at 160 (holding that "the asserted 'right to life' and 'right to health' are insufficiently definite to constitute rules of customary international law . . . . [I]n order to state a claim under the [ATS], we have required that a plaintiff allege a violation of a 'clear and unambiguous' rule of customary international law"); *Beanal v. Freeport-McMoran*, 197 F.3d 161, 167 (5th Cir. 1999) (stating that customary international law cannot be established by reference to "abstract rights and liberties devoid of articulable or discernable standards and regulations"); *but see Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 423-30

18

(S.D.N.Y. 2002) (recognizing peaceful assembly as part of an inviolable body of political rights actionable under the ATS); *see also Wiwa,* 2002 WL 319887 at *11.

This Court agrees that the liberty and security claims asserted are not yet definite enough to meet *Sosa*'s standards.  Nor can the Court apply the comparative standard set forth in *Doe v. Qi* and *Xuncax* because there is not sufficient jurisprudence recognizing a violation of right to life, liberty, security of person and peaceful assembly to compare to this case and determine whether the alleged conduct has been universally condemned as violating this right.  Therefore, the Court GRANTS defendants' motion for summary judgement as to this cause of action.

**F.      Plaintiffs' cause of action for a consistent pattern of gross violations of human rights**

Plaintiffs appear to concede that their claim of consistent patterns of gross violations of human rights cannot survive scrutiny after *Sosa* and instead choose to focus on their independent causes of action.  P. Opp. to Mot. Summ. J. at 39 ("Nonetheless, plaintiffs do not rely on that norm here because each of the abuses at issue here rise to the level of abuses that are independently actionable regardless of whether a 'consistent pattern' has been shown.")  Accordingly, the Court GRANTS defendants' motion for summary judgment as to plaintiffs' eighth cause of action.

**IV.      Whether plaintiffs were required to exhaust Nigerian remedies**

According to defendants, exhaustion of local remedies is a prerequisite to an ATS claim.  The Supreme Court in *Sosa* noted in dicta that exhaustion of remedies could be a possible argument against jurisdiction in ATS claims. 542 U.S. at 733 n.21.  But *Sosa* neither affirmed nor repudiated an exhaustion requirement; the requirement was mentioned in a note responding to an amicus brief filed by the European Commission[10] and the Court noted that it would consider the requirement in an appropriate case. *Id.*  Tellingly, the Supreme Court did not repudiate pre-*Sosa* cases that had rejected an exhaustion requirement.

---

[10]The European Commission's *amicus* brief argued that domestic remedies should be exhausted before a plaintiff can file a claim in a foreign jurisdiction.  *See Sosa,* 542 U.S. at 733 n.21.

19

Defendants have cited no opinion holding that an ATS plaintiff must exhaust local remedies. As defendants recognize, the Ninth Circuit has previously upheld justiciability of ATS claims without requiring exhaustion of local remedies. *See, e.g.*, *Marcos*, 25 F.3d at 1475-76 (finding that jurisdiction was proper over plaintiffs' common law ATS claims without evaluating the issue of exhaustion); *see also Alperin v. Vatican Bank*, 410 F.3d 532, 544-58 (9th Cir. 2005). Now, however, defendants request that this Court await the Ninth Circuit's *en banc* ruling in *Sarei v. Rio Tinto*, which will consider, *inter alia*, whether exhaustion is a requirement for ATS jurisdiction. After evaluating ATS jurisprudence and congressional intent, the original Ninth Circuit panel in *Sarei* found that exhaustion was neither explicitly nor implicitly required. *Sarei*, 487 F.3d 1193, 1223 (9th Cir. 2007) ("We therefore conclude that it would be inappropriate, given the lack of clear direction from Congress (either in 1789 or when it revisited the issue in 1991), and with only an aside in a footnote on the issue from the Supreme Court, now to superimpose on our circuit's existing ATCA jurisprudence an exhaustion requirement where none has been required before."), *review granted en banc*, 499 F.3d 923 (9th Cir. 2007).

Although the Ninth Circuit could find that exhaustion is required for ATS claims, this Court need not await *en banc* review of *Sarei* because defendants have failed to prove that Nigerian remedies are adequate and available. Failure to exhaust, if it is a requirement, would be an affirmative defense; accordingly, defendants have an evidentiary burden to support an exhaustion defense. *See Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996) ("The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant."); *see also Enahoro*, 408 F.3d at 891.

Defendants claim that there are domestic remedies available in Nigeria that plaintiffs did not pursue, citing plaintiffs' expert testimony that oil companies were not immune from suit in Nigeria. Nobuyo Breen Decl., ex. 12 at 174 (Sagay deposition). Moreover, defendants' Nigerian law expert claims that there have been several Nigerian judgments against international oil companies. Nobuyo Breen Decl., ex. 60 at 102 (Babalakin deposition). However, the experts did not cite a specific cause of action for the remaining federal claims in this suit and Mr. Babalakin described cases where oil companies were forced to compensate communities for environmental damage, not human rights violations. *See id.* at 98-101. This evidence is insufficient to prove the availability of specific remedies

United States District Court
For the Northern District of California

in Nigeria, particularly where oil companies are liable based on the underlying actions of the Nigerian military.

Even if remedies were available in Nigeria, plaintiffs have offered some evidence that these remedies are "ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." S. Rep. No. 102-249, *10. According to the U.S. Department of State's Nigeria Country Report on Human Rights Practices for 1999, the Nigerian judiciary "remained subject to executive and legislative branch pressure . . . and subject to corruption and inefficiency" which prevented the courts from functioning adequately. Laura Faer Decl., ex. O at section 1(e). Federal courts regularly rely upon these reports as evidence of a country's human rights situation. *Margos v. Gonzales*, 443 F.3d 593, 599 (7th Cir. 2006); *Giday v. Gonzales*, 434 F.3d 543, 556 (7th Cir. 2006); *Abiola v. Abubakar*, 435 F. Supp. 2d 830, 837 (N.D. Ill. 2006); *Wiwa*, 2002 WL 319887 at *17.

Furthermore, Nigeria was under a military dictatorship until May 29, 1999,[11] and the report noted that the head of state, General Abubakar, and the Provisional Ruling Council "exerted undue influence on the judiciary." *Id.* Relying upon the same reports from the same time period, Judge Cudahy of the Seventh Circuit has noted that "[t]here can be little doubt but that the legal remedies offered by the Nigerian courts were indeed ineffective, unobtainable, unduly prolonged, inadequate or obviously futile under any applicable exhaustion provisions." *Enahoro*, 408 F.3d at 892 (Cudahy, J., dissenting in part). On remand in that case, the district court found that the evidence in the State Department's country reports on Nigeria was sufficient to undermine the defendant's exhaustion defense. *Abiola*, 435 F. Supp. 2d at 837. The court added that the TVPA exhaustion requirement was not meant to be an overly stringent condition. *Id.*; *see also Xuncax*, 886 F. Supp. at 178. The incident at issue in *Enahoro* occurred one month after the Parabe platform incident and the *Enahoro* courts considered the adequacy of a Nigerian forum during the same time period at issue in this case. For these reasons, the Court agrees with the *Enahoro* courts that domestic remedies in Nigeria would be inadequate and futile and therefore do not warrant an exhaustion requirement.

_____

[11]Plaintiffs first filed a complaint in this Court on May 27, 1999.

V.      **Choice of law analysis**

Defendants argue that the doctrine of "prescriptive comity" requires courts to conduct a choice of law analysis which accounts for the interests of the foreign nation implicated in the claims.  If the court finds it necessary to conduct a choice of law analysis, defendants claim that the *Lauritzen* test[12] governs the choice of law analysis for plaintiffs' maritime claims.  However, the plain language of the ATS, as well as ATS jurisprudence, indicate that ATS claims are defined by and derived from the law of nations, making a choice of law analysis unnecessary.

Defendants rely upon Justice Scalia's dissent in *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 817 (1993), to show that plaintiffs' federal common law claims have no extraterritorial application.  Justice Scalia defined prescriptive comity as "the respect sovereign nations afford each other by limiting the reach of their laws.  That comity is exercised by legislatures when they enact laws, and courts assume it has been exercised when they come to interpreting the scope of laws their legislatures have enacted."  *Id.* (Scalia, J., dissenting).  Justice Scalia supported this definition by citing the principle espoused in *Charming Betsy*: "an act of congress ought never to be construed to violate the law of nations if any other possible construction remains."  *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1904).

Unlike in *Hartford Fire*, however, plaintiffs are not asking this Court to apply substantive laws enacted by Congress to the behavior of foreign nationals.  The ATS reads: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, *committed in violation of the law of nations or a treaty of the United States*."  28 U.S.C. § 1350 (emphasis added).  The Supreme Court has held that the ATS is a jurisdictional statute and permits only those causes of action that are derived from the law of nations, not from domestic laws.  *See Sosa*, 542 U.S. at 714.  Furthermore, plaintiffs are

---

[12]The Supreme Court has articulated a list of eight non-exclusive factors to be considered in determining the appropriate choice-of-law in an admiralty case. These factors are: (1) the place of the wrongful act, (2) the law of the flag, (3) the allegiance or domicile of the injured party, (4) the allegiance of the shipowner, (5) the place of the seaman's employment contract, (6) the accessibility of a foreign forum, (7) the law of the forum, and (8) the shipowner's base of operations. *Lauritzen v. Larsen*, 345 U.S. 571, 583-92 (1953); *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 309 (1970) (adding eighth factor).

1  alleging a violation of *jus cogens* norms, which, by definition, are norms arising from international law

2  and are defined by the law of nations.

> [A] jus cogens norm, also known as a 'peremptory norm' of international law, is a norm
> accepted and recognized by the international community of states as a whole as a norm
> from which no derogation is permitted and which can be modified only by a subsequent
> norm of general international law having the same character.

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Vienna

Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679).  Thus,

plaintiffs are not attempting to apply U.S. domestic law to events that took place in Nigeria but instead

seek to apply the law of nations, which is in accordance with the principle of prescriptive comity and

cannot violate the *Charming Betsy* doctrine.  In other words, this Court's use of the ATS cannot violate

the law of nations because it derives its source of law from the law of nations, and Justice Scalia's

prescriptive comity *caveat* is of little application.

Defendants' argument also fails for reasons beyond the differences between applying domestic

law, as in *Hartford Fire*, and customary international law, as here.  First, the Supreme Court actually

upheld the extraterritorial application of the Sherman Act even after considering the principle of

international comity.  *Hartford Fire*, 509 U.S. at 795-96.  Second, defendants argue that according to

the Second Circuit in *Filartiga*, federal common law under the ATS should not apply when a choice of

law analysis supports the application of a foreign country's law.  While the Second Circuit did remand

the case to the district court in part to consider the choice of law question, *Filartiga*, 630 F.2d at 889,

the district court on remand interpreted the term "tort" in the ATS as a violation of international law and

thus concluded that "it should determine the substantive principles to be applied by looking to

international law" and not the law of a foreign state.  *Filartiga v. Pena-Irala*, 577 F. Supp. 860, 862, 863

(E.D.N.Y. 1984).  For all of these reasons, the Court finds that the law of nations is the proper source

of law governing this action and a choice of law analysis is therefore unnecessary.

## VI.    Applicable statute of limitations

Defendants claim that California's one year statute of limitations for wrongful death should be

applied and thus plaintiffs' claims are time-barred.  Thus far, this action has proceeded on the basis that

plaintiffs' common law ATS claims are not time-barred.  In an August 22, 2006 order, the Court granted plaintiffs' motion for leave to file an Eighth Amended Complaint in order to name Chevron USA ("CUSA") as a defendant in certain claims.  *See* August 22, 2006 Order (Docket No. 1206).  That order granted plaintiffs leave to amend "those claims against CUSA that were not time-barred as of June 28, 2002" which included plaintiffs' ATS claims. *Id.* at 16.  Furthermore, the Court noted that "[d]efendants do not oppose plaintiffs' motion for leave to amend to the extent it seeks to add CUSA as a defendant to claims brought under the ATS or TVPA, as the statute of limitations on those claims has not yet run." *Id.* at 10-11.  Nevertheless, defendants point out that they reserved the right to raise a statute of limitations defense and thus may properly assert the defense now.

While the ATS does not include a statute of limitations, the Ninth Circuit has adopted the ten-year statue of limitations provided in the TVPA for ATS claims. *Deutsch v. Turner Corp.,* 324 F.3d 692, 717 (9th Cir. 2003) ("The statute of limitations under the ATCA is 10 years."); *Papa v. United States*, 281 F.3d 1004, 1012 (9th Cir. 2002) ("[W]e decide that the statute of limitations applicable to the ATCA is that provided by the TVPA.").  In reaching this decision, the Ninth Circuit relied upon the rule in *North Star Steel Co. v. Thomas*, 515 U.S. 29 (1995), which held that the statute of limitations of the forum is applied unless "a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking," *id.* at 35; *see also Papa,* 281 F.3d at 1011-12.  Applying *North Star Steel*, the Ninth Circuit in *Papa* compared the ATS with the TVPA and found that both statutes had similar goals and similar mechanisms for effectuating such goals.

Defendants argue that the Ninth Circuit's pre-*Sosa* decision cannot be reconciled with *Sosa* and that this Court must therefore apply California's one-year statute of limitation for plaintiffs' remaining federal law claims.  *See Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir. 2003) (a circuit precedent is controlling unless the court of last resort undercuts the "theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable").  It is true that the Ninth Circuit decided *Papa* prior to *Sosa,* and thus before it became clear that the ATS was merely a jurisdictional

United States District Court
For the Northern District of California

statute.  The distinction, however, does not undercut the logic of *Papa*'s holding or its comparison between the ATS and the TVPA.

Furthermore, cases decided after *Sosa* have continued to apply the ten-year statute of limitations used in *Papa* and *Deutsch*.  *See Arce v. Garcia,* 434 F.3d 1254, 1264 (11th Cir. 2006) (reaffirming application of the TVPA's ten-year statute of limitations for ATS claims); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1153 (11th Cir. 2005) (recognizing that the ATS and the TVPA share the same statute of limitations); *Doe v. Qi,* 349 F. Supp. 2d at 1321 n.43 (applying the ten-year statute of limitations in the TVPA to the plaintiffs' ATS claims); *Jama v. INS*, 343 F. Supp. 2d 338, 364-66 (D.N.J. 2004). Defendants cite no authority to the contrary.

## VII.    Whether plaintiffs have a viable claim for punitive damages under California law

Defendants also argue that plaintiffs are unable to provide clear and convincing evidence that defendants are liable for punitive damages under California law.  Plaintiffs have presented evidence that officers and managers at CNL employed the GSF in spite of prior knowledge that the GSF was prone to violence.  Furthermore, plaintiffs have presented evidence that CNL authorized or ratified the alleged conduct at issue.  Whether or not plaintiffs have provided clear and convincing evidence is a matter for a jury to decide.  For these reasons, the Court DENIES defendants' summary judgment motion as to plaintiffs' claim for punitive damages under California law.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' summary judgment motion as to plaintiffs' first, seventh, and eighth claims.  If plaintiffs wish to amend their complaint to state a cause of action for wrongful death under DOHSA, they must do so by June 5, 2008.  The Court DENIES defendants' motion for summary judgment on plaintiffs' fourth and sixth claims [Docket No. 1688]. The Court also DENIES defendants' motion for summary judgment as to plaintiffs' claim for punitive damages under California law [Docket No. 1452].

**IT IS SO ORDERED.**

Dated: May 30, 2008

_____
SUSAN ILLSTON
United States District Judge

25